Page 1

1            IN THE UNITED STATES DISTRICT COURT

2             FOR THE SOUTHERN DISTRICT OF OHIO

3                          *   *   *

4    DEMOND MOORE,

5          Plaintiff,

6        vs.                 CASE NO. 1:22-CV-00548

7    NEXT GENERATION

8    HOSPITALITY, LLC,

9          Defendant.

10                          *   *   *

11               Deposition of DEMOND ALEXANDER

12   MOORE, Plaintiff herein, called by the Defendant

13   for cross-examination pursuant to the Rules of

14   Civil Procedure, taken before me, Karen M. Rudd,

15   a Notary Public in and for the State of Ohio,

16   via Zoom at 1625 Roosevelt Avenue, Dayton, Ohio,

17   on Friday, July 7, 2023, at 9:05 a.m.

18                          *   *   *

19

20

21

22

23

24

25

Page 2

```
1          EXAMINATIONS CONDUCTED    PAGE
2  BY MR. ENGEL:.......................    7
3  BY MR. LONG:.........................    95
4
5          EXHIBITS MARKED
6  (Thereupon, Exhibit L, Complaint,
7  having been previously marked, was
8  presented for purposes of
9  identification.)....................    19
10 (Thereupon, Exhibit M, Plaintiff's
11 Objections and Responses to
12 Defendant's First Set of
13 Interrogatories and Requests for
14 Production of Documents, was marked
15 for purposes of identification.)......    20
16 (Thereupon, Exhibit F, Authorization
17 for Light Duty, having been
18 previously marked, was presented for
19 purposes of identification.)..........    50
20 (Thereupon, Exhibit N, job
21 application, was marked for purposes
22 of identification.)...................    55
23
24
25
```

Page 3

```
1  (Thereupon, Exhibit A, February 8,
2  2021, incident report email, having
3  been previously marked, was
4  presented for purposes of
5  identification.)....................    62
6  (Thereupon, Exhibit B, February 8,
7  2021, incident report, having been
8  previously marked, was presented for
9  purposes of identification.)..........    65
10 (Thereupon, Exhibit C, statement of
11 Rhonda Craddock, having been
12 previously marked, was presented for
13 purposes of identification.)..........    67
14 (Thereupon, Exhibit D, February 9,
15 2021, Employee Disciplinary Action
16 Form, having been previously marked,
17 was presented for purposes of
18 identification.)....................    72
19 (Thereupon, Exhibit E, March 10,
20 2021, Employee Write Up, having been
21 previously marked, was presented for
22 purposes of identification.)..........    75
23
24
25
```

Page 4

```
1  (Thereupon, Exhibit G, March 15,
2  2021, statement of Gini Kaur, having
3  been previously marked, was
4  presented for purposes of
5  identification.)....................    83
6  (Thereupon, Exhibit H, March 18,
7  2021, statement of Gini Kaur, having
8  been previously marked, was
9  presented for purposes of
10 identification.)....................    86
11 (Thereupon, Exhibit I, statement of
12 Nikki Williams, having been
13 previously marked, was presented for
14 purposes of identification.)..........    89
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1  REMOTE APPEARANCES:
2  On behalf of the Plaintiff:
3       Spitz Law Firm
4  By:  Samuel L. Long
          Attorney at Law
5       710 East Main Street
        Suite 104
6       Lexington, Kentucky 40502
        859 469-6202
7       sam.long@spitzlawfirm.com
8  On behalf of the Defendant:
9       Engel and Martin
10 By:  Joshua Adam Engel
          Attorney at Law
11      4660 Duke Drive
        Suite 101
12      Mason, Ohio 45040
        513 445-9600
13      engel@engelandmartin.com
14          * * *
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1        DEMOND ALEXANDER MOORE
2 of lawful age, Plaintiff herein, having been
3 first duly cautioned and sworn, as hereinafter
4 certified, was examined and said as follows:
5        MR. ENGEL:  We are on the record.
6 Before we begin, a couple of notes between the
7 parties.  First is the parties have stipulated
8 that this deposition would take place by
9 videoconference.
10        The second is that the plaintiff is
11 not able to access his laptop and is using his
12 cell phone to conduct this deposition.  We will
13 try to proceed, but if at some point it is
14 difficult for him to access documents, I think
15 we'll just suspend the deposition and continue
16 it another date when he gets his laptop working.
17        And then third is we are still
18 waiting on the production of other documents and
19 medical records.  So while we will do our best
20 to cover all the topics in this deposition, it
21 is likely we will not complete this deposition
22 today and may have to come back on another day
23 once medical records are produced in this case.
24 Is that right, Sam?
25        MR. LONG:  That's correct.

Page 7

1        CROSS-EXAMINATION
2 BY MR. ENGEL:
3        Q.  So, sir, would you please state and
4 spell your name?
5        A.  D E M O N D, A L E X, last name
6 M O O R E.
7        Q.  Okay.  You are the plaintiff in
8 this case?
9        A.  Yes.
10        Q.  So where are you working right now?
11        A.  I am currently working from home.
12        Q.  Doing what?
13        A.  I am a driver.
14        Q.  So you don't drive at home though.
15 Where do you drive?
16        A.  Well, like if packages or something
17 needs to be delivered or small items, I deliver
18 those.
19        Q.  Is this full-time work?
20        A.  No, it's part-time.
21        Q.  Okay.  Do you have any other jobs
22 at the moment?
23        A.  No.
24        Q.  What other jobs have you worked
25 since you were terminated by the defendant in

Page 8

1 this case?
2        A.  I worked at Homewood Suites.
3        Q.  Anywhere else?
4        A.  Residence Inn.
5        Q.  Anywhere else?
6        A.  No.
7        Q.  Okay.  So Homewood Suites, where
8 was that located?
9        A.  In West Chester, Ohio.
10        Q.  What did you do there?
11        A.  I was a housekeeping supervisor.
12        Q.  Why did you leave?
13        A.  Hours.
14        Q.  What do you mean, hours?
15        A.  Overworked.
16        Q.  Did you quit or were you
17 terminated?
18        A.  No, I quit.
19        Q.  And you say hours.  You wanted more
20 hours or less hours?
21        A.  Less.
22        Q.  And the Residence Inn, where was
23 that located?
24        A.  Beavercreek.
25        Q.  And how long did you work for

Page 9

1 Homewood Suites, by the way?
2        A.  I worked there for about three
3 months, and then I went to Residence.
4        Q.  How long did you work at Residence
5 Inn?
6        A.  I worked at Residence Inn for about
7 four -- about four or five months.
8        Q.  Did you quit there or were you
9 terminated?
10        A.  No, I --
11        Q.  Which one?
12        A.  -- was let go.
13        Q.  Why were you let go?
14        A.  My mother passed.
15        Q.  Wait, they let you go because your
16 mother passed?
17        A.  That is correct.
18        Q.  How did that work out?  Tell me
19 about that.
20        A.  I don't want to go into detail -- I
21 don't want to go into reference for that.  My
22 mother -- my mother passed away, and I'm the
23 only child, and I took -- my mother passed on
24 Super Bowl Sunday.  They wanted me to come to
25 work.  So who goes to work when their mother

Page 10

1 just passes.
2     Q.  Well, I'm sorry for your loss.
3 This was last year your mother passed away?
4     A.  Yes.
5     Q.  Okay.  I'm sorry.
6     A.  Very touchy subject for me.
7     Q.  Well, so they wanted you to come
8 into work, you said no, and that's why they
9 terminated you?
10     A.  That's correct.
11     Q.  Any other reason that they would
12 give that they let you go?
13     A.  No.  No.  I needed -- I needed -- I
14 needed two weeks off.  They wanted me to come
15 in.  I needed two weeks.  I had to prepare the
16 funeral.  And that's all I'm going to say about
17 that.  I don't want to go into detail about
18 that.
19     Q.  Have you been -- at Residence Inn
20 or Homewood Suites, did you receive any
21 disciplinary actions?
22     A.  No.
23     Q.  Any warnings about your work?
24     A.  No.
25     Q.  So, now, prior to working for my

Page 11

1 client, where did you work?
2     A.  I worked for Holiday Inn.
3     Q.  What did you do there?
4     A.  I worked there for two or three
5 years.  I was a house person, houseman, and then
6 I -- I did everything.  I inspected rooms.  I
7 cleaned rooms.  I did everything.
8     Q.  How about before -- why did you
9 leave the Holiday Inn?
10     A.  Overworked.
11     Q.  Did you quit or were you let go?
12     A.  I left.
13     Q.  What about before the Holiday Inn,
14 where did you work?
15     A.  Before the Holiday Inn, I worked
16 for my mother.
17     Q.  Doing what?
18     A.  Whatever she asked me to do.
19     Q.  What sort of business was your
20 mother in?
21     A.  At that time, it wasn't a business.
22 My mother just -- that's just how things were.
23 We were going to start some things at that time,
24 and, you know -- so I was up and down in
25 reference to career choices, if I wanted to stay

Page 12

1 in the hospitality area or if I wanted to go
2 into another area.  And at that time, she said
3 while you're making your decision, she said I'll
4 pay you to do different things, and that's what
5 I did.
6     Q.  Did your mother --
7     A.  So basically I kept her house.
8     Q.  Did your mother have a company?
9     A.  Not at that time, no.
10     Q.  So she was just paying you to do
11 odd jobs and chores and stuff like that?
12     A.  Correct.  Yes.
13     Q.  Was she paying you in cash?
14     A.  Yes.
15     Q.  So if I pulled your tax records,
16 are you going to disclose all that income on
17 your tax records?
18     A.  What do you mean?
19     Q.  Well, when you file -- every year
20 you file taxes, right?
21     A.  I'm not -- I'm not understanding
22 what you're saying.  If my mother gives me --
23     Q.  Do you file taxes?
24     A.  If my mother says hey, I want you
25 to -- listen, here is how we're going to do

Page 13

1 this -- here is how we're going to do this --
2     Q.  Sir, we're going to do this how I
3 want to do it, because it's my deposition.  You
4 have -- I get to ask the questions, you have to
5 answer them.  Okay?  Have you ever been in a
6 deposition before?
7     A.  Uh-uh.
8     Q.  That's a yes?  How many times have
9 you been in a deposition before?
10     A.  I haven't.
11     Q.  Okay.  So let me go over -- and I
12 apologize, I probably should have done it at the
13 beginning -- some of the rules we have here.
14 First is my job is to ask the questions and your
15 job is to answer them.  If any question I ask
16 seems ambiguous or you don't understand it,
17 please let me know, and I will try to clarify
18 it.  Okay?
19     A.  Copy that.
20     Q.  Great.  And you're doing a great
21 job so far.  All your answers have to be out
22 loud.  So those normal human interactions like
23 shrugs or hand gestures or anything like that
24 our fabulous court reporter cannot take down, so
25 that's why we need to make sure we answer

4 (Pages 10 - 13)

Page 14

1 everything out loud. Understood?
2     A. Copy.
3     Q. You are not a hostage here, so if
4 at any point you need to take a break, just let
5 us know and we'll take a break. If you need to
6 talk to your attorney about a legal issue, you
7 can do that, as well. The only thing I'd ask is
8 if there's a question pending, we'll answer the
9 question, and then we'll take the break. Okay?
10     A. Okay.
11     Q. All right. Have you ever been
12 involved in any legal cases before?
13     A. No.
14     Q. Ever been charged with a crime?
15     A. Uh-huh.
16     Q. Tell me -- how many crimes have you
17 been charged with?
18     A. I don't know.
19     Q. Have you ever been convicted of a
20 crime?
21     A. I can't -- I don't -- I don't know.
22 I don't recall. A few traffic violations.
23     Q. Okay, yes. So, you know, we have
24 all gotten speeding tickets. I take it you've
25 had a few speeding tickets?

Page 15

1     A. We all have.
2     Q. Yeah. Anything more serious than a
3 minor traffic violation?
4     A. I don't understand the question.
5     Q. Have you ever been arrested?
6     A. Yes.
7     Q. How many times have you been
8 arrested?
9     A. I don't remember.
10     Q. Is it more than once?
11     A. Probably, yes.
12     Q. Okay. I mean, if I were arrested,
13 I'd remember it, so, I mean --
14     A. Well, we're two different people,
15 so --
16     Q. Well, I mean, so you're telling me
17 you've been arrested so many times you can't
18 remember how many?
19     A. I've been arrested a few times, but
20 I don't remember exactly how many.
21     Q. Okay. Have you ever been convicted
22 of a crime?
23     A. Yes.
24     Q. What crimes have you been convicted
25 of? There's a question pending I think.

Page 16

1     A. I'm sorry?
2     MR. ENGEL: Can you read the
3 question back, please?
4     (Record read.)
5     THE WITNESS: Assault.
6 BY MR. ENGEL:
7     Q. Is that a misdemeanor or felony?
8     A. I don't -- I don't recall.
9     Q. What other crimes have you been
10 convicted of?
11     A. I don't recall.
12     Q. You don't recall. Have you ever
13 been convicted of a felony?
14     A. I have.
15     Q. What felonies have you been
16 convicted of?
17     A. I've been convicted of burglary and
18 abduction.
19     Q. Where was that?
20     A. What do you mean? I don't
21 understand the question.
22     Q. What county was that in?
23     A. It was in Greene County.
24     Q. I'm sorry, Grand County?
25     A. Greene County.

Page 17

1     Q. Oh, Greene County. Have you been
2 convicted of any other felonies other than --
3     A. No, I have not.
4     Q. Have you been convicted of any
5 crimes -- well, have you been convicted of any
6 misdemeanors other than the assault charges?
7     A. I don't recall. I don't remember.
8 That's not something that I have on my person
9 every day and that I keep on me, so I don't
10 know. If you'd like for me to get that
11 information, I can get that for you. But at
12 this time, I don't know, and I don't recall.
13     MR. ENGEL: All right. That would
14 be great. So we'll make a document request for
15 copies of any convictions, Sam, of the
16 plaintiff, misdemeanor and felony. Is this
17 good, or do you need me to send over a formal
18 Rule 34 request?
19     MR. LONG: We'll supplement that --
20 those responses.
21     MR. ENGEL: Okay. And we'll keep
22 the deposition open for that purpose if we need
23 to ask more questions later about that stuff.
24 BY MR. ENGEL:
25     Q. Sir, tell me about your educational

Page 18

1 background.
2    A.  I went to high school.
3    Q.  Where did you go to high school?
4    A.  I went to Dunbar High School.
5    Q.  Did you graduate?
6    A.  Uh-huh.
7    Q.  How were your grades?
8    A.  My grades were okay.
9    Q.  Any disciplinary problems --
10    A.  No.
11    Q.  -- at the high school?  Did you go
12 to college?
13    A.  I went to a little bit of Sinclair.
14    Q.  Okay.  What did you take at
15 Sinclair?
16    A.  Just classes for music.
17    Q.  Did you get a degree from Sinclair?
18    A.  No.  Nope.
19    Q.  Any other college classes?
20    A.  No.  No.
21    Q.  All right.  So first thing, I'm
22 going to start sharing some documents here, and
23 I am going to show you the amended complaint in
24 this case.  And hopefully you're able to see a
25 little bit of this on the screen.  We previously

Page 19

1 marked this as an exhibit.  I believe it's
2 Exhibit K [sic].
3    (Thereupon, Exhibit L, Complaint,
4 having been previously marked, was presented for
5 purposes of identification.)
6 BY MR. ENGEL:
7    Q.  So I'll just ask you some general
8 questions.  First, are you familiar with this
9 document?
10    A.  It's kind of hard to see, but yeah.
11 You kind of -- okay.  Yeah, go ahead.
12    Q.  So just a couple simple questions
13 about this first.  It says first amended
14 complaint for damages and injunctive relief, and
15 it says Demond -- by the way, am I pronouncing
16 your name right?  Is it Demond?
17    A.  It's Demond.  I go by Alex, please.
18    Q.  You go by Alex.  Okay.  So -- and
19 is it okay if I call you Alex?
20    A.  Go ahead.
21    Q.  Okay.  So, Alex, did you review
22 this document before your lawyer filed it?
23    A.  Yes.
24    Q.  And did you review it to make sure
25 that everything in there was 100 percent true

Page 20

1 and accurate?
2    A.  Yes.
3    Q.  Do you believe that everything in
4 this document is 100 percent true and accurate?
5    A.  I don't understand -- I don't -- I
6 don't understand the question.
7    Q.  Do you believe that everything in
8 the first amended complaint is 100 percent true
9 and accurate?
10    A.  Yes.
11    MR. ENGEL:  And then I'm going to
12 now show you what we'll mark as Exhibit L.  Is
13 that right?
14    MR. LONG:  I think L is actually
15 the complaint.  So the next one would be M.
16    MR. ENGEL:  Oh, is it?  Okay.  Do
17 you know what, let's call it M just in case.
18 That way if we messed up, if we missed the
19 letters, it's not the end of the world, but we
20 don't have duplicates.
21    (Thereupon, Exhibit M, Plaintiff's
22 Objections and Responses to Defendant's First
23 Set of Interrogatories and Requests for
24 Production of Documents, was marked for purposes
25 of identification.)

Page 21

1    MR. ENGEL:  So we will call L the
2 amended complaint and M is going to be the
3 answers to interrogatories and discovery.
4 BY MR. ENGEL:
5    Q.  So you have up on the screen a
6 document we've marked as Exhibit M titled
7 Plaintiff's Objections and Responses to
8 Defendant's First Set of Interrogatories and
9 Requests for Production of Documents.  Have you
10 seen this document before, sir?
11    A.  Yes.
12    Q.  Did you help prepare this document?
13    A.  I don't understand the question.  I
14 don't -- I don't -- do you mean type up the
15 document?  If that's what you mean, prepared --
16    Q.  Your lawyer probably typed it up,
17 right?
18    A.  Okay.
19    Q.  But did you help provide
20 information for this document?
21    A.  Yes.  Yes, I did help give
22 information.  Yes.
23    Q.  And did you try to provide
24 information that was true and accurate?
25    A.  Yes.

Page 22

1    Q.   And did you review this document
2  before it was sent to my office?
3    A.   Yes.
4    Q.   So I'm going to ask you a couple of
5  questions.  So let's skip ahead to interrogatory
6  number four.  It asks you to identify all
7  persons with knowledge of the events described
8  in the amended complaint and describe in detail
9  the knowledge of each person.  And you listed
10  four people.  The first is a person named Gerri,
11  Gerri with G E R R I, last name unknown.  Who is
12  that person?
13    A.   She worked in the laundry room.
14  She is retired now.  She is retired.  I don't
15  know where she's at.
16    Q.   Do you have any emails or text
17  messages or communications with her?
18    A.   No.
19    Q.   And then Nikki Williams.  How do
20  you know Nikki Williams?
21    A.   She was a manager.
22    Q.   Do you have any text messages,
23  emails, other communications with Nikki Williams
24  about any of the events described in the
25  complaint?

Page 23

1    A.   No.
2    Q.   Do you have any other communications
3  with her in any way?
4    A.   No.
5    Q.   When is the last time you spoke to
6  Nikki Williams?
7    A.   I haven't spoke to her since I
8  left.
9    Q.   The next person you listed is Wanda
10  [sic] Craddock.  Who is that?
11    A.   She worked at the job.
12    Q.   Do you have any text messages,
13  emails, or other communications with Wanda
14  Craddock about the events in the complaint?
15    A.   No.
16    Q.   Do you have any communications at
17  all with Wanda Craddock?  That was a bad
18  question.  Let me rephrase that.
19        So do you have any emails, text
20  messages, other written communications with
21  Wanda Craddock at all about any topic?
22    A.   No.  Oh, no.
23    Q.   So you never communicated with her
24  by text or email or anything like that?
25    A.   By text or email, yes.  I've talked

Page 24

1  with her by text or email.  I thought you was
2  talking about about the situation.
3    Q.   Well, I mean -- well, have you
4  searched -- do you still have the email
5  communications with Wanda?
6    A.   No.  No.
7    Q.   What happened to all those
8  communications?
9    A.   I don't have my phone.  It's an old
10  phone.  It got stolen from that job.
11    Q.   So as you sit here today, you have
12  no documents to support your description of your
13  relationship with Wanda Craddock?
14    A.   I'm not -- I'm not understanding.
15  What do you mean?  What do you -- we were
16  friends.  What documents do you need?
17    Q.   One second here.  Going back to
18  the -- I'm sorry.  How would you describe your
19  relationship with Wanda Craddock?  You said you
20  were friends?
21    A.   We're friends.
22    Q.   So let me look at the complaint
23  here.  In paragraph 18, you write -- I'll make
24  it a little bigger here -- was romantically
25  involved with his supervisor, Wanda Craddock,

Page 25

1  prior to working at Kings Inn.  Is that --
2    A.   That's true.
3    Q.   -- a true and accurate statement?
4    A.   That's correct.
5    Q.   So it's fair to say you guys were
6  more than friends?
7    A.   We were friends.
8    Q.   Well, what do you mean by
9  romantically involved?
10    A.   I mean we were friends.  We went
11  out.  We -- you know, we went out.  We were
12  friends.
13    Q.   Did you have sexual relationships
14  with her?
15    A.   Sure.
16    Q.   How often?
17    A.   I can't answer that.  I don't -- I
18  don't -- I don't -- I don't recall.  You know,
19  we got together a few times.
20    Q.   Well, it says prior to working --
21  so let's focus at the time prior to working at
22  Kings Inn.  Why did you say that you were
23  romantically involved with her?
24    A.   What did you -- you said why did I
25  say that?

7 (Pages 22 - 25)

Page 26

1    Q.  Yeah.
2    A.  Because, you know, hey, it needed
3 to be known.
4    Q.  Okay.  So let me back up.  Is it a
5 true statement that you were romantically
6 involved with Wanda Craddock prior to working at
7 Kings Inn?
8    A.  That is correct.  We were friends.
9    Q.  Is friends different than romantic?
10    A.  Everybody -- everybody says --
11 calls it -- calls it what they want.  She was a
12 friend.
13    Q.  Well, I'm asking you what you
14 called it.  These are your words.
15    A.  I just called it what I said.  I
16 said a friend.  I don't have to be -- I don't
17 have to be -- I don't have to be in a romantic
18 relationship to have sex with anybody -- to have
19 sex with somebody.  Okay?
20    Q.  Were you in a romantic relationship
21 with Wanda Craddock prior to --
22    A.  I had sex with her.
23    Q.  -- working at --
24    A.  I had sex with her.
25    Q.  Okay.  Is that what you would

Page 27

1 describe as a romantic relationship?
2    A.  That's what I -- what's what I --
3 that's what I said, we had sex.
4    Q.  How many times --
5    A.  We went out.
6    Q.  -- did you have sex?  How
7 many times --
8    A.  We went out.
9    THE COURT REPORTER:  Excuse me.
10 There can only be one person speaking at a time.
11 BY MR. ENGEL:
12    Q.  How many times did you have sex
13 with her prior to working at Kings Inn?
14    A.  I don't know.  I don't know.  I'm a
15 man.  I don't keep record of that.  I don't keep
16 record of that.  I don't know any man that does
17 that.  So I don't know.
18    Q.  Was it more than once?
19    A.  Sure it was.
20    Q.  How often were you engaging in
21 sexual relations with Ms. Craddock prior to
22 working at Kings Inn?
23    A.  I don't know.  Maybe once -- maybe
24 once or twice a week.  I don't know.  I don't
25 know.

Page 28

1    Q.  When was the last time you had
2 sexual relations with Ms. Craddock?
3    A.  Oh, it's been a while.
4    Q.  Okay.  So was it before -- did
5 you -- I mean, let me rephrase that.  Was the
6 last time you had sex with Ms. Craddock prior to
7 your working at Kings Inn?
8    A.  Yes.
9    Q.  Why did you guys stop having sexual
10 relations?
11    A.  What do you mean?  We -- I don't --
12 I'm not -- we just don't do it.  I don't -- I
13 just -- I'm not interested.
14    Q.  So just so I'm clear, at some point
15 prior to your working at Kings Inn, you guys
16 stopped having sexual relations, but you can't
17 tell me why?
18    A.  We just stopped.  There was no
19 reason.
20    Q.  We'll go back to the interrogatory
21 answers.  The last person you listed was someone
22 named Chris.  Who is Chris?
23    A.  She was -- she was a person that
24 they were paying under the table that worked
25 there and -- she lived there and was getting

Page 29

1 paid under the table.  I forget her name.  And
2 her name was Chris, but she -- you know, she was
3 there.  She saw how they treated me.  But she's
4 no longer working there.  I don't know where
5 she's at now.
6    Q.  When is the last time you spoke to
7 Chris?
8    A.  When the last time I was -- when --
9 the last time I was there.
10    Q.  Now, in interrogatory number five,
11 you're asked to name all persons who have
12 knowledge of damages you've suffered, and you
13 identify the same people as before.  So anyone
14 else who is aware of any damages that you
15 suffered in this case?
16    A.  No.
17    Q.  Is there anyone else who has
18 knowledge of the facts of this case that we
19 haven't talked about here today?
20    A.  No.
21    Q.  Now, in interrogatory number six,
22 you were asked to describe any mental anguish,
23 emotional distress, or other similarly related
24 conditions that you suffered as a result of the
25 actions of the defendant described in the

8 (Pages 26 - 29)

1 amended complaint.
2        So first I want you to tell me,
3 what emotional damages have you suffered as a
4 result of being terminated by my client?
5        A.   Well, first of all, when they fired
6 me for no reason, you know, that creates a
7 financial stress on you.  You have different
8 things that you have to take care of.  That's a
9 financial stress, you know.  How I was treated,
10 it was -- it was -- it was uncalled for.
11        Q.   Anything else other than the
12 financial stress?
13        A.   I just told you, the emotional
14 stress and anguish that they put me through
15 then, when I was there, yeah.
16        Q.   Describe that for me, please.
17        A.   How she talked to people, and how I
18 talked --
19        Q.   Who --
20        A.   -- you know.  Nikki was just
21 very -- just very -- you know, that's just how
22 it is.  That's just how she was.  So it just
23 made it a very -- a very not pleasant place to
24 work.
25        Q.   Was she mean to you?  Well, let me

1 rephrase that.  What did she do to make it not a
2 pleasant place to work?
3        A.   She already -- listen, you tell her
4 different things that go on, that's wrong with
5 that place, she don't want -- don't want --
6 don't want to fix it.  She wants you to go
7 outside and wash windows.  I'm not a window
8 washer.  I can't do that.  That's not -- I can't
9 wash windows.  On a hotel on the outside?  Come
10 on.  You hire a company for that.
11        Q.   Is there anything else that she did
12 that made it not a pleasant place to work?
13        A.   She did stuff like that, had you
14 out there shoveling snow with a snow -- with a
15 snow blower, and you out there shoveling snow
16 around the whole parking lot, and you didn't
17 want to hire somebody to come in and do it.
18 Yeah, that's -- that's a lot.  Either you do
19 it -- either you do it or you go home, you know,
20 stuff like that.
21        Q.   Was it only you that --
22        A.   What can you do.  You need a job.
23 You have to do it.
24        Q.   Was it only you that she would give
25 these other tasks to, or was it everybody?

1        A.   I was the house person, I was the
2 supervisor, all of that stuff, so I had to do
3 it.
4        Q.   Was anyone else asked to do that
5 work?
6        A.   I don't know about anybody else.  I
7 know what she told me.
8        Q.   Anything else that she did that
9 made it not a pleasant place to work?
10        A.   No.
11        Q.   Anything else she did that caused
12 you emotional stress and anguish?
13        A.   Not that I can recall.
14        Q.   Did you ever see a doctor or
15 therapist or anyone else for this stress?
16        A.   Do you mean besides going to my
17 chiropractor being stressed out and for the
18 back?  No.  Other than that, no.
19        Q.   Okay.  So the chiropractor is the
20 only medical provider you saw?
21        A.   And going to my regular doctor when
22 needed, yes.
23        Q.   Okay.  Did you discuss this mental
24 distress with your regular doctor?
25        A.   I don't remember.

1        Q.   Did you discuss this mental
2 distress with your chiropractor?
3        A.   I don't remember.  Probably.
4        Q.   So how did this -- so let me
5 focus -- so I heard two things.  So I want to
6 focus first on the emotional stress and anguish
7 you suffered on the job.  Did this result in any
8 physical symptoms?
9        A.   What do you mean physical symptoms?
10        Q.   Well, did you have trouble sleeping?
11        A.   I don't recall.
12        Q.   Did you have headaches or other
13 pains?
14        A.   Sure.
15        Q.   Describe those to me.
16        A.   We get them when we're stressed
17 out.  We get a headache, and you get pains.
18        Q.   Did you report either your
19 headaches or your pains to your doctor?
20        A.   No.  The headache was the job.  The
21 headache is when you go in there, you don't
22 let -- you don't let -- when people are talking
23 to you stupid, you just let it go in one ear and
24 out the other so you don't stroke out.
25        Q.   Did you have any problems with your

9 (Pages 30 - 33)

Page 34

1 vision?
2     A.  Yes.
3     Q.  Describe that to me.
4     A.  I wear glasses.
5     Q.  Do you wear glasses because of the
6 stress?
7     A.  I wear glasses because -- I wear
8 glasses because of my vision.  You just asked
9 me --
10     Q.  Okay.
11     A.  -- do I have problems with my
12 vision, and I said yes.  So I --
13     Q.  Fair enough.
14     A.  So I wear glasses.
15     Q.  Fair enough.  I apologize.  I asked
16 an imprecise question.
17         Did you have any problems with your
18 vision resulting from the emotional stress and
19 anguish on the job?
20     A.  I don't understand the question.
21     MR. ENGEL:  Could you read it back,
22 please?
23     THE WITNESS:  I still don't
24 understand it.
25         (Record read.)

Page 35

1         THE WITNESS:  I've never heard of
2 anything like that, so I don't understand the
3 question.  You can --
4 BY MR. ENGEL:
5     Q.  Well, let me -- is the answer no,
6 you didn't?  I mean, it's either yes or no.
7     A.  I can't answer the question.  I've
8 never heard of that.  Give me an example of what
9 you mean.
10     Q.  Well, I'm asking -- I'm just asking
11 if you had it.  If you didn't have those
12 symptoms --
13     A.  I can't say yes or no.  If you --
14 okay, here's the thing -- now, let me just say
15 this, you're asking me a question, I say I don't
16 understand, I say give me an example, and you're
17 telling me it's a yes or no question -- answer.
18 I can't -- if you can't give me an example, I
19 can't give you a yes or no answer.
20     Q.  I'm not asking, sir -- maybe this
21 will help you.  I'm not asking you to be a
22 doctor and tell me what would be normal
23 symptoms.  I'm just asking you as a factual
24 matter, did you suffer any vision problems that
25 you believe was the result of the stress and

Page 36

1 anxiety on the job?
2     A.  Again, I can't answer that
3 question, because I'm not a doctor.
4     Q.  Okay.  Did you hear voices as a
5 result of the emotional stress and anguish on
6 the job?
7     A.  No.
8     Q.  Did you have trouble concentrating
9 as a result of the stress and anguish on the
10 job?
11     A.  Yes.
12     Q.  How severe was that?
13     A.  Depending on the day.
14     Q.  Did you have decreased appetite or
15 energy level as a result of the stress and
16 anguish on the job?
17     A.  I don't recall.
18     Q.  Did you have any other physical
19 impairments as a result of the stress or anguish
20 on the job that we haven't discussed here?
21     A.  I have scoliosis.
22     Q.  Do you believe the scoliosis was a
23 result of the stress and anguish on the job?
24     A.  No, that's not what I said.  You
25 said any other impairments.  I said I have

Page 37

1 scoliosis.
2     Q.  So I'm asking you do you have any
3 other physical impairments or symptoms as a
4 result of --
5     A.  No.
6     Q.  -- the stress and anguish on the
7 job?
8     A.  No.  No.
9     Q.  What other people would have
10 knowledge of the stress and anguish on the job
11 you were suffering?
12     A.  I don't know.
13     Q.  Can you think of anybody who could
14 compare your emotional condition prior to
15 working on this job and after working on this
16 job?
17     A.  Say that again, because --
18     MR. ENGEL:  Can you read the
19 question back, please?
20     (Record read.)
21     THE WITNESS:  I'm not sure.
22 BY MR. ENGEL:
23     Q.  And then you indicated as a result
24 of being terminated from the job, you suffered
25 from financial stress.

10 (Pages 34 - 37)

Page 38

1    A.   No, no, that's not what I said.  I
2 said from being terminated from the job, it does
3 create -- it does create a financial stress, but
4 you go on.
5    Q.   Other than this financial stress,
6 did you suffer any emotional distress as a
7 result of being terminated by the job?
8    A.   Well, yeah, you know, I think
9 that -- I think that -- that people have maybe
10 put a bad -- a mark when you try to go out and
11 get another hotel job.  So I don't know.  People
12 know people.  So, yeah, I feel like that
13 sometimes.
14    Q.   Okay.  So that's a good answer, but
15 I want to go back to the question I originally
16 asked, because I'm going to come back to that.
17         First, did you suffer any emotional
18 distress as a result of your being terminated by
19 my client?
20    A.   Again, yes, because you're --
21 you're trying to figure out how you're going to
22 take care of -- how you're going to live.  Yes,
23 that's distress when you're fired and you're let
24 go from a job.  Yes.
25    Q.   So all the stress -- if I'm hearing

Page 39

1 you right, you're telling me the emotional
2 distress -- let me rephrase that.
3         If I'm hearing you correctly,
4 you're telling me that the emotional stress that
5 you suffered as a result of being terminated by
6 my client was related to financial pressures and
7 difficulty in finding another job?
8    A.   Here is how I'm saying it, when
9 you're let go from a job, when you're being
10 stressed out on the job, that's stress.  And
11 you're let go for no reason, that is stress.  So
12 I don't know how you -- how you want to label
13 it, but I'm telling you how I understand the
14 question, and that's how I'm able to answer it.
15    Q.   So how long -- when -- so after you
16 worked for my client, you then went to work for
17 Homewood Suites you said, right?
18    A.   That's correct.
19    Q.   Okay.  How long after being
20 terminated by my client did you go and get a job
21 at Homewood Suites?
22    A.   I don't know.  Maybe it was a few
23 months after.  Maybe a few months.  I don't
24 know.  I don't remember the time frame.
25    Q.   Okay.  During that time frame, what

Page 40

1 did you do to try to find other places to work?
2    A.   I tried to look for other places to
3 work.
4    Q.   What other places did you look at?
5    A.   Everywhere that I could.
6    Q.   Can you name some for me?
7    A.   I cannot, because there were quite
8 a few places that I put on the internet.  I
9 walked in different places; I put applications
10 in.  It was quite a few at that time.  I can't
11 recall.  I didn't make a list or, you know,
12 write it down.  I don't remember, so I cannot
13 provide that.
14    Q.   Did Homewood Suites pay you the
15 same as my client?
16    A.   No, they -- Homewood Suites paid me
17 better.  Your client paid me a certain amount
18 one day -- $11 one day, and then on Tuesdays and
19 Fridays paid me $13 to be the supervisor.  You
20 don't do stuff like that.  I've never had nobody
21 do me like that.  And that was the whole thing
22 in a nutshell.  So they never -- so Homewood
23 Suites paid me better, yes.
24    Q.   Do you have any documents to
25 support your claim that you suffered emotional

Page 41

1 distress either working for my client or as a
2 result of the termination of my client?
3    A.   What do you mean, documents?  No, I
4 don't understand what you mean.
5    Q.   Do you have any medical records?
6    A.   No, because I couldn't afford to go
7 to the doctor.
8    Q.   Do you have any emails?
9    A.   No.
10    Q.   Text messages?
11    A.   Let me go back and -- go back and
12 restate again.  The phone that I had with all
13 emails and text messages had been stolen from
14 the previous job that I was working at, which
15 was Kings Inn & Suites, so I'm going to go back
16 to the original answer that I gave you a few
17 moments ago earlier.
18    Q.   In other words, what I'm looking
19 for is you're claiming that you suffered
20 emotional distress working for my client and
21 then as a result of being terminated by my
22 client, and I want to know is there any piece of
23 paper that you have in your possession that
24 supports what you're saying?
25    A.   Let me go back again and restate

11 (Pages 38 - 41)

Page 42

1 again to you that the text messages, emails,
2 anything of that nature was in the other phone
3 that was stolen.
4      Q.  So as we sit here today, you don't
5 have any documents?
6      A.  I don't understand the question.
7      MR. ENGEL:  Can you read it back,
8 please?
9      (Record read.)
10      THE WITNESS:  I just answered -- I
11 just answered the question, I think this will be
12 the third or fourth time, that I don't have
13 anything.  The text messages, emails, were in
14 the device that was stolen from Kings Inn &
15 Suites.
16 BY MR. ENGEL:
17      Q.  Okay.  So going on to interrogatory
18 number seven.  This asks you to describe any
19 mental anguish, emotional distress, or other
20 similar or related conditions that you suffered
21 from prior to the events described in the
22 amended complaint.  And you described in your
23 answer three things, a back injury, scoliosis,
24 and rheumatoid arthritis.  Is that the entire
25 list of conditions that you suffered from?

Page 43

1      A.  Yes.
2      Q.  Have you ever received any
3 psychiatric treatment prior to the events
4 described in the complaint?
5      A.  What do you mean?
6      Q.  Have you ever seen a psychiatrist
7 or psychologist or someone like that?
8      A.  Yes.
9      Q.  When did you see that person?
10      A.  I don't recall the date and the
11 year.  I don't recall that.  It's been a few
12 years ago.  I don't recall that.
13      Q.  How many years ago was it?
14      A.  It's been over eight years ago.  I
15 don't -- I don't recall.
16      Q.  What did you see them for?
17      A.  For medical reasons.
18      Q.  What medical reasons?
19      A.  I -- that's personal.
20      Q.  Well, we're here in a deposition,
21 and you have put your medical --
22      A.  Okay.  Well, here --
23      Q.  -- in play, so --
24      THE COURT REPORTER:  There's two
25 people talking, and I can't get either of you.

Page 44

1      MR. ENGEL:  Let me do this, if you
2 need to take a break and talk to your attorney,
3 he can explain --
4      THE WITNESS:  Yeah, let's take a
5 break.
6      MR. ENGEL:  -- your medical -- let
7 me finish, please.
8      THE WITNESS:  Let's do that.
9      MR. ENGEL:  He can explain to you
10 once you put your mental condition in play, you
11 are required to produce all medical records that
12 could affect that, and I'm entitled to take
13 discovery on these things.  So if you're going
14 to continue with that claim, you're going to
15 have to answer my questions.
16      So let's take a break, you can talk
17 to your counsel, and we'll come back.
18      THE WITNESS:  Copy.
19      MR. ENGEL:  We'll come back in five
20 minutes.
21      MR. LONG:  Sure.
22      MR. ENGEL:  Is that enough time,
23 Sam?
24      MR. LONG:  Yeah, that will be fine.
25      MR. ENGEL:  Okay, see you in five

Page 45

1 minutes.
2      (Recess taken.)
3      MR. ENGEL:  We're back on the
4 record.
5 BY MR. ENGEL:
6      Q.  Would you please describe to me any
7 prior psychiatric treatment that you have
8 received?
9      A.  I talked to a psychologist.
10      Q.  When?
11      A.  It's been a few years ago.  I don't
12 recall the date.  It's been over ten years ago.
13      Q.  What was the topic that you were
14 discussing with the psychologist?
15      A.  It might have been the death of my
16 grandmother.
17      Q.  Where was the psychologist located?
18      A.  I don't recall.  I really don't
19 recall.
20      Q.  Let's go back to your answers here.
21 Interrogatory number eight asked you to list any
22 treatment providers for the back injury you
23 described in the amended complaint.
24      So let me back up.  Before you
25 started to work at Kings Island [sic] Suites,

12 (Pages 42 - 45)

Page 46

1 did you have a back injury?
2     A.  Yes.
3     Q.  Can you describe that, please?
4     A.  My scoliosis.  I was not able to
5 touch my toes.
6     Q.  Any other symptoms as a result of
7 that back injury?
8     A.  Surgery.
9     Q.  When did you have that surgery?
10    A.  That's back -- oh, I don't know.
11 2017, somewhere around there, 2016.
12    Q.  Where did you have that surgery
13 performed?
14    A.  At the hospital, Miami Valley.
15    Q.  Does that hospital have a name?
16    A.  I just said Miami Valley.
17    Q.  I'm sorry, which hospital?
18    A.  Miami Valley.
19    Q.  Oh, Miami Valley.  Okay.  And you
20 listed in response to this interrogatory three
21 treatment providers.  Are there any other
22 treatment providers who are not listed in this
23 interrogatory answer who have information about
24 your back injury?
25    A.  It might -- let me see.  There

Page 47

1 might be -- maybe one more, a chiropractor.
2 Yeah, Cincinnati Healing Arts.
3     Q.  When did you see them?
4     A.  I don't know.  For about a year, I
5 guess.
6     Q.  When was that?
7     A.  Well, this was after the fact, so,
8 no, it's not even relative.  So this was about a
9 year or so ago, so this is not even related.  So
10 it's about a year or so ago.  So other than
11 that, no.
12    Q.  What efforts have you made to
13 obtain documents from the three providers listed
14 in response to interrogatory number eight?
15    A.  What effort?
16    Q.  Yeah.
17    A.  They're providing them.  They're
18 getting them, and they will be emailed and some
19 have to be picked up.
20    Q.  So you expect to obtain those
21 within the next couple weeks then?
22    A.  Yes.
23    Q.  And then I'd ask you just to
24 provide those to your lawyer, who can then
25 review them --

Page 48

1     A.  Okay.
2     Q.  -- and send them to us.
3     A.  All right.  Here, let me turn this
4 up a little bit.  All right.
5     Q.  How did your back injury affect
6 your ability to perform your job duties for my
7 client?
8     A.  Well, first of all, it's difficult
9 to do a lot of -- you know, long periods of
10 standing, which is -- you know, doing hotel
11 work, you know, you're able to sit down for a
12 little bit.  There are periods.  But, you know,
13 you're not able to make beds, you know, do a lot
14 of bending all through the day.  That's --
15 that's -- I -- yeah, you can't do that, not on
16 an everyday basis.
17    Q.  Do you consider yourself to be
18 disabled?
19    A.  Yes, but I don't -- I don't -- no,
20 let me say this, scoliosis is a disease, but
21 it's all in how you carry yourself.  I have to
22 work.  If I don't work, I'll die.  So you have
23 to keep moving.
24        So on the clinical standpoint, yes,
25 I'm disabled.  In my mind, no, I'm not disabled.

Page 49

1 Do you understand what I'm saying?
2     Q.  I do.  Do you have any documents
3 from a doctor or medical provider who says
4 you're disabled?
5     A.  Well, I'm going to put it to you
6 like this, I haven't -- I haven't signed up for
7 any type of disability.  I'm going to say that
8 scoliosis is a disabilitating [sic] disease.
9 I'm going to say that.  But you do -- you're
10 asking me do I have documentation on do I have
11 scoliosis.  Yes, I do.
12    Q.  Do you have any documentation
13 suggesting that you have a disability that
14 prevents you from working the duties of the job
15 that we're talking about here in this case?
16    A.  Oh, yeah.  You know, I -- at that
17 time, I do -- I do -- like I did talk to my
18 doctor, you know, about that, you know, the
19 bending and stuff, and, you know, she just told
20 me things to do.  You have to take breaks.  Just
21 don't do a lot of bending.  Yeah, she gave me
22 different advice, different things to do.
23    Q.  Okay.  Do you have any documents
24 indicating that you were unable to perform your
25 job duties for my client?

13 (Pages 46 - 49)

1      A.  Not in hand, no.

2      Q.  Are you aware of any documents that
3  existed?

4      A.  I -- I don't recall, but, you know,
5  I --

6          (Thereupon, Exhibit F, Authorization
7  for Light Duty, having been previously marked,
8  was presented for purposes of identification.)

9  BY MR. ENGEL:

10     Q.  Okay.  So let me show you, then, a
11  document that we marked previously as Exhibit --

12     A.  Oh, that might have been from my
13  chiropractor.  See, I have to --

14         MR. ENGEL:  It's Exhibit F; am I
15  right?

16         MR. LONG:  Yes, that's correct.

17  BY MR. ENGEL:

18     Q.  So we showed you Exhibit F, which
19  is a note from your chiropractor suggesting that
20  you should have light duty from March 13th,
21  2021, through March 18th of 2021.

22     A.  Correct.

23     Q.  Okay.  So first tell me, how did
24  you get this document?  What led to that?

25     A.  Well, it was no doubt that at that

1  time -- I don't remember -- I don't remember if
2  we had a lot of people, but it was something
3  going on to the fact to where I had to make a
4  lot of beds.  I think somebody quit or
5  something.  I don't know, but it was a lot.  And
6  I just could not make -- listen, I couldn't
7  make -- they say seven rooms, right, but if you
8  have a double bed in a room, that seven turns
9  into 14 beds.  That's a lot of beds to make.
10  You're bending, and you've got to clean the
11  toilets and the showers.  That's a lot.  That's
12  a lot.  And you -- that's a lot, yeah.

13         So there was no way that I can do
14  that every day on a daily basis, and I -- and I
15  asked her to, you know, have me on, you know --
16  you know, the -- a different task or not so much
17  of it, and -- but in the result of that, I was
18  having difficulties with my back to where I
19  could hardly walk and get out of the freaking
20  bed.

21     Q.  So this document here is the only
22  document I've seen.  Are you aware of any other
23  documents suggesting that you have a medical
24  condition and you should work light duty?

25     A.  You said -- repeat that last part

1  that you said.

2      Q.  This is the only document I've
3  seen.  Are there any other documents out there
4  that we don't have?

5      A.  Well -- well, you know, you have to
6  get the other medical report.  So there may be
7  some other things in those reports.  So I can't
8  answer that question.  And that --

9      Q.  Are there any other documents that
10  were given to your employer other than what
11  we've marked here as Exhibit L?

12     A.  There's a possibility that there
13  could have been, yes.

14     Q.  Well, I don't want to know
15  possibilities.  I want to know do you have any
16  other documents that were provided to your
17  employer saying that you had a health condition
18  that prevented you from doing all of your job
19  duties?

20     A.  Do I have any -- well, she knew.

21     Q.  I'm asking a very specific
22  question.  I apologize, because --

23     A.  No, because everything -- I was
24  able to do everything up until -- up until the
25  bed making.  I wasn't hired to make beds.

1      Q.  So when you started your job, you
2  were able to do all of your job duties?

3      A.  When I was -- when I was hired, I
4  was hired to be a house person.  That means just
5  go around sweep, you know, do a little mopping,
6  do a little stuff here and there in the main
7  lobby, you know, stuff like that, not -- not --
8  not strenuous.  Not a lot.  Then next thing you
9  know, they had me cleaning rooms.

10     Q.  When you were hired, did you tell
11  them that you had any limitations on your work
12  due to your back issues?

13     A.  Yes.  Yes.

14     Q.  So let me show you interrogatory
15  answer number 11.  And you said -- I'm looking
16  at the last paragraph.  You say plaintiff worked
17  with general manager Nikki Williams prior to his
18  employment with defendant and gave notice of his
19  disability to her.  Is this a true and accurate
20  statement?

21     A.  Yes.

22     Q.  How did you give her notice of your
23  disability?

24     A.  She knew.  We talked.  I said -- I
25  said -- I said now, Nikki, I said you know --

14 (Pages 50 - 53)

Page 54

1 you know I got the, you know, scoliosis and had
2 the back injury.  She says oh, yeah, I know.
3 She says Alex, I know, because we worked
4 together.  I said okay, good.  And that was --
5 that was it.
6      Q.   And then you say additionally,
7 plaintiff wrote the details of his disabilities
8 on his application to work for defendant.  Is
9 that a true and accurate statement?
10      A.   Say that again.
11      Q.   In response to your interrogatory,
12 you wrote, quote, plaintiff wrote the details of
13 his disabilities on his application to work for
14 defendant.
15      A.   Yes.
16      Q.   Is that a true and accurate
17 statement?
18      A.   Yes.
19      Q.   So let me pull up here, then, what
20 we marked as -- I don't know if we marked it
21 yet.  We'll mark this as N.
22           MR. LONG:  Are you talking about
23 the job application?
24           MR. ENGEL:  Yeah.
25           THE WITNESS:  There was two of

Page 55

1 them.  There was two job applications.
2           MR. ENGEL:  Let me -- sir, let me
3 ask the questions here.
4           (Thereupon, Exhibit N, job
5 application, was marked for purposes of
6 identification.)
7 BY MR. ENGEL:
8      Q.   So I'm showing you what we're
9 marking as Exhibit N, which is a job
10 application.  Is that your name at the top here?
11      A.   Let me go -- let me go -- let me
12 see that.  Yeah, that's my name.
13      Q.   Is this the job application that
14 you filled out for Kings Inn & Suites?
15      A.   Yes.
16      Q.   Now, down here at the bottom, it
17 says you went to Wright State.
18      A.   You -- oh, wait a minute.  My phone
19 just went out.  Yeah, those were some little
20 classes that you were able to take back in the
21 days.
22      Q.   It says you completed three years
23 at Wright State.  Is that accurate?
24      A.   Well, the three -- actually, no.
25 The --

Page 56

1      Q.   So that piece of information on
2 your job application is not true?
3      A.   That is not correct, and that's why
4 I say that is -- there were two -- there were
5 two job --
6      Q.   Wait, wait, wait.  I'm going to
7 ask -- let me ask the questions, sir.  Let me --
8      A.   That is correct.  No.  No, that is
9 correct.
10      Q.   You completed three years at Wright
11 State?
12      A.   No.
13      Q.   So when you wrote down that you
14 completed three years at Wright State on your
15 job application, that was not a true statement,
16 was it?
17      A.   No, it was not.
18      Q.   Now, on the job application here,
19 it says -- there's a line here that says -- and
20 I'll make it bigger because you're looking on
21 your phone -- any health issues or concerns --
22      A.   And there again --
23      Q.   -- and you left it blank.
24      A.   And there again -- I did, and I
25 got -- I'll let you go ahead and I'll answer

Page 57

1 your questions, and I'll go back and tell you
2 there were two job applications, but go ahead.
3      Q.   Okay.  Where is this other job
4 application?  Because nobody has seen it.
5      A.   I couldn't answer that.
6      Q.   So there's a mystery -- so your
7 testimony here today is that --
8      A.   Here --
9      Q.   Let me ask the question first.
10 First, it's true that you -- on the question on
11 the job application that says any health issues
12 or concerns, you left it blank?  That's true,
13 right?
14      A.   I left it blank.  I left it blank,
15 because when I was filling out the application,
16 I said now you know I had this back surgery.
17 They said oh, that's okay.  Don't worry about
18 it.  And that -- and that was it.
19      Q.   And you're saying now -- so now is
20 it your testimony that there's a separate
21 mystery job application out there somewhere --
22      A.   Well, I'm --
23      Q.   -- that you detailed all your
24 health information?
25      A.   I'm saying that there was two

15 (Pages 54 - 57)

1 applications. There was another -- there was a
2 paper application. There was a one-page
3 application, and then there was another
4 application that was -- that was two pages. So
5 I don't know. I don't know.
6     Q. Well, this is two pages here.
7     A. It's not folded.
8     Q. This is two pages.
9     A. It wasn't folded. It wasn't
10 folded. There was an application that was two
11 pages. There was another application that was
12 a one-page.
13    Q. And it's your testimony that you
14 wrote about your health issues on that one-page
15 mystery application?
16    A. I didn't say that. I just said
17 there were two applications.
18    Q. Did you write on that other
19 application about your health issues?
20    A. I don't -- I don't remember. I
21 don't remember. Because I don't have it in
22 front of me, so I wouldn't be able to answer
23 that question.
24    Q. Okay. Well, you said in your
25 response to interrogatories that you wrote the

1 details of your disability on your application
2 to work for defendant. Is that a true
3 statement?
4    A. There was two applications.
5 Again --
6    Q. And is it your testimony -- is it
7 your testimony that on this other application
8 that nobody can find, you wrote the details of
9 your disability?
10    A. There were two applications I
11 filled out, all right. I filled out the other
12 application. That application that you have in
13 front of you I did not put it on there. I made
14 the statement hey, I had back surgery, you know,
15 da, da, da, da. Oh, okay, no problem. I said
16 okay, fine. They said oh, I know. I said okay,
17 fine. And, you know --
18         I'll put this here. That will be
19 better.
20    Q. When did you start working for my
21 client?
22    A. I don't remember the month.
23    Q. How long were you working there
24 before you started to have difficulties?
25      MR. LONG: Object to the form. You

1 can answer.
2      THE WITNESS: I can answer?
3      MR. LONG: Yeah, go ahead.
4      THE WITNESS: Restate the question
5 again.
6 BY MR. ENGEL:
7    Q. How long were you working there
8 before you started to have some difficulties
9 with your supervisor?
10    A. I'll say -- say about a month or so
11 after, maybe two months, I guess. Maybe
12 somewhere around there.
13    Q. Can you describe --
14    A. Can I answer the -- can I answer?
15 Somewhere around -- somewhere around
16 Thanksgiving'ish, Christmastime. Somewhere
17 around in there.
18    Q. Okay. So let me -- then let's talk
19 about February of 2021. Do you remember
20 February 2021?
21    A. February 2021.
22    Q. Okay. Do you remember on
23 February 6th of 2021 that Ms. Craddock gave you
24 a task, and you arrived late to work?
25    A. Okay.

1    Q. Did that happen?
2    A. What was the task?
3    Q. Do you remember on February 6th of
4 2021 you were asked to go and inspect a room for
5 cleanliness and intentionally placed items on
6 the floor and told front desk agents that the
7 room was clean?
8    A. Say what?
9    Q. Do you remember on February 6th of
10 2021 being asked to strip all the rooms and make
11 all the beds in each room, but the work was not
12 done?
13    A. To sweep all the rooms and to make
14 all the beds? That was probably a day that I --
15 that I had 14 rooms. That's a lot. I wasn't
16 hired to make beds. That's the issue. I wasn't
17 hired to make beds.
18    Q. So when you were asked to make
19 beds, did you refuse those orders?
20    A. No, I didn't refuse. I went ahead,
21 and I started, and I -- and I couldn't -- I
22 couldn't -- I couldn't complete it. I couldn't
23 do it.
24    Q. All right. So let's do this --
25 let's do it this way, I'll show you a

1 February 8th, 2021, email from Rhonda Craddock
2 that we've marked as, I think, Exhibit A.
3          (Thereupon, Exhibit A, February 8,
4 2021, incident report email, having been
5 previously marked, was presented for purposes of
6 identification.)
7 BY MR. ENGEL:
8      Q.   Can you review this and tell me if
9 you believe anything in there is not true and
10 accurate?
11     A.   That's incorrect.
12     Q.   Tell me everything about the
13 information provided in this document that is
14 incorrect.
15     A.   I would never intentionally put any
16 crumbs or anything on the floor in a room that I
17 have to inspect.  That's my name.  I would never
18 do anything like that.
19     Q.   Anything else in the description of
20 events in this document that you believe is
21 inaccurate?
22     A.   Yeah, I did not refuse to do any --
23 any -- any work.  It was too much of a task.  It
24 was too much.
25     Q.   Anything else in here that's not

1 accurate?
2      A.   I don't -- it is inaccurate that I
3 only completed a few rooms and for ten hours,
4 because if you think that they're going to let
5 me be in that place for ten hours and not
6 anybody walk around and check on me to see if
7 I'm working, you know that's inaccurate.  So
8 that's not -- that's not true.
9      Q.   So why would Ms. Craddock include
10 information in --
11     A.   I -- I --
12     Q.   -- this email that is not accurate?
13     A.   I can't answer that.  I'm not
14 Ms. Craddock.  But what I can say is that you
15 know as well as I know, if you're on the job
16 approximately ten hours, that means there has to
17 be someone else that's over you.  So in
18 reference to having someone else that is there
19 over you, you mean to tell me for ten hours --
20 supposedly I was there ten hours and didn't do
21 anything but just a few rooms?  That doesn't
22 sound right.
23     Q.   Can you think of any reason why
24 Ms. Craddock would intentionally include false
25 information in this incident report?

1      A.   I felt that she was pressured into
2 it because she needed her job.  I felt -- I feel
3 that she was pressured.  We all had worked
4 together at a previous job.  We all had worked
5 together.  And she wanted to keep her job
6 because she has a family.  Of course.  So, yeah,
7 she probably wrote some stuff, you know.  But
8 guess what --
9      Q.   Why would --
10     A.   I can't answer why, but what I can
11 say is that, again, if you're on the job ten
12 hours, right, and you mean to tell me that
13 Rhonda Craddock was a supervisor or housekeeping
14 manager and no one else came to check on me
15 during that whole ten hours?
16     Q.   Who was --
17     A.   Come on.
18     Q.   Who was pressuring her to put false
19 information --
20     A.   I can't --
21     Q.   -- in the report?
22     A.   I can't answer that.  I can't
23 answer that.  Maybe Nikki.  I can't answer that.
24 I don't know.
25     Q.   Do you have any -- do you have any

1 reason to believe Nikki was pressuring her to
2 include false information about you?
3      A.   I'm -- maybe.  I'm quite sure.
4      Q.   Well, okay.  So now you said maybe,
5 you're quite sure.  What evidence do you have to
6 support your claim?
7      A.   I don't -- I don't have any
8 evidence.  I'm just giving you -- I'm just
9 telling you what I think.
10          (Thereupon, Exhibit B, February 8,
11 2021, incident report, having been previously
12 marked, was presented for purposes of
13 identification.)
14 BY MR. ENGEL:
15     Q.   All right.  Let me show you, then,
16 what we marked I think as Exhibit B, which is an
17 incident report dated February 8th, 2021, from
18 the manager on duty.  Can you please review this
19 document and tell me if there's anything in here
20 that you believe is inaccurate?
21     A.   Okay.  Here you have three or four
22 different -- this is -- hey, you know what --
23 okay.  So here -- again, I don't agree with any
24 of that.
25     Q.   Which parts are not true in your

17 (Pages 62 - 65)

Page 66

1 opinion?
2     A.  I don't agree with any of it.  I'm
3 not -- you're not going to be at no hotel for
4 ten hours and only strip -- and only do three to
5 four rooms, so -- in ten hours.  Where the heck
6 was I hiding, huh?  Where was I?  That's --
7     Q.  Would you agree that if you only
8 did three or four rooms, that would be not --
9     A.  I don't agree -- I don't agree to
10 that.  You just didn't hear what I said.  I said
11 that if I'm there -- if I'm at a job ten hours,
12 and you're given a task, and you mean that whole
13 time you have not come to check on me?  See,
14 you're contradicting.
15        It says here every time I came --
16 every time I came in the laundry room, he was
17 talking about -- he was being -- making rude
18 comments and assumed I was following him.  So if
19 I'm in the laundry room where they're doing
20 laundry and I'm complaining about there's no
21 towels or whatever the case may be, maybe I'm in
22 the laundry room doing laundry.  That doesn't
23 sound right.  That just does not sound right.
24 So I don't agree with it.
25     Q.  And did you make rude comments to

Page 67

1 the manager?
2     A.  I don't recall that.
3     Q.  Did you call the manager racist?
4     A.  What does -- does that say that in
5 there?
6     Q.  No, I'm just asking.  Did you call
7 the manager racist?
8     A.  I don't recall that.
9     Q.  So why would the manager create
10 this incident report with false information
11 saying you were rude, saying you weren't
12 working?  What was her motivation?
13     A.  Maybe because they were trying to
14 do a paper trail to get rid of me.
15     Q.  Why would she --
16     A.  They were trying to make things --
17 they wanted me to, you know -- whatever.  They
18 wanted to make life hard on me.
19     Q.  Why did they want to make life hard
20 on you?
21     A.  I can't answer that.  You'd have to
22 ask them.
23        (Thereupon, Exhibit C, statement of
24 Rhonda Craddock, having been previously marked,
25 was presented for purposes of identification.)

Page 68

1 BY MR. ENGEL:
2     Q.  Sorry, my camera turned off for a
3 second.  All right.  Let me show you, then, a
4 statement from Rhonda Craddock that's undated
5 that we marked as Exhibit C previously.
6        Can you please review this document
7 and tell me if any of the information in there
8 is not true and accurate?
9     A.  Okay.  So, again, that was all done
10 on the same day.  I don't agree with that.
11     Q.  Why do you believe Ms. Craddock
12 would include false information about you in
13 this --
14     A.  Again, she.
15     Q.  -- document?
16     A.  Again, she was pressured.  She
17 wanted to keep her job.  She wanted to keep her
18 fricking job.
19     Q.  Okay.  So a couple questions.
20 First, who was pressuring her?
21     A.  I can't answer that.  I wasn't
22 there.
23     Q.  Second --
24     A.  Maybe -- maybe -- maybe Nikki.
25 Maybe the other manager.  I don't know.  I

Page 69

1 wasn't there.
2     Q.  Why would including false
3 information about you help Rhonda keep her job?
4     A.  I can't answer that.
5     Q.  Did Rhonda know about your previous
6 sexual relationship with Nikki?
7     A.  What?  I don't think you know what
8 you're talking about.
9        MR. ENGEL:  Can you please repeat
10 the question?
11        (Record read.)
12        THE WITNESS:  I didn't know about
13 my previous sexual relationship with Nikki.
14 BY MR. ENGEL:
15     Q.  Wait.  I'm confused.  Because
16 previously you said you had a sexual
17 relationship with Nikki --
18     A.  No, I didn't.
19     Q.  -- before you started working
20 there.
21     A.  No, I didn't.
22     Q.  Was it -- do I have the wrong
23 person?  Was it Ms. Williams?
24     A.  Yeah, I think you've got
25 everything --

18 (Pages 66 - 69)

Page 70

1 Q. Was it Ms. Nikki Williams?
2 A. I think you've got it all wrong.
3 Can we take a recess?
4 Q. No, no, no, no, I want to clarify
5 this. Who was the human being at Kings Island
6 who you were having a sexual relationship with
7 before you started working there?
8 A. I didn't have a sexual relationship
9 at Kings Island.
10 Q. Before you started working there,
11 you said you had a sexual relationship with some
12 human being. What was the name of that human
13 being?
14 A. I never worked at Kings Island.
15 Q. Oh, I'm sorry. When I said Kings
16 Island, I meant the defendant in this case,
17 Kings Inn. I'm sorry, Wanda [sic]. Excuse me.
18 Not Nikki, Wanda. Let me back up.
19 So at the time -- let me back up
20 then. Did Rhonda know that you were having a
21 sexual relationship -- scratch the whole thing.
22 A. Scratch what?
23 Q. I'm confused. Never mind. Let me
24 go back to the other document, then, from the
25 manager on duty. Did the manager on duty know

Page 71

1 that you had had a previous sexual relationship
2 with Rhonda Craddock?
3 A. I don't know.
4 Q. Do you have any reason to believe
5 she would know?
6 A. I don't know. I can't answer that
7 question.
8 Q. Did you ever tell her?
9 A. No, I didn't have discussions like
10 that with her. That's personal.
11 Q. So just so we're clear, it's your
12 testimony today that you never told Gini Kaur
13 that you had a sexual relationship with Rhonda
14 Craddock?
15 A. We never had a discussion about
16 that, that is correct.
17 Q. All right. Do you need to take a
18 break, or do you want to keep going? You had
19 said you might need a break, so I want to make
20 sure --
21 A. You said no, but -- you said no,
22 but go ahead.
23 Q. Okay. So next I'm going to show
24 you a document that we marked as Exhibit D, I
25 believe. No. D, right? Is it D?

Page 72

1 (Thereupon, Exhibit D, February 9,
2 2021, Employee Disciplinary Action Form, having
3 been previously marked, was presented for
4 purposes of identification.)
5 BY MR. ENGEL:
6 Q. This is an employee disciplinary
7 action form. Have you seen this document
8 before?
9 A. Go ahead.
10 Q. Have you seen this document before?
11 A. No.
12 Q. Okay. So it looks like there's an
13 employer statement here. Can you tell me if
14 anything in that employer statement is
15 inaccurate?
16 A. One second here. Hold on one
17 second. This phone keeps dying. Yeah. Yeah, I
18 remember this.
19 Q. Okay. Did that happen?
20 A. Did it happen?
21 Q. Yeah. Did what's described in the
22 employer statement happen?
23 A. No. I didn't refuse to work, no.
24 Q. Did you show up late for work that
25 day?

Page 73

1 A. Yeah, there was probably something
2 wrong with my car, because I don't -- I don't
3 very seldom come to work late. That was in
4 February. It could have had some battery issues
5 or something. But I'm never late.
6 Q. Why didn't you provide any
7 information in the box marked employee
8 statement?
9 A. Because I didn't agree with it.
10 I'm not going to sign anything I don't agree
11 with.
12 Q. Why did you refuse to sign this?
13 A. Because I didn't agree with it. I
14 don't sign something I don't agree with. It's a
15 document.
16 Q. Were you given the opportunity to
17 provide information to the supervisors?
18 A. No. She said here, sign. I said
19 sign what. Sign it. I said I'm not signing
20 that, and I walked away.
21 Q. Did you see the box that said
22 employee statement?
23 A. What did I just -- no.
24 Q. Let me show you the next document.
25 Am I missing one here? Let's look at this one

19 (Pages 70 - 73)

Page 74

1 then, which I believe is a document -- well, let
2 me back up. One other question about that other
3 document. I'm sorry.
4     Why do you believe that -- well,
5 let me back up. It looks like there is -- is
6 that Nikki's name at the bottom there in the
7 warning decision thing?
8     A. Okay.
9     Q. Why do you think that all these
10 people made up this information about you?
11     A. Again, I wasn't able to make those
12 beds. I wasn't hired to be a housekeeper. I
13 was hired to be a houseman. A houseman is not
14 required to make beds. Again, I was not hired
15 to be a housekeeper.
16     Q. Any other reason do you think they
17 would make up this information about you?
18     A. They're not -- listen, they wanted
19 me to do a job that I was not hired for, that I
20 could not do on a daily basis. So I asked them
21 to accommodate me, and they did not. So what
22 other way to do is to give you bogus tasks for
23 you to do to not to be able to complete and to
24 write you up and to have a paper trail to get
25 you out. We know how the game is played, and

Page 75

1 this is how they played it.
2     Q. Why did they want to get you out?
3     A. I can't answer that question.
4 That's something that you have to ask them.
5 Again, they asked me to clean rooms, and I was
6 not able to complete the task. I'm not able to
7 complete 14 rooms -- to clean seven to 14 rooms
8 per day, make the beds, clean the showers, clean
9 the toilet, clean the floor, and vacuum and take
10 the trash out of each of the rooms. Come on.
11     Q. So let me now show you the document
12 that we marked as Exhibit --
13     MR. ENGEL: Did we mark this one
14 already? Do we have this one marked? This is
15 an employee write-up dated March 10th of 2021.
16     MR. LONG: It's Exhibit E.
17     (Thereupon, Exhibit E, March 10,
18 2021, Employee Write Up, having been previously
19 marked, was presented for purposes of
20 identification.)
21 BY MR. ENGEL:
22     Q. That's Exhibit E. Okay. Do you
23 remember seeing this document?
24     A. I can't see it. You're flipping it
25 around, and I'm not able to -- so I don't know

Page 76

1 what you're doing. I was reading something.
2 What just happened?
3     Q. Sorry, I hit the wrong button.
4 That's my bad. There you go.
5     A. That's -- that's not true.
6     Q. What in this document is not true
7 and accurate?
8     A. Listen, I -- there's no way -- that
9 was on 2-9 of 2021. They had a meeting. I was
10 able to -- able to clean two rooms an hour. If
11 unable, we would not have work for him. I
12 replied no problem. If that's what you need,
13 then that's what I'll do, but I need the 40
14 hours. Yeah, see --
15     Q. Are you saying that happened or it
16 didn't happen?
17     A. Well, here is the thing, it's not
18 accurate.
19     Q. The document then goes on to
20 describe some events that occurred on March 9th
21 and March 10th. Are those accurately described
22 in this document?
23     A. Yeah, some of that is true. It's
24 hard for me to -- so 52 -- they say I was 52
25 minutes late. That was on the 9th. And they're

Page 77

1 putting that down with the March the 10th you
2 see.
3     Q. So you were late for work one of
4 those days?
5     A. Yeah, but it's not accurate on
6 here. Let's go back. Let's -- you know, no, I
7 don't agree with this. I don't.
8     Q. And I see this was also signed --
9 you refused to sign it. Why did you refuse to
10 sign this document?
11     A. I don't -- I don't know what -- I
12 don't know what they're talking about. Refused
13 to sign what document? I don't even talk like
14 that. Who wrote -- who wrote -- who wrote this?
15 Who wrote this Alex just kept saying okay, my
16 bag, won't happen again. Who wrote that? Who
17 wrote that down?
18     Q. So did you say --
19     A. No, I don't --
20     Q. Do you deny saying okay --
21     A. I don't -- I don't talk like that,
22 okay, my bag. I don't talk like that.
23     Q. So who --
24     A. I don't talk like that.
25     Q. Who --

20 (Pages 74 - 77)

Page 78

1    A.  That's not how I talk.  Whoever
2  wrote that, that's -- that's their language.  I
3  don't talk like that.  I do not talk like that,
4  okay, my bag.  That's not -- I don't -- I don't
5  use that type of verbiage or whatever.  I don't
6  even know what you call it.  I don't talk like
7  that.
8    Q.  I see Ms. Williams' signature on
9  there.  Was Ms. Williams your supervisor?
10    A.  Yeah, she wrote that.  She was the
11  manager.
12    Q.  Why would she include false
13  information in a document about you?
14    A.  Because, like I said, she wanted to
15  get me out of there.  So she --
16    Q.  Why did she want you out of there?
17    A.  She's doing a paper trail.  That's
18  what they do.
19    Q.  Why did she want --
20    A.  I talked about that.
21    Q.  But why did she want to get you out
22  of there?  What has she got against you?
23    A.  I don't know what she had against
24  me.  I can't answer that.  I guess because she
25  said that I wasn't doing -- see, see, it said in

Page 79

1  that previous statement Alex completed ten of
2  the 12 rooms.  Because why?  The beds were made.
3  The beds were made.
4    Q.  I'm just -- I'm just confused.  Why
5  did she want to get rid of you?  What did
6  Ms. Williams have against you?  Why did she want
7  to get rid of you?
8    A.  I can't answer that question.
9  That's something you'd have to ask her.
10    Q.  Was she --
11    A.  I'm -- I'm only -- I only know that
12  when they asked me to do those rooms, make those
13  beds, when I wasn't able to make those beds, she
14  got mad.  I wasn't able to make the beds.
15    Q.  Did you ever -- are you done?  I'm
16  sorry.
17    A.  Go ahead.
18    Q.  Did you ever tell Ms. Williams
19  about your previous sexual relationship with
20  Ms. Craddock?
21    A.  Yeah, she knew.
22    Q.  How did she know?
23    A.  I told her.
24    Q.  When did you tell her?
25    A.  I don't know the date, but I told

Page 80

1  her.
2    Q.  Did you tell her after you started
3  working at the --
4    A.  Yes.
5    Q.  Approximately when did you tell
6  her?
7    A.  I can't -- I don't know the date.
8  I can't recall the date.
9    Q.  Was it before or after March 10th
10  of 2021?
11    A.  Probably before.
12    Q.  Tell me everything you remember
13  about the conversation when you told her this.
14    A.  I just told her.
15    Q.  Why did you tell her?
16    A.  Because she was trying to bring --
17  she was trying to play people against people.
18  In other words, she -- you know, make a long
19  story short, she tried to make people argue.
20  Not a good workplace.  So, basically, you know,
21  she did things.
22    Q.  Who is the she in that sentence?
23    A.  We were talking about Nikki, right?
24    Q.  Yeah.  That's Ms. Williams?
25    A.  That's her name.  I think it's

Page 81

1  Vela, whatever.  Something with a V, yeah.
2    Q.  So I'm just confused.  Why did --
3  why did you tell Ms. Williams that you had a
4  prior sexual relationship with Ms. Craddock?
5    A.  Because, you know, if -- you know,
6  you are trying to make me and Rhonda not friends
7  because she doesn't like me, because she's mad
8  because I'm not doing the job.  I'm not able to
9  perform it, so she's mad.  And I told her I'll
10  do anything else, but I can't make those beds
11  every day.
12    So she was trying -- she was having
13  her write me up, and I said, you know, you --
14  you know, hey, this is what's going on.  How can
15  you -- how can you do that, you know.  So that's
16  how that happened.
17    Q.  Were you treated differently by the
18  defendant in this case on the basis of your
19  gender?
20    A.  Who are we talking about?
21    Q.  Well, Ms. Williams, did she treat
22  you differently than she treated women?
23    A.  I don't know what kind of question
24  that -- I don't know what kind of question that
25  is.  Of course she did.  She's a woman.  Women

Page 82

1  talk to women different than they do men, so of
2  course. I'm quite sure.
3      Q.  Okay.  How did Ms. Williams
4  discriminate against you on the basis of your
5  gender?
6      A.  I didn't -- I didn't say she
7  discriminated against me on my gender.  You
8  asked me did she treat me different.  I said she
9  treated me different because I was a male.  You
10 know, just different in conversation.  Like
11 women say hey, girl, how are you doing.  She
12 wouldn't say hey -- you know, she would say hey,
13 Alex, how are you.  And that's -- stuff like
14 that, that was it.
15     Q.  So did anyone at Kings Inn & Suites
16 discriminate against you on the basis of your
17 gender during your employment?
18     A.  No, not because I'm a man.
19     Q.  Did anyone discriminate against you
20 because you had had a previous sexual
21 relationship with Ms. Craddock?
22     A.  I can't answer that.
23     Q.  Did anyone insult you on the basis
24 of your disability?
25     A.  Give me an example of what you mean

Page 83

1  insult.
2      Q.  Well, in your complaint, paragraph
3  48, you wrote as a result of being constantly
4  harassed and insulted on the basis of his
5  disability during his employment at Kings Inn.
6  So who constantly harassed and insulted you on
7  the basis of your disability?
8      A.  Nikki and, you know, Gini.
9      Q.  And what did they do?
10     A.  Just -- just -- just -- just --
11 just give me tasks to do knowing that I couldn't
12 do them -- knowing that I can't do them.
13     Q.  How is that an insult?
14     A.  Well, it's an insult when you're
15 doing it and then you go and talk to other
16 people and you're talking about me in front of
17 other people.  That's very insulting.  You're
18 discussing it with the other people, and you're
19 discussing it with Rhonda at that time.  That
20 was very -- that was very insulting.
21     (Thereupon, Exhibit G, March 15,
22 2021, statement of Gini Kaur, having been
23 previously marked, was presented for purposes of
24 identification.)
25 BY MR. ENGEL:

Page 84

1      Q.  Let's go back to this timeline
2  here.  I'm going to show you a document which we
3  previously marked as Exhibit G from Ms. Kaur.
4  Could you please review this document and tell
5  me if anything in there is not 100 percent true
6  and accurate?
7      A.  Now, what was your question?
8      Q.  Is there anything in this document
9  that is not true and accurate?
10     A.  None of it.
11     Q.  So why would Ms. Kaur --
12     A.  I didn't create -- I did not create
13 a hostile work environment.  Again, I have to
14 keep saying the same thing.  I wasn't able to
15 make the beds.
16     Q.  So why on March 15th of 2021 would
17 Ms. Kaur create a false document?
18     A.  What do you mean?
19     Q.  Why would she do this?  Why would
20 she go to all the trouble --
21     A.  Okay.  So why -- so why would
22 you -- you're going to do you on March the
23 15th, but why would you -- why would you do it
24 then and this happened back in January.  You
25 understand what I'm saying?  If all this stuff

Page 85

1  happened -- if all this stuff happened back
2  then, you should have let me go, right.  I would
3  have been okay, fine.  Yeah, I was.  I was
4  nasty, rude, disrespectful.  Okay, fine.  I did
5  deserve that.  I do deserve getting fired.  But
6  this is bull crap, and you know it.
7      Q.  Why would they go to the trouble of
8  making all of this up just to --
9      A.  Why wouldn't they?  Why wouldn't
10 they?  Why wouldn't they?
11     Q.  I don't know.  You brought the
12 lawsuit.  You tell me.
13     A.  They think I'm a weakling.  They
14 think hey -- hey, I needed the money.  I needed
15 the freaking job.  I drove 40 some freaking
16 miles every day to work.  Every day.  So you
17 didn't think I needed the job.  You don't think
18 I'm going to do a good job.  You don't think
19 that they hired me because I was good at what I
20 do.  Of course they did.
21     But when I wasn't able to make
22 those beds every day, what I wasn't hired to do,
23 then they got mad.  When I started speaking out,
24 hey, I can't do that, that's a lot.  Hey, let me
25 pull -- let me have somebody help.  If I'm a

22 (Pages 82 - 85)

Page 86

1 supervisor, I should be able to pull somebody
2 off a task and say hey, I need you to come over
3 here and do this and help me, and then I'll
4 figure out some way and I'll have everybody get
5 some work done to make the load less for me.
6 I'm supervising. That's what a supervisor does,
7 they supervise.
8       But you're not going to have me
9 making 14 freaking beds every day and going
10 around and supervise and do -- there's no
11 freaking way. They're not doing it, and they
12 didn't do it.
13       Q. Can you think of any other reason
14 that they would have --
15       A. No.
16       Q. -- made up all of this?
17       A. No. No, that's a definite in a
18 nutshell.
19       (Thereupon, Exhibit H, March 18,
20 2021, statement of Gini Kaur, having been
21 previously marked, was presented for purposes of
22 identification.)
23 BY MR. ENGEL:
24       Q. All right. Then on March 18th,
25 2021, in a document that we previously marked as

Page 87

1 Exhibit H, there is an allegation that a guest
2 complained about you. Did that happen?
3       A. Listen, that was bogus too, and
4 I'll tell you about what happened about that.
5 The guest complained. Let me tell you what
6 happened. Here was the rule, that if a guest
7 asked for towels, then I had to get the towels
8 back from the previous guest before I was able
9 to give out more towels.
10       So this guy asked me -- which they
11 had been smoking marijuana and stuff in the
12 room, which you're not supposed to, okay. So I
13 said -- he says can I get -- I said yes, sir, no
14 problem, I said but let me get those other
15 towels. Oh, and they -- and these towels on
16 this cart or wherever it was they were going,
17 they were going somewhere else. I said well,
18 here, let me get -- no, don't take those. I
19 said let me give you these other ones. I said
20 we're taking these to another room, another
21 guest. He gets mad. He goes down there,
22 complains.
23       Hey, you get complaints. You're in
24 the hotel industry. And I didn't act rude.
25 That was somebody, a guest, not even -- not even

Page 88

1 credible.
2       Q. So, again, can you think of a
3 reason why Ms. Kaur would create false
4 information about you?
5       A. I didn't say that was false. I
6 said that was true. I remember that guest.
7       Q. Okay.
8       A. I don't have -- I don't have bad
9 interactions, okay. I don't have bad
10 interactions. I remember that guy. Yeah, he
11 wanted to fight. I said this dude is crazy. I
12 said why don't you put him out of the hotel.
13 She didn't want to put him out of the hotel.
14 She wanted me and him to have a confrontation.
15 So I said okay, no problem. I didn't serve that
16 room the whole time they was there.
17       Q. Why did she --
18       A. That is correct.
19       Q. Why did she want you to have a
20 confrontation --
21       A. I can't -- I can't answer that.
22 Because she didn't want me to be there. You're
23 going to keep asking me the same questions and
24 revamping them. My answer is not going to
25 change. She didn't want me there, so she's

Page 89

1 doing everything in her little -- in her little
2 tricks.
3       (Thereupon, Exhibit I, statement of
4 Nikki Williams, having been previously marked,
5 was presented for purposes of identification.)
6 BY MR. ENGEL:
7       Q. Okay. So next we're going to show
8 you a document that we previously marked as
9 Exhibit I, I believe, which is a March 26, 2021,
10 statement from Nikki Williams describing the
11 reason for your separation. Would you please
12 review this document and tell me if anything in
13 this document is not accurate? And let me know
14 if you need me to scroll.
15       A. No, that's not correct.
16       Q. What in this document is not
17 correct?
18       A. It's not.
19       Q. Anything in particular in this
20 document that's not accurate?
21       A. None of it. None of it.
22       Q. Why would Ms. Williams create a
23 document with false information in it?
24       A. My answer is not going to change.
25       Q. But it's true that you were

23 (Pages 86 - 89)

Page 90

1 terminated then or on about March 26th of 2021?
2      A.  That's correct.
3      Q.  Do you believe that you were
4 terminated on the basis of your gender?
5      A.  On the basis of me being a man?
6      Q.  Yeah.
7      A.  Why would -- I don't know.  I don't
8 understand the question.
9      Q.  Let's show you the amended
10 complaint, paragraph 69.  Well, let's start with
11 paragraph 58.  Defendant discriminated against
12 Moore on the basis of his gender throughout his
13 employment with the company.  How did the
14 defendant discriminate against you on the basis
15 of your gender?  You need to answer, sir.
16      A.  I can't answer that right now.
17      Q.  Paragraph 57, defendant treated
18 Moore differently than other similarly situated
19 employees based on his gender.  How were you
20 treat differently than other similarly situated
21 employees based on your gender?
22      A.  Well, I should say more of the
23 disability.
24      Q.  We'll talk about that in a minute.
25 We're focusing -- this is your gender complaint.

Page 91

1 You said -- remember you told me earlier you
2 read this, and you said it was 100 percent
3 accurate.  You're claiming as we sit here today
4 defendant treated you, quote, differently than
5 other similarly situated employees based on his
6 gender, end quote.  Tell me how.
7      A.  Well, making me feel -- making me
8 feel like, you know, since I'm a man, I should
9 be able to do more and handle more, but that
10 wasn't -- you know, that was -- if I was able
11 to, I would have done more when I was physically
12 able, so --
13      Q.  Any other way you were treated
14 differently than other --
15      A.  No.
16      Q.  -- similarly situated --
17      A.  No.
18      Q.  And who are those similarly
19 situated employees that you're referencing in
20 paragraph 57?
21      A.  Who are they?  I don't know their
22 names.
23      Q.  Yeah, which human beings?
24      A.  What do you mean which human
25 beings?  I don't know those human beings.  I

Page 92

1 don't know their names.  They don't even work
2 there anymore.  These were people that were paid
3 under the table.
4      Q.  Well --
5      A.  These people were not --
6      Q.  Respectfully, sir, it's your
7 complaint.  You said there were other similarly
8 situated employees who were treated differently.
9 I want to know who those human beings are.
10      A.  Okay.  A lady named Chris.  She --
11 she had some kind of -- I don't know what was
12 going on with her.  She was disabled, but she --
13 she worked under the table.  She got paid cash
14 though.  She -- they had her vacuuming and
15 different things like that.  But since I was a
16 man, they made me vacuum, clean rooms, strip
17 rooms.  So that's how the difference came as far
18 as that.  They figured since I was a man, I
19 should have been able to do more.  So that's
20 where the discrepancy comes in at.
21      Q.  Were there any women who were asked
22 to strip beds and clean rooms?
23      A.  Yeah.  They didn't do it.
24      Q.  Then in paragraph 59, you say
25 Craddock treated Moore differently on the basis

Page 93

1 of a previous romantic relationship.
2      A.  Of course she did.
3      Q.  Describe that for me.
4      A.  Again, she was -- of course, she's
5 trying to keep her job.
6      Q.  Well, how would keeping her job
7 affect the fact that you had a previous romantic
8 relationship?
9      A.  She's trying to keep her job.  If
10 they are -- listen, she treated me different,
11 all right --
12      Q.  How?
13      A.  -- after all this -- after all this
14 stuff went down.
15      Q.  How?
16      A.  She wrote me up writing bogus crap.
17 That's what happened.
18      Q.  Did you ever report sexual
19 harassment to your supervisor?
20      A.  No.
21      Q.  Did you ever report disability
22 discrimination to your supervisor?
23      A.  Disability, no, I did not.
24      Q.  Did you ever report a failure to
25 accommodate you to your supervisor?

24 (Pages 90 - 93)

Page 94

1   A.  What do you mean?  They're the ones
2  that failed to accommodate.
3      Q.  Did you ever report that to someone
4  up the chain?
5      A.  Who is up the chain?  That's
6  privately owned.  This -- there's no calling --
7  that's the problem.  There's no calling in to HR
8  management in Oklahoma City or California
9  somewhere.  That's the issue.
10     Q.  I'm just asking --
11     A.  I'm answering your question.  It's
12 privately owned.  So did I go up the chain?  No,
13 because the chain stops at Gini.  Gini is the
14 owner's daughter.  She stayed in the place.  She
15 stayed in the hotel.  Nikki was running it.
16 Rhonda was the housekeeping supervisor.  So, no,
17 the chain stops right there.  That answers your
18 question.
19     Q.  Did you ever -- did you ever make a
20 formal complaint to Ms. Kaur about a failure to
21 accommodate your disability?
22     A.  What did I just tell you?  She
23 knew.  The answer is yes.  The chain stops
24 there.
25     Q.  Did you ever make that complaint in

Page 95

1  writing?
2      A.  No, because there's -- they don't
3  have stuff like that there.  They don't have
4  paperwork like that.  That's why I went to my
5  doctor and got a light duty.  When I got that,
6  that's when all this paper trail stuff started.
7  That's when they started doing it.  You know,
8  it's too much.  Very stressful.
9          MR. ENGEL:  All right.  I have no
10 further questions at the moment.  We might have
11 to come back when we get medical records, but
12 for now that's all I have.  I'll turn it over to
13 my learned colleague.  Thank you for your time.
14         MR. LONG:  Can we take a break for
15 five minutes?
16         MR. ENGEL:  Sure.
17         MR. LONG:  Thanks.
18         (Recess taken.)
19         MR. LONG:  Back on the record.
20         REDIRECT EXAMINATION
21 BY MR. LONG:
22     Q.  Mr. Moore, I just have a few
23 follow-up questions.  You mentioned earlier in
24 your deposition that you -- you were facing
25 financial stress after you were terminated.  Can

Page 96

1  you just describe to me what that financial
2  stress -- how that affected your emotions and,
3  you know, any physical manifestations that that
4  stress had on you?
5      A.  Okay.  Well, you know, not able
6  to -- worried about how you're going to, you
7  know, make -- meet your bills and make ends
8  meet.  It was very stressful for me not -- you
9  know, putting in applications, and even putting
10 them down where you worked.  People know people,
11 and it was -- I had a heck of a time trying to
12 get -- you know, getting hired.  You know, my
13 car note was due at that time, everything.  It
14 just seemed like the bottom was falling in.
15     Q.  And what was your emotional state,
16 you know, during that time period when you were
17 facing those problems?
18     A.  My emotional state was very -- it
19 was very depressing, because, again, you don't
20 want to have to look -- or to turn to family.
21 They have issues of their own.  And so that made
22 it a very challenging time.
23     Q.  Did you have any anxiety about
24 having to pay bills and not being able to meet
25 your financial obligations during that time?

Page 97

1      A.  I -- it did create a lot of
2  anxiety, because I didn't know where -- again,
3  where the next dollar was coming from, and, you
4  know, talking to the different bill collectors,
5  some nice, some not so nice.  You know, some
6  things, cards, got shut down because of that,
7  so, you know --
8      Q.  Were you past due on any of your
9  bills?  Did you have any, you know, electricity
10 turned off, cell phone turned off, anything like
11 that?
12     A.  I had -- yeah, I was late with my
13 vehicle.  Yeah, I was late with a lot.  I didn't
14 have my lights or anything turned off, but I was
15 definitely late with car payments and stuff like
16 that, so -- yeah, and the credit card, that
17 just -- because, you know, people live off their
18 cards.  So, you know, I used that, and then I
19 was -- like every other week I would just pay it
20 and then reuse it again.  So that really put me
21 in a bind.
22     Q.  When you first started working at
23 Kings Inn, did you have any problems initially
24 when you started working there?
25     A.  No, everything was great.  In fact,

Veritext Legal Solutions
www.veritext.com                                          888-391-3376

Page 98

1 they were happy to get me, because, again, we
2 all had worked together. We were -- you know, I
3 thought we were all friends. You know, I
4 thought we were, you know, a work family, quote,
5 unquote.
6      They was glad to get me, because
7 they knew they would get the job done, you know,
8 as far as the cleanliness of the hotel. Because
9 they were suffering in that aspect with points.
10 They were trying to build up their clientele, so
11 that's what was going on.
12      Q. So when you first started, what
13 were your job duties?
14      A. My job duties were to make sure
15 that the lobby was clean, make sure that the
16 upstairs, the different floors were clean and
17 vacuumed, and, you know, different things like
18 that, the windowsills were free of debris,
19 bathrooms in the lobbies were cleaned. Just
20 mainly the -- what they call the public areas.
21 I was in charge of public space.
22      Q. When did your job duties, your
23 assignment, start to change?
24      A. At the point where they needed more
25 staff. So when they needed more staff, I was

Page 99

1 okay with, you know, doing more things. I
2 said -- I said what do you need me to do. I
3 said I'll do anything. What do you need me to
4 do? They said well, we need you to inspect some
5 rooms. I said okay. I said is there going to
6 be a pay difference? They said yes. I said
7 okay, well, I'll do it. And that's where
8 that -- that's where that -- that's where that
9 came in at.
10      Q. Did you ever -- when -- do you
11 recall when those job duties started to change?
12      A. That was around November. That was
13 around November that it changed. After
14 December, Christmas party time, that's when --
15 after -- really around December, that's when
16 things started to change.
17      Q. Before your job duties changed, did
18 you have any issues at all working there?
19      A. No. No. In fact, I liked -- in
20 fact, I liked the little place. It wasn't a bad
21 hotel, it was just a drive. It was almost an
22 hour. And traffic -- you know, I had to leave
23 my house at least an hour and 15 minutes
24 sometimes because you never knew how Cincinnati
25 traffic would be, 275 going that way. So

Page 100

1 actually I liked that place.
2      Q. In February 2021, what were your
3 job duties like at that time?
4      A. Like hell, because they were giving
5 me tasks that I just could not -- I could not
6 complete. The tasks -- some of the tasks that I
7 couldn't complete, again, they were the cleaning
8 of the seven, eight, ten rooms, and then still
9 wanting me to clean and to take care of the
10 public space, and that -- that can be difficult
11 for anyone.
12      Q. So you mentioned that you had
13 worked with Nikki in the past. When did you
14 work with her?
15      A. I worked with her at Holiday Inn in
16 West Chester, but she worked in the restaurant
17 department and I worked in the housekeeping
18 department.
19      Q. Did you have any friendship or
20 regular interactions with her when you were both
21 working there?
22      A. You know, I'm not going to say
23 friendship, but what I'm going to say is
24 friendliness. So we got to the point, you know,
25 we'd speak all the time. Then we got to the

Page 101

1 point to where, you know, sometimes she would
2 invite me to different little things privately,
3 like her and one of her other -- one of her
4 other friends and me and Rhonda that we all went
5 to. And we would have lunch, you know,
6 sometimes, and just do different things like
7 that a few times. But I didn't -- I didn't
8 really want to hang out with her, because, you
9 know, she was -- she was, you know, a little bit
10 older than me.
11      Q. Uh-huh. Did she know that you had
12 problems with your back when you were both
13 working at Holiday Inn before Kings Inn?
14      A. Oh, yeah. Yeah. Oh, yeah. Oh,
15 yeah. Every -- even when I was at Holiday Inn,
16 they knew. They respected that. They knew
17 and -- but I still got the job done, and, you
18 know, I was able to perform.
19      Q. When your job duties changed, you
20 know, around February of 2021, did you mention
21 to Nikki that, you know, you were having
22 problems due to your back with the job duties
23 that they were assigning?
24      A. Yes. And she says well, just do
25 the best you can, and I said okay. So then I

Page 102

1 would do the best that I could, so it wasn't --
2 it wasn't good enough.  So I said well, you
3 know -- you know, I'll try harder the next day.
4 But one particular day, I just couldn't --
5 couldn't get out of bed.  Just I was aching.
6 And I went to work, and I said, you know, I've
7 got to go to my doctor.
8        And I was talking to my doctor, and
9 that's -- he said, you know, you need to be on
10 light duty, he said, because all your tissue is
11 inflamed back here.  He said you can't do that.
12 Everything is inflamed.  I said well, I said, if
13 I don't do it, you know, I'll lose my job.
14        He said well, we'll have -- we'll
15 put you on light duty for a little bit and see
16 how things go and then -- until your back
17 gets -- you know, it's not inflamed, and we'll
18 go from there.  I said okay, fine.  And then,
19 you know, that was it.
20     Q.   At any time did Nikki or Gini
21 provide you with any paperwork or ask you for
22 any paperwork for a request for an accommodation
23 under the ADA?
24     A.   Under the ADA?  No.  I did give her
25 the paper from the doctor.  But they didn't give

Page 103

1 me any paperwork to fill out, no.
2     Q.   So after you told them that, you
3 know, you were having problems with your back,
4 and, you know, you had limitations, they never
5 gave you any documentation or asked you to fill
6 out any forms?
7     A.   No.
8     Q.   So the form that you provided, you
9 created that on your own with -- in conjunction
10 with your doctor?  They never provided you
11 anything to fill out, correct?
12     A.   No.  That's correct.
13     Q.   At any time do you recall saying to
14 Gini that she was being racist and treating you
15 different based on your race in terms of
16 following you around and monitoring, you know,
17 what you were doing every day?
18     A.   Well, here -- here was -- yeah.
19 Well, to go back, yeah, because, see, she was --
20 you know, she would say little things like in
21 reference to black people, like something is
22 missing or something of that nature.  And, you
23 know, we had a little break area that -- we used
24 to sit in there, and she didn't -- she didn't
25 want anybody -- well, she didn't say she didn't

Page 104

1 want anybody.  She said she didn't want me
2 sitting in there.  And she said well, things is
3 coming up missing.  Okay.  Well, I was the, you
4 know, only black people there, you know.  I just
5 felt like okay, so what are you saying like.
6        And I made a comment, I don't have
7 to come all the way, 40 some miles, to steal
8 anything.  That would be stupid, you know.
9 Whatever it is, it's not worth it, you know.
10 So, no, she made little weird comments.  She was
11 different.
12     Q.   Did anyone ever give you any
13 guidance or tell you if you wanted to report any
14 complaints about discrimination in any way how
15 you were supposed to do that?
16     A.   No.  No.  You talk -- you talk to
17 Nikki.  You know, it's just talk.  See, it's
18 privately owned, so it goes from Nikki to Gini,
19 which is the daughter -- owner's daughter.  So
20 it goes from there to there to nowhere.  That's
21 just it.  It goes from there to there to
22 nowhere, and that's just it and that's all.
23        I was just really trying to hang in
24 there to find another job, but I just wasn't
25 able to.  They just fired me before I was able

Page 105

1 to.
2        MR. LONG:  I don't have any further
3 questions.
4        MR. ENGEL:  I have no follow-up.
5 Thank you very much.
6        MR. LONG:  Thank you for your time,
7 Mr. Moore.  We'll read.
8        (Thereupon, the deposition was
9 adjourned at 11:40 a.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

27 (Pages 102 - 105)

**Page 106**

1  STATE OF OHIO        )
2  COUNTY OF MONTGOMERY ) SS:  CERTIFICATE
3        I, Karen M. Rudd, a Notary
4  Public within and for the State of Ohio, duly
5  commissioned and qualified,
6        DO HEREBY CERTIFY that the
7  above-named DEMOND ALEXANDER MOORE, was by me
8  first duly sworn to testify the truth, the whole
9  truth and nothing but the truth.
10        Said testimony was reduced to
11  writing by me stenographically in the presence
12  of the witness and thereafter reduced to
13  typewriting.
14        I FURTHER CERTIFY that I am not a
15  relative or Attorney of either party, in any
16  manner interested in the event of this action,
17  nor am I, or the court reporting firm with which
18  I am affiliated, under a contract as defined in
19  Civil Rule 28(D).
20
21
22
23
24
25

**Page 107**

1      IN WITNESS WHEREOF, I have hereunto set
2  my hand and seal of office at Davton, Ohio, on
3  this 12th d
4        _Karen M. Rudd_
       _____
5        _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
       KAREN M. RUDD
6        NOTARY PUBLIC, STATE OF OHIO
       My commission expires 5-21-2027
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 108**

1        Veritext Legal Solutions
         1100 Superior Ave
2        Suite 1820
         Cleveland, Ohio 44114
3        Phone: 216-523-1313
4
   July 19th, 2023
5
   To: Samuel L. Long
6
   Case Name: Moore, Demond v. Next Generation Hospitality LLC
7
   Veritext Reference Number: 5930169
8
   Witness:  Demond Alexander Moore     Deposition Date:  7/7/2023
9
10 Dear Sir/Madam:
11
   The deposition transcript taken in the above-referenced
12
   matter, with the reading and signing having not been
13
   expressly waived, has been completed and is available
14
   for review and signature.  Please call our office to
15
   make arrangements for a convenient location to
16
   accomplish this or if you prefer a certified transcript
17
   can be purchased.
18
19 If the errata is not returned within thirty days of your
20 receipt of this letter, the reading and signing will be
21 deemed waived.
22
23 Sincerely,
24 Production Department
25
   NO NOTARY REQUIRED IN CA

**Page 109**

1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
        ASSIGNMENT REFERENCE NO: 5930169
3        CASE NAME: Moore, Demond v. Next Generation Hospitality LLC
        DATE OF DEPOSITION: 7/7/2023
4        WITNESS' NAME: Demond Alexander Moore
5        In accordance with the Rules of Civil
        Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
        I have made no changes to the testimony
7  as transcribed by the court reporter.
8
        _____
9  Date           Demond Alexander Moore
10      Sworn to and subscribed before me, a
        Notary Public in and for the State and County,
11  the referenced witness did personally appear
        and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
        Statement; and
14      Their execution of this Statement is of
        their free act and deed.
15
        I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
18      _____
        Notary Public
19
        _____
        Commission Expiration Date
20
21
22
23
24
25

Page 110

1        DEPOSITION REVIEW
        CERTIFICATION OF WITNESS

2

     ASSIGNMENT REFERENCE NO: 5930169
3   CASE NAME: Moore, Demond v. Next Generation Hospitality LLC
     DATE OF DEPOSITION: 7/7/2023
4   WITNESS' NAME: Demond Alexander Moore
5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7    I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9    I request that these changes be entered
   as part of the record of my testimony.
10
     I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13 _____  _____
   Date        Demond Alexander Moore
14
     Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17    They have read the transcript;
    They have listed all of their corrections
18  in the appended Errata Sheet;
    They signed the foregoing Sworn
19  Statement; and
    Their execution of this Statement is of
20 their free act and deed.
21   I have affixed my name and official seal
22 this _____ day of_____, 20____.
23 _____
     Notary Public
24
25    Commission Expiration Date

Page 111

1       ERRATA SHEET
    VERITEXT LEGAL SOLUTIONS MIDWEST
2     ASSIGNMENT NO: 7/7/2023
3  PAGE/LINE(S) /    CHANGE    /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19

   _____  _____
20 Date       Demond Alexander Moore
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23 _____
     Notary Public
24

25    Commission Expiration Date

Veritext Legal Solutions

Ohio Rules of Civil Procedure

Title V. Discovery

Rule 30

(e) Submission to Witness; Changes; Signing.
When the testimony is fully transcribed, the
deposition shall be submitted to the witness for
examination and shall be read to or by the witness,
unless examination and reading are waived by the
witness and by the parties. Any changes in form or
substance that the witness desires to make shall be
entered upon the deposition by the officer with a
statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness, unless the parties by stipulation
waive the signing or the witness is ill, cannot be
found, or refuses to sign. The witness shall have
thirty days from submission of the deposition to
the witness to review and sign the deposition. If
the deposition is taken within thirty days of a
trial or hearing, the witness shall have seven days
from submission of the deposition to the witness to
review and sign the deposition. If the trial or
hearing is scheduled to commence less than seven
days before the deposition is submitted to the
witness, the court may establish a deadline for the

witness to review and sign the deposition. If the deposition is not signed by the witness during the period prescribed in this division, the officer shall sign it and state on the record the fact of the waiver or of the illness or absence of the witness or the fact of the refusal to sign together with the reason, if any, given therefor; and the deposition may then be used as fully as though signed, unless on a motion to suppress the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.