Page 1

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF OHIO

3                        *   *   *

4    DEMOND MOORE,

5          Plaintiff,

6          vs.                CASE NO. 1:22-CV-00548

7    NEXT GENERATION

8    HOSPITALITY, LLC,

9          Defendant.

10                       *   *   *

11          Deposition of GAGANPREET KAUR, Witness

12   herein, called by the Plaintiff for

13   cross-examination pursuant to the Rules of Civil

14   Procedure, taken before me, Karen M. Rudd, a

15   Notary Public in and for the State of Ohio, via

16   Zoom at 1297 Cobblestone Chase, Westlake, Ohio,

17   on Thursday, July 6, 2023, at 10:00 a.m.

18                       *   *   *

19

20

21

22

23

24

25

Page 2

1            EXAMINATIONS CONDUCTED    PAGE
2   BY MR. LONG:..........................    5
3   BY MR. ENGEL:.........................    89
4   BY MR. LONG:..........................    119
5
6            EXHIBITS MARKED
7   (Thereupon, Exhibit A, February 8,
8   2021, incident report email, was
9   marked for purposes of
10  identification.)......................    48
11  (Thereupon, Exhibit B, February 8,
12  2021, incident report, was marked
13  for purposes of identification.)......    50
14  (Thereupon, Exhibit C, statement of
15  Rhonda Craddock, was marked for
16  purposes of identification.)..........    55
17  (Thereupon, Exhibit D, February 9,
18  2021, Employee Disciplinary Action
19  Form, was marked for purposes of
20  identification.)......................    56
21  (Thereupon, Exhibit E, March 10,
22  2021, Employee Write Up, was marked
23  for purposes of identification.)......    61
24
25

Page 3

1   (Thereupon, Exhibit F, March 13,
2   2021, Authorization for Light Duty,
3   was marked for purposes of
4   identification.)......................    65
5   (Thereupon, Exhibit G, March 15,
6   2021, statement of Gini Kaur, was
7   marked for purposes of
8   identification.)......................    69
9   (Thereupon, Exhibit H, March 18,
10  2021, statement of Gini Kaur, was
11  marked for purposes of
12  identification.)......................    72
13  (Thereupon, Exhibit I, statement of
14  Nikki Williams, was marked for
15  purposes of identification.)..........    75
16  (Thereupon, Exhibit J, Defendant's
17  Response to First Set of Requests
18  for Discovery, was marked for
19  purposes of identification.)..........    85
20  (Thereupon, Exhibit K, job
21  application, was marked for purposes
22  of identification.)...................    92
23  (Thereupon, Exhibit L, Complaint,
24  was marked for purposes of
25  identification.)......................    118

Page 4

1  REMOTE APPEARANCES:
2    On behalf of the Plaintiff:
3        Spitz Law Firm
4    By: Samuel L. Long
         Attorney at Law
5        710 East Main Street
         Suite 104
6        Lexington, Kentucky 40502
         859 469-6202
7        sam.long@spitzlawfirm.com
8    On behalf of the Defendant:
9        Engel and Martin
10   By: Joshua Adam Engel
         Attorney at Law
11       4660 Duke Drive
         Suite 101
12       Mason, Ohio 45040
         513 445-9600
13       engel@engelandmartin.com
14  ALSO PRESENT REMOTELY:
15       Trisha Breedlove
16
               * * *
17
18
19
20
21
22
23
24
25

Page 5

1            GAGANPREET KAUR
2   of lawful age, Witness herein, having been first
3   duly cautioned and sworn, as hereinafter
4   certified, was examined and said as follows:
5            CROSS-EXAMINATION
6   BY MR. LONG:
7        Q.  Good morning.  My name is Sam Long.
8   I'm an attorney for the plaintiff, Mr. Moore.
9   Before we get started today, I'm going to go
10  over some ground rules.
11       We have a court reporter here
12  taking down everything that's being said, so
13  please give your answers out loud, verbally.
14  Please avoid shaking or nodding your head.
15  Please respond with a clear yes or no instead of
16  uh-huh.
17       Please avoid using words like he or
18  she.  Try to use proper names where possible.
19  If you need a break at any time today, let me
20  know, and we'll go off the record and come back
21  when you're ready.
22       Lastly, we're trying to create a
23  record of everything that's said today, so
24  please allow me to finish asking my question
25  before you start answering, and I'll let you

2 (Pages 2 - 5)

1 finish answering before I move on to my next
2 question.
3      If you don't understand any
4 question that I'm asking today, please let me
5 know, and I can rephrase it or repeat it to make
6 sure that you're answering the question to the
7 best of your knowledge.
8      Do you have any questions about
9 those ground rules or issues?
10     A.  No.
11     Q.  Great.  Can you please state your
12 name and spell it for the record?
13     A.  Yes.  So my full name is Gaganpreet
14 Kaur, so G A G A N P R E E T, and last name is
15 Kaur, K A U R.
16     Q.  And what is your birthday?
17     A. ███████
18     Q.  Are you on any medication that
19 could impact the testimony you're about to give?
20     A.  No.
21     Q.  Is there any other reason why your
22 memory would be impaired today?
23     A.  No.
24     Q.  What's your current address?
25     A.  I already gave that.  Do I need to

1 give that again?
2      Q.  Yes.
3      A.  Okay.  1297 Cobblestone Chase,
4 Westlake, Ohio.
5      Q.  What's the highest level of
6 education you've completed?
7      A.  Master's.
8      Q.  Where did you get your master's
9 from?
10     A.  The Ohio State University.
11     Q.  What was the degree?
12     A.  Master's in healthcare innovation.
13     Q.  What about your bachelor's, where
14 did you go for that?
15     A.  The Ohio State University, a
16 bachelor's in psychology.
17     Q.  And when did you graduate from
18 undergrad?
19     A.  2018.
20     Q.  And what about your master's, when
21 did you finish that?
22     A.  2021.  2020 it should be.
23     Q.  Do you have any other certificates
24 or other training relevant to your position?
25     A.  No.

1      Q.  Have you ever had your deposition
2 taken before?
3      A.  Can you repeat the question again?
4      Q.  Have you ever had your deposition
5 taken before?
6      A.  Like have I ever been in a
7 deposition?
8      Q.  Yes.
9      A.  No.  No.
10     Q.  Have you ever been a party to a
11 lawsuit before?
12     A.  Nope.
13     Q.  Have you ever been arrested for any
14 reason?
15     A.  Nope.
16     Q.  And are you currently represented
17 by counsel in this case?
18     A.  Yes.
19     Q.  What did you do to prepare for your
20 deposition today?
21     A.  I did speak with Josh.
22     Q.  Don't tell me --
23     MR. ENGEL:  I'm going to instruct
24 the witness obviously not to disclose the
25 contents of communications with counsel, but you

1 can go ahead and ask other questions.
2 BY MR. LONG:
3      Q.  Did you review any documents to
4 prepare for today?
5      A.  Yes.
6      Q.  What documents did you review?
7      A.  Whatever is going to be presented
8 today.
9      Q.  So the exhibits that I sent to
10 Mr. -- counsel for the defendant?
11     A.  Yeah.
12     Q.  Did you review any documents on
13 your own to prepare for today?
14     A.  Yes, uh-huh.
15     Q.  What documents did you review?
16     A.  All documents --
17     MR. ENGEL:  Before you answer, I'm
18 just going to caution the witness.  Obviously
19 there was work product and conversations with
20 counsel to prepare for this deposition.  So to
21 the extent that documents were selected by
22 counsel for the witness to review, that would be
23 covered by the work product privilege.  So I'm
24 going to instruct her not to answer this
25 question.

1 BY MR. LONG:
2     Q.  Did you review any documents that
3 weren't provided by counsel for the defendant?
4     A.  No.
5     Q.  Did you review any documents
6 prepared by individuals other than counsel for
7 the defendant?
8     A.  No.
9     Q.  When did you start working at Kings
10 Inn?
11     A.  This was back in May of 2020, as
12 soon as I graduated.
13     Q.  So did you work anywhere else
14 before then?
15     A.  I was a student at The Ohio State
16 University.
17     Q.  When you were hired, what was your
18 position?
19     A.  I was -- it's my dad's hotel, so I
20 was basically an acting owner on the property,
21 and I would say I was a manager, as well.
22     Q.  How long has your family owned that
23 hotel?
24     A.  I think since 2019.
25     Q.  So what was your position title?

1     A.  I was an owner and a manager.
2     Q.  What kind of duties did you have in
3 that role?
4     A.  So with my day-to-day operations, I
5 was in charge of payroll.  I was in charge of
6 hiring employees.  I was also handling all the
7 front desk operations, as well, anything in the
8 background with hiring, HR, and just making sure
9 supplies were there.  So just day-to-day
10 operations there.
11     Q.  Did -- does the company have a
12 different HR representative for employees at
13 all?  Would that be things that you handled?
14     A.  I handled those.
15     Q.  So the plaintiff in this case,
16 Mr. Moore, was terminated on March 16th [sic],
17 2021.  Can you just walk me through what led up
18 to his termination?
19     A.  What date did you say?
20     Q.  March 26th, 2021.
21     A.  Okay, yes.  So --
22         MR. ENGEL:  Objection to the form
23 of the question, but you can go ahead and
24 answer.
25         THE WITNESS:  So this started

1 around February where Alex was not coming -- he
2 wasn't listening to us at all.  He would come to
3 work late.  He was disobedient, wouldn't listen
4 to management, especially me.  He wouldn't
5 listen to me.  He was very disrespectful, rude
6 to staff, as well as guests.
7         So after multiple meetings, after
8 multiple warnings, we just had to let him go.
9 It was affecting our day-to-day operations.  But
10 this all started around February.
11 BY MR. LONG:
12     Q.  When did you make the decision to
13 terminate his employment?
14     A.  On the 26th, uh-huh.
15     Q.  Who was involved in that decision
16 besides yourself?
17     A.  It was -- I had a general manager
18 at that time.  So it was Nikki Williams, uh-huh.
19     Q.  Was there anybody else involved in
20 that?
21     A.  No.
22     Q.  Did you discuss it with your
23 parents or --
24     A.  No.
25     Q.  So who is the owner exactly for the

1 hotel?
2     A.  It's my dad.
3     Q.  Your dad?
4     A.  Uh-huh.
5     Q.  So you didn't discuss the
6 termination with your dad before it took place?
7     A.  Nope.
8     Q.  Other than Nikki, did you speak
9 with anyone else about terminating Mr. Moore?
10     A.  No.
11     Q.  Did you meet with her on the 26th
12 to discuss the termination of Mr. Moore?
13     A.  Yes, we talked about all the
14 reports and the statements that we had, and we
15 terminated him.
16     Q.  Did you consider any other possible
17 discipline other than termination?
18     A.  Can you rephrase that for me?  What
19 was the question?
20     Q.  Yeah.  Did you consider issuing
21 alternative discipline other than terminating,
22 for instance, suspension, or something like
23 that?
24     A.  No.  We already had been down that
25 path for two months.  We sent him home a couple

4 (Pages 10 - 13)

Page 14

1  times, and it just continued to happen. So this
2  was our last resort was terminating him.
3      Q. So when you terminated him on the
4  26th, did you call him into the office, or where
5  did that take place?
6      A. So it was with my manager and I,
7  and he -- from the documents -- from one of them
8  she has listed what took place that day. But he
9  was going to get fired regardless, but it
10 happened in the -- like it happened right there
11 and then.
12      Like he was being very disruptive
13 that day. He came to work late. He wasn't
14 doing anything. Like that was it. That was
15 when we fired him. But that was going to
16 happen, because he was just being very
17 disruptive, so --
18      Q. During that conversation, did you
19 tell him why he was being fired?
20      A. He knew why he was getting fired.
21      Q. After that, did you issue a
22 termination letter, anything similar to that?
23      A. No, we did not.
24      Q. When you were discussing it with
25 Nikki, did she have any other thoughts about

Page 15

1  whether or not to terminate Mr. Moore?
2      A. No.
3      Q. So she was in agreeance with you
4  that he should be terminated?
5      A. He should be terminated, yep.
6      Q. Did she say why she thought that he
7  should be terminated?
8      A. Just based on that two months and
9  everything that unfolded on that day, we --
10 that's why we fired him. He was not -- he was
11 disruptive. He was disobedient, did not listen
12 to us. And that was -- like I said, we just
13 couldn't keep -- we couldn't tolerate that
14 behavior anymore at our workplace, so we had to
15 fire him.
16      Q. Do you recall in specific what
17 happened that day before the termination?
18      A. I don't remember all the details,
19 but from what I remember, it is listed in one of
20 those exhibits, and that was 1:22-cv-00548
21 DEF30. So this is exactly what happened during
22 that day, and so if you want to read that.
23      Q. Okay, we'll go over that later.
24 Other than that document, did you create any
25 documents that day or any notes about the

Page 16

1  termination or reason for it?
2      A. I don't think so, no.
3      Q. Did you ever keep any personal logs
4  or notes about his prior discipline or issues at
5  all?
6      A. No, just what I -- what's presented
7  to you here, that was all I had, uh-huh.
8      Q. Did you have any reservations about
9  terminating him for any reason?
10      A. No.
11      Q. Did Nikki express any reservations
12 about terminating his employment?
13      A. No.
14      Q. So when you had this meeting with
15 him and you told him he was being terminated,
16 what was his response?
17      A. He was combatative [sic]. Like he
18 started walking around. He just left. He
19 didn't even talk to us when we told him that.
20 So that's when all that took place.
21      He was just reckless. Like he
22 would go -- he would just start -- his behavior
23 was very unpredictable. We just didn't know
24 what Alex we would get every day.
25      So, I mean, these are all the

Page 17

1  events that folded that day -- unfolded that
2  day. So he would call me racist like prior to
3  that, but he was just -- it was coming. He did
4  not react well, if that's what you're looking
5  for. He did not react well.
6      Q. When did he call you racist?
7      A. On -- it was in one of -- the
8  documentation on February 9th, on one shift
9  where I was there, and he called me racist
10 multiple times, didn't listen to me.
11      Q. Did he call you racist at any other
12 point?
13      A. Can you rephrase that question
14 again?
15      Q. Yeah. Did he ever say at any other
16 times that you were racist?
17      A. No, that's the only event that I
18 know -- only time I know, uh-huh.
19      Q. So you said he just left the
20 meeting and started walking around. Where did
21 he go?
22      A. In the hotel. He was walking
23 around the rooms, and he just -- he was not
24 listening to us. So eventually he came down,
25 and then he started talking to my manager, and

Page 18

1 that's when kind of events unfolded. Like we
2 just had to fire him, uh-huh.
3     Q.  So who did he talk with?  Would
4 that be Nikki who he talked with?
5     A.  Yeah, but I was there.  I was
6 witnessing everything.
7     Q.  Okay.  So you had the discussion
8 with him, and then he left and walked around,
9 and then he came back for another discussion, or
10 was there just one discussion?
11     A.  I think he was -- that day he was
12 going around.  Like he left our conversation, so
13 we started looking for him.  We couldn't find
14 him.  So then he came down.  He started -- he
15 started arguing with the manager.  They worked
16 previously.  So I guess he started calling her a
17 dirty bitch.  He called her a bitch, and then
18 that was it.  Like we just -- like you're being
19 combatative.  You're threatening us.  We need to
20 have you leave the premises now, so -- yeah.
21     Q.  So did he leave after that
22 conversation?
23     A.  Yeah, he left, and he said I will
24 fucking sue you, or something like that.  You
25 can't fire me, blah, blah, blah.  Yeah.

Page 19

1     Q.  Did you have any discussions with
2 Nikki after that happened about the termination
3 or what he said?
4     A.  No.  I said yeah, he's fired.  I
5 mean, his behavior was like this for two months,
6 so we couldn't tolerate that anymore.
7     Q.  After that day, did Mr. Moore ever
8 contact you or Nikki about his job?
9     A.  No.
10     Q.  Are you still currently working in
11 the same position there?
12     A.  No.
13     Q.  When did you leave?
14     A.  I believe it was in May of '21.
15     Q.  Why did you decide to leave?
16     A.  I just found a job in my field.  I
17 helped my dad for like a year, like seven
18 months, eight months.  So I was ready to go and
19 do something in my field, yeah.
20     Q.  What are you doing now?
21     A.  I'm a health analyst at a health
22 company -- organization.
23     Q.  So that's completely different than
24 your previous role at Kings Inn?
25     A.  Yeah.  Yes, uh-huh.

Page 20

1     Q.  When you were working at Kings Inn,
2 did you have the ability to discipline
3 employees?
4     A.  Yes, uh-huh.  And so did my
5 manager, uh-huh.  Yeah.
6     Q.  If you wanted to issue discipline
7 to an employee, could you just walk me through
8 the steps you would take to do that?
9     A.  We would usually have a meeting,
10 and we would talk about the discipline or the
11 action that has happened that we were
12 disciplining you for.  And then we would write
13 everything down on a paper, and then we would
14 sign it, and he would sign -- like the employee
15 would sign it, as well, so -- yeah.  And after,
16 you know, a few warnings, if it doesn't work
17 out, then, you know, that can lead up to
18 termination.
19     Q.  Does Kings Inn have an actual
20 employee handbook?
21     A.  Yes, we do.  Uh-huh.
22     Q.  Is there a progressive discipline
23 policy in that handbook?
24     A.  I don't know.  I don't recall.
25     Q.  During your time when you were

Page 21

1 working there, did you use a progressive
2 discipline system?
3     A.  I don't know.  Like I don't know
4 what you mean by that.
5     Q.  For instance, you know, the first
6 incident would be a warning, and the second
7 would be a second warning, and then the third
8 would be a termination, or something similar to
9 that.
10     A.  Yeah.  I would say yes, to an
11 extent we did.  But we were also during Covid
12 times, so if employees -- we gave them many
13 chances is what I'm saying.
14     Q.  Was it like a formal system, or was
15 it more informal the way you disciplined
16 employees on a case-by-case basis?
17     A.  It was formal.  It applied to
18 everyone.
19     Q.  Did you document all the discipline
20 you issued to employees with written records?
21     A.  Yes, uh-huh.  I mean, if I didn't,
22 then my manager did, so yes.
23     Q.  And that would be Nikki?
24     A.  Yes, uh-huh.
25     Q.  Would there be anybody else

Page 22

1  involved in the process of issuing discipline to
2  an employee?
3      A.  No.
4      Q.  If you wanted to terminate
5  somebody, what would you -- what are the steps
6  you would take to do that?
7      A.  Like how it would come to
8  termination?  Like what steps?
9      Q.  Yeah.  Like leading up to the
10 decision to terminate and then performing that
11 termination, who would be involved and what
12 steps would you take?
13     A.  Okay.  Well, after multiple like
14 warnings, you know, if the behavior doesn't
15 change, then we look at, you know, all the
16 written statements we have, and from there we go
17 and decide like, you know, this is the fifth
18 time this is happening now, like we can no
19 longer continue with this, so, you know, do we
20 want to keep him or do we want to give him
21 another chance.
22         So that's a discussion that I have
23 with my manager.  And then from there, we, you
24 know, talk to the employee that's getting
25 terminated.  But in Alex's case, he just didn't

Page 23

1  really want to listen to us, so --
2      Q.  Are there any reasons that you
3  would immediately terminate an employee at Kings
4  Island [sic] instead of going through a
5  progressive policy?
6      A.  I'm sorry, can you repeat that
7  question?
8      Q.  Yeah.  If you wanted to immediately
9  terminate somebody at Kings Inn, what would be
10 reasons that you would, you know, conduct an
11 immediate termination rather than issuing
12 warnings and going through the progressive
13 discipline policy?
14     A.  Well, it's like if anyone is being
15 combative, threatening, we just terminate them
16 immediately.  We don't need that behavior on our
17 property.
18     Q.  In your experience, have you
19 terminated other individuals for being
20 combative or insubordinate or anything like
21 that?
22     A.  No.
23     Q.  How many people have you had to
24 terminate at Kings Inn in your experience there?
25     A.  Only one.

Page 24

1      Q.  Only one?
2      A.  Yes.
3         THE WITNESS:  Do you think I could
4  take a break?
5         MR. LONG:  Sure.
6         THE WITNESS:  Okay.
7         MR. LONG:  Five minutes or ten
8  minutes?
9         THE WITNESS:  Five minutes is fine.
10        MR. LONG:  Okay.
11        (Recess taken.)
12 BY MR. LONG:
13     Q.  In your experience there at Kings
14 Inn, do you recall issuing discipline to any
15 employees for any reason?
16     A.  Yes, to Alex, like -- and I don't
17 remember, but like he's the one that I remember
18 the most recent, yeah.
19     Q.  Do you recall anyone else that you
20 might have issued discipline to for any reason?
21     A.  Can you repeat the question again?
22     Q.  Yeah.  Do you recall anyone else
23 that you might have issued discipline to for any
24 reason?
25     A.  No.

Page 25

1      Q.  When you went off the record, did
2  you speak to counsel for any reason?
3      A.  Yes, I did.  Uh-huh.
4      Q.  What is Kings Inn's policy
5  regarding equal employment opportunity?
6      A.  I don't remember.
7      Q.  Was that written somewhere in the
8  employee handbook?
9      A.  I don't remember.  It's been two
10 years.  I -- it should be, but I can't say
11 confidently right now since I'm not there
12 anymore.
13     Q.  In your role, were you responsible
14 for equal employment opportunity and similar
15 antidiscrimination policies?
16     A.  Like, yes, we were aware of those
17 policies, so yes.
18     Q.  In your role, were you responsible
19 for informing employees or training employees on
20 these type of policies that the company had?
21        MR. ENGEL:  I'm going to object to
22 the form.  You can go ahead and answer.
23        THE WITNESS:  Can you repeat?  Like
24 if I did what?
25 BY MR. LONG:

7 (Pages 22 - 25)

Page 26

1     Q. In your role there at Kings Inn,
2 did you have any responsibility to train or
3 inform employees about the company's equal
4 employment opportunity policies and
5 antidiscrimination policies?
6     A. No, I was not doing that.
7     Q. Do you know if anyone else had that
8 responsibility or did that?
9     A. I don't remember. But at the most,
10 my manager was -- Nikki was the most experienced
11 one, so I would have expected her to follow
12 those policies if needed.
13     Q. Do you know if the company's
14 handbook had any policy regarding investigating
15 complaints of discrimination?
16     A. I don't remember.
17     Q. During your time at Kings Inn, were
18 you involved in any investigations of complaints
19 of discrimination?
20     A. No.
21     Q. Did you receive any complaints of
22 discrimination during your time there?
23     A. No.
24     Q. When Mr. Moore said that you were
25 racist, did you interpret that as a complaint

Page 27

1 regarding discrimination --
2     A. No.
3     Q. -- based on his race?
4     A. No, I think he was lashing out at
5 me since I was asking about his work and his
6 daily duties.
7     Q. Did you share that comment with
8 anybody else?
9     A. No, just in that paper, that
10 written paper that I -- the statement that I
11 had. So my manager saw it.
12     Q. So can you -- so when he made that
13 comment, did he say it directly to you, or did
14 he say it to someone else?
15     A. He said it directly to me.
16     Q. Was there anybody else there at
17 that time?
18     A. No, it was just me.
19     Q. And was he just calling you racist?
20 Did he say anything about anyone else being
21 racist?
22     A. No, he just called me racist.
23     Q. Did you say anything in response to
24 that?
25     A. I said Alex, I'm not racist. I'm

Page 28

1 just asking you what you have done. Like this
2 has nothing to do with race. That was my --
3 that's how I responded to him.
4     Q. Did you talk with Nikki about that
5 comment at all?
6     A. I don't remember. I may have, but
7 I don't remember what our conversation was.
8     Q. Do you recall what Kings Inn's
9 policy was regarding accommodations for
10 employees who had disabilities?
11     A. I don't remember the actual policy,
12 but I know for a fact that we did require
13 employees to bring in any forms, any notices
14 that they have from their doctors regarding
15 their disability.
16     Q. So were you in charge of handling
17 that process?
18     A. Both me and my manager, Nikki.
19     Q. So if somebody said, you know, I
20 have a disability, I need an accommodation, can
21 you walk me through the steps that, you know,
22 you would take in response to a request like
23 that?
24     A. Well, we never really were ever in
25 this process. We never really had to really run

Page 29

1 through the process, so -- but I would say at
2 the most case, like if they had a disability,
3 they would let us know, and we would provide
4 them full accommodations, uh-huh.
5     Q. So who would be involved in
6 receiving a request like that or considering it
7 or granting an accommodation?
8     A. Both me and my manager, Nikki, at
9 that time, yeah.
10     Q. Do you recall if Mr. Moore ever
11 requested an accommodation for any reason?
12     A. No.
13     Q. So after you said that you
14 requested employees to submit medical
15 documentation, would you be responsible for
16 reviewing that documentation?
17     A. Me and my manager at that time,
18 Nikki.
19     Q. In your experience there, has
20 anyone submitted a request for an accommodation
21 for any reason?
22     A. No, not that I remember, but -- no,
23 as far as I remember.
24     Q. Do you know if there's anything in
25 Kings Island's policies or the employee handbook

8 (Pages 26 - 29)

Page 30

1 about relationships, romantic relationships,
2 between employees?
3     A.  I don't remember.
4     Q.  Do you recall ever discussing that
5 issue with Nikki or anyone else?
6     A.  What issue?
7     Q.  Potential relationships between
8 employees.
9     A.  No.
10    Q.  If there had been a relationship
11 between an employee -- two employees, would that
12 have concerned you for any reason?
13    A.  I would like to know about it, but
14 that wouldn't have concerned me.
15    Q.  What was Mr. Moore's position at
16 Kings Island called?
17    A.  So he was working in a housekeeping
18 capacity.  So he was -- during Covid times,
19 everybody was working in different capacities.
20 So he was in a housekeeping role, so we had him
21 work as a housekeeper, laundry, and houseman.
22 So that kind of included those three roles that
23 we had for him at that time, so yeah.
24    Q.  Was this a supervisory role?
25    A.  No, but I think at one point we did

Page 31

1 give him a supervisory role when our
2 housekeeping manager was -- she was going to be
3 out for a period of time, so we did hand over
4 that responsibility to him.
5     Q.  So he was acting as the
6 housekeeping manager for some time?
7     A.  Yeah, he was.  Uh-huh.
8     Q.  Was that, you said, a temporary
9 basis while the other employee was on leave or
10 something like that?
11    A.  Yes.  Like we did -- you know, if
12 he -- his work ethic was great, you know, at one
13 point, so like he was doing a good job, but --
14 so that was temporary at that point, but, you
15 know, if he kept up the good work, we would have
16 maintained his supervisory position.
17    Q.  Do you recall when he started in
18 that position?
19    A.  I do not recall, but it was around
20 like January, I'm assuming.  I don't remember,
21 but around that time.
22    Q.  When did he stop working in that
23 role?
24    A.  That I don't remember, but it was
25 shortly -- I'm thinking February when everything

Page 32

1 kind of started to go downhill with him.
2     Q.  So why did he stop working in that
3 role --
4     A.  Because of his --
5     Q.  -- as the housekeeping manager?
6     A.  Because of his behavior, his work
7 ethic.  He wasn't doing anything in that role,
8 so he was basically milking our clock and doing
9 nothing.  So from a day-to-day -- from a
10 management perspective, we just couldn't have
11 that anymore.  So we had to let him go for that
12 role, but he was more than welcome to work in
13 other roles.
14    Q.  When he was taken out of that role,
15 did you have a meeting with him, or how did
16 that -- how was that informed to him?
17    A.  I don't remember.  I don't think I
18 was there for that, but I don't remember.
19    Q.  You said he was in the position of
20 housekeeper; is that correct?
21    A.  Housekeeper.  Like anything
22 housekeeping, laundry, houseman.
23    Q.  What duties would that position
24 entail?
25    A.  Which one?

Page 33

1     Q.  The -- you know, anything that he
2 was -- I guess basically his whole -- the scope
3 of his job duties there when he was not acting
4 as the housekeeping manager.
5     A.  Yeah, so wherever -- during that
6 day, whatever we need him to do.  So if we need
7 rooms turned down, if we needed rooms to be
8 stripped, you know, we would assign those duties
9 to everyone.  You know, he was not the only one.
10 So stripping rooms, laundry, making sure the
11 carts are filled, cleaning the rooms, and
12 cleaning common areas, as well.
13    Q.  How many rooms does the hotel have?
14    A.  I don't remember.  I can give you
15 an estimate.  Like I think it was around -- we
16 had some rooms that were not working, but the
17 whole hotel probably has like 100 rooms, I
18 believe.
19    Q.  How many people were in the
20 housekeeping staff?
21    A.  We had a few, like three or four
22 people, including Alex, uh-huh.
23    Q.  So would they basically split up
24 what rooms had to be cleaned and serviced every
25 day?

9 (Pages 30 - 33)

Page 34

1    A.  Yes, uh-huh.
2    Q.  Who was responsible for managing
3 the day-to-day assignments?
4    A.  Our supervisor, Rhonda.
5    Q.  Would that be Rhonda Craddock?
6    A.  Yes, uh-huh.
7    Q.  Is she still in that role?
8    A.  No.
9    Q.  Do you know when she left?
10    A.  I think September of '21, but I
11 could be wrong.  But I think it's around that
12 time.
13    Q.  Why did she leave?
14    A.  I don't remember.  But she wasn't
15 keeping up her duties, as well.  I think she
16 found another job too.  So I don't recall since
17 I wasn't on site when she left.
18    Q.  So was that after you had found
19 another job and moved to a different position?
20    A.  Yeah, so I don't remember.
21    Q.  So typically how many rooms would
22 an employee, a housekeeping -- a member of the
23 housekeeping staff have to clean per day?
24    A.  It was like two an hour.  Like
25 that's kind of what we had an expectation for

Page 35

1 all the housekeepers is to basically clean two
2 rooms an hour, and that's their expectation.  So
3 it just depends on the day.  Like on Sundays we
4 had a lot more rooms, because it was the
5 weekend.  Weekdays we didn't have that many
6 rooms.  So it just depended on day-to-day and
7 how many guests we had.
8    Q.  Other than actually cleaning or
9 changing sheets and things like that, did
10 members of the housekeeping staff do any
11 paperwork or similar type of work?
12    A.  Like what do you mean by that?
13 Like training, or like anything on the computer?
14    Q.  Yeah.  Like other than just, you
15 know, the cleaning or housekeeping, did
16 employees have any other duties that, you know,
17 didn't require them to stand or lift or, you
18 know, move sheets or anything like that?
19    A.  No.  I don't remember, but no.
20    Q.  In your experience there, have you
21 ever had any employees request light duty for
22 any reason?
23    A.  Yeah.  I believe I have before,
24 yeah.
25    Q.  And if an employee requested light

Page 36

1 duty, what kind of assignments would they be
2 given?
3    A.  So they would still be given a room
4 to clean, but we would do some of -- like the
5 stuff that they couldn't do.  So, you know,
6 making the bed, vacuuming, anything that
7 required bending, we would accommodate that.
8 But depending on their situation.  So if they
9 can't lift anything, then somebody else would
10 lift something, so yeah.
11    Q.  Other than -- do you recall if
12 Mr. Moore ever requested light duty?
13    A.  Yes, in March.
14    Q.  Do you recall anyone else ever
15 requesting light duty?
16    A.  I don't remember, but I believe
17 someone may have.  But I just don't remember,
18 yeah.  But he was not the first one, yeah.
19    Q.  Who would be responsible for, you
20 know, reviewing that kind of request and then,
21 you know, figuring out which job duties they
22 could do or couldn't do?
23    A.  Like who would be involved in that
24 process?
25    Q.  Yes.

Page 37

1    A.  My manager and I and Rhonda, our
2 housekeeping manager, to see where we can --
3 where we need help.
4    Q.  So were you involved in hiring
5 Mr. Moore?
6    A.  I was not.  It was my manager,
7 Nikki.
8    Q.  Do you know if anyone else besides
9 Nikki was involved?
10    A.  I'm assuming Rhonda, because she
11 did interview him, so -- because it's a
12 housekeeping role, so I believe Rhonda, as well.
13 But I don't remember, but I'm assuming Rhonda,
14 as well, uh-huh.
15    Q.  When somebody gets hired, do you
16 play any role in reviewing that or approving it
17 before it's finalized?
18    A.  I would look over the verification
19 forms.  But I think for the most part like
20 Rhonda and Nikki, they worked before, so a lot
21 of like the employees that came in they knew.
22 So I always trusted their judgment on who they
23 were hiring.
24    Q.  Did anyone ever mention to you when
25 Mr. Moore was hired that he had any kind of

10 (Pages 34 - 37)

Page 38

1 physical limitations at all?
2    A.  No.
3    Q.  Do you recall meeting Mr. Moore
4 after he was hired?
5    A.  Yeah, I did say hi to him, yep, but
6 he -- I did talk to him, yeah.
7    Q.  Was that pretty soon after he was
8 hired?
9    A.  Yeah.  Like he filled out the form,
10 and he was right there, so I did say hi to him,
11 uh-huh.  Yep, I introduced myself to him,
12 uh-huh.
13    Q.  So did you have a friendly
14 relationship with him?
15    A.  Like throughout the employment?
16    Q.  Yeah.  Initially did you have any
17 issues?
18    A.  Oh, no, not at all.  He was
19 pretty -- he worked -- like he was pretty nice.
20 He worked like other employees.  Like he was
21 good.
22    Q.  Did you ever socialize with him or
23 talk to him outside of work for any reason?
24    A.  No.
25    Q.  So you mentioned that when he

Page 39

1 initially started, his performance was good; is
2 that correct?
3    A.  Yeah, uh-huh.  Yeah.
4    Q.  So when did you notice that there
5 was any change in his performance?
6    A.  February.
7    Q.  Before that, did you notice any
8 issues with his employment -- his performance?
9    A.  No.  I would say it was around
10 January, February.  I don't know the exact time
11 frame, but prior to that, we had no issues with
12 him.
13    Q.  Do you know what happened, why, you
14 know, he was a good employee and then he started
15 having issues?
16    A.  I don't know.  It was just his
17 behavior became unpredictable.  It was just
18 erratic.  I mean, when he was a good employee,
19 he was a good employee.  But his behavior was
20 just erratic.  He would yell, scream.  Just you
21 wouldn't know what Alex would walk through the
22 door, you know, once his behavior started being
23 unpredictable, so I --
24    Q.  Do you know any reason at all why
25 he was, you know, behaving erratically or in

Page 40

1 those ways you described?
2    A.  No, I -- all I can think is that,
3 you know, when -- later down the road when I
4 found out about Rhonda and Alex, they had a
5 prior relationship before coming and working at
6 Kings Inn, I thought about the fact that she did
7 get married around February.  So I don't know if
8 that had something to do with it.  But he was
9 good before.  Like we didn't have any issues
10 with him.
11    Q.  When did you find out that
12 Ms. Craddock and Mr. Moore had had a previous
13 relationship?
14    A.  Like later down the road.  Like it
15 wasn't anything that -- we didn't think it would
16 cause any issue.  Like it was later down the
17 road like his behavior was very unpredictable.
18 But Rhonda wasn't there most of the time, like
19 when his behavior was like that.
20        So I don't know like why he didn't
21 listen to us.  He was disobedient.  Like he was
22 also taken off his supervisory role because he
23 wasn't doing all those things, so -- but that
24 despite that information, like that had nothing
25 to do with it.  He was just a bad employee.

Page 41

1    Q.  Did anybody raise that -- you know,
2 discuss that, their prior relationship, with you
3 before he was fired, or was that after?
4    A.  It was brought up later, but that
5 was not the reason he was fired.
6    Q.  Who told you about what happened
7 between them?
8    A.  Nobody.  I don't have any details
9 about what happened between them.  I think Alex
10 is the one who brought it up verbally when they
11 were arguing, so that's all I know.
12    Q.  Did you see them argue, or how did
13 you learn about them arguing for any reason?
14    A.  No, he was arguing -- when we were
15 sitting there, he was arguing with us.  So it
16 was said in front of us that there was a prior
17 relationship.  I don't remember what was said,
18 but that's how I knew that.  That's when we
19 found out, me and Nikki.
20    Q.  So he told you about that prior
21 relationship at some point?
22    A.  No, he didn't.  Like that's when he
23 brought it out, like during one of his
24 disciplinary actions I think.
25    Q.  Okay.

11 (Pages 38 - 41)

Page 42

1    A.  Yeah.
2    Q.  So this was a different meeting
3  before his termination then?
4    A.  Yes, I think so.  I don't recall.
5  But it was brought up at one of those meetings,
6  yeah.
7    Q.  Do you recall what he said when he
8  brought up, you know, that they had dated in the
9  past or had a relationship?
10    A.  I don't remember what he said.
11    Q.  Did you ever talk with Ms. Craddock
12  about it?
13    A.  I didn't, but my manager did.
14    Q.  Do you know what -- did she tell
15  you what Ms. Craddock had said about what --
16    A.  She told me -- my manager told me
17  she asked Rhonda.  She goes it was like prior to
18  this.  It was a long time ago.  So this has
19  nothing to do with his work -- you know, his
20  work ethic right now, so he is just finding a
21  reason to blame somebody.
22    Q.  Do you know if they were involved
23  romantically during the time that he was working
24  there?
25    A.  No.

Page 43

1    Q.  Did anyone ever report that to you?
2    A.  No.
3    Q.  You said that Ms. Craddock got
4  married, you said, in February?
5    A.  Yeah, around -- yeah, in February,
6  uh-huh.  I don't recall exactly what date or
7  time, but around that time frame.
8    Q.  Do you know any other reasons why
9  he initially started as a good performer and
10  then later he had issues?
11    A.  I don't know.  He just -- he just
12  became a bad -- like he was just a bad employee.
13  Like, you know, we gave him multiple chances,
14  multiple warnings, and he just didn't change
15  after that.  So, I mean, he apologized here and
16  there, and, you know, we accepted his apology,
17  but it just kind of continued, so -- yeah.
18    Q.  You mentioned that his behavior was
19  erratic.  In what ways was it erratic?
20    A.  So like one day he would come and
21  be happy, you know, be nice, he would be
22  all like ready to work, like ready to go, and
23  then, you know, the next day he would just come
24  in mad, come an hour late, start slamming, you
25  know, carts and just doors.

Page 44

1    So we just -- that's how it was
2  erratic.  Like it just changed.  We just didn't
3  know what Alex we would get every day.  Like
4  that's how he changed, yeah.
5    Q.  Did any other employees ever have
6  any complaints about him?
7    A.  They did, I just don't remember
8  what they were.
9    Q.  Would that be other members of the
10  housekeeping staff?
11    A.  Yeah, like I think -- I think it
12  was Rhonda, but I don't remember -- it was
13  also -- I had a laundry lady, as well, so, you
14  know, there were complaints not just about him,
15  but about Rhonda too.  So I can't recall.  I
16  mean, I had complaints with him, so -- because
17  he would leave his cart inside the room instead
18  of outside the room when he was cleaning a room,
19  so we just wouldn't know where he was.  And we
20  told him multiple times hey, Alex, you have to
21  leave the cart outside the room so when we're
22  doing our rounds, we need to know where you are,
23  what room you're cleaning so we can let our
24  front staff know what rooms to mark clean in the
25  system.  So that's the one complaint I had with

Page 45

1  him, but --
2    Q.  What kind of complaints were there
3  about Mrs. Craddock?
4    A.  I think just cleanliness at the
5  most.  Like that was my complaint.  Sometimes
6  she wouldn't, you know, look at the rooms as a
7  supervisor would.  So I would find some things,
8  but, you know, that was just like here and there
9  cases, yeah.
10    Q.  Who was the -- you said head of
11  laundry.  Who was that?
12    A.  Gerri at that time.  She's retired
13  now I think.
14    Q.  What was her last name?
15    A.  I don't know.  I don't remember.
16    Q.  At some point did Mr. Moore request
17  light duty based on physical issues he was
18  having?
19    A.  Yeah, in March he did.
20    Q.  When he made that request, did you
21  meet with him, or did someone else meet with him
22  to talk about that?
23    A.  Yeah, I think it was both of us.  I
24  don't remember.  Both of us, meaning my manager,
25  Nikki.  So we were involved in that process, but

12 (Pages 42 - 45)

Page 46

1 basically we kind of came up with a plan like,
2 you know, he can't lift, he can't do this, but
3 like we can, like I said, make the beds for him,
4 vacuum. So we had somebody else doing that for
5 him, so --
6     Q. Who was -- who else was involved in
7 that process? You said you and Nikki; is that
8 correct?
9     A. Yeah. Yeah. Uh-huh.
10     Q. Was there anybody else involved in
11 that?
12     A. Like making the decision of --
13 approving the decision for light duty?
14     Q. Yes.
15     A. No, uh-uh.
16     Q. You said that you reassigned some
17 of his job duties; is that correct?
18     A. Yeah, like vacuuming and making the
19 beds.
20     Q. Who assisted with those duties if
21 he didn't do it?
22     A. Like it was either me -- it was
23 whoever was -- like we were short staffed, so we
24 usually had other housekeepers. Rhonda helped
25 with that too. But I don't -- it was somebody.

Page 47

1 We had somebody do it, I just don't remember
2 who. Like it was a bunch of different people
3 helping him.
4     Q. Do you recall if he requested any
5 other type of accommodation or change in his job
6 duties?
7     A. No.
8     Q. Were there any issues with
9 providing the light duty request that he made in
10 terms of staffing?
11     A. No.
12     Q. So before January 2021, you're not
13 aware of any issues that Mr. Moore had at work?
14     A. No.
15     Q. When did you -- when do you recall
16 the first issue with him occurred?
17     A. I think in February. Like just
18 problems with him in general?
19     Q. Yes.
20     A. I think February, but I'm not sure
21 when it all started, but that's when I first
22 documented him.
23     Q. Are you aware of any incidents
24 prior to the first documentation that he had at
25 all?

Page 48

1     A. I don't remember.
2         MR. LONG: All right. I'd like to
3 introduce my first exhibit. I'm marking it as
4 Exhibit A. I'll share it on the screen here.
5         (Thereupon, Exhibit A, February 8,
6 2021, incident report email, was marked for
7 purposes of identification.)
8 BY MR. LONG:
9     Q. Can you see this document?
10     A. Uh-huh.
11     Q. It's an email entitled Incident
12 Report. Can you please read that?
13     A. Yes. Sorry, let me move this.
14 Okay. This statement is in reference --
15     Q. You don't have to read it out loud.
16 Just --
17     A. Oh, just read it, okay. I'm glad.
18 Sorry. Okay.
19     Q. Have you seen this email before?
20     A. Yes, it was sent to me and my
21 manager. Uh-huh, yep.
22     Q. After you received this email, what
23 steps did you take in regards to the report?
24     A. So we did a verbal warning. We
25 talked to him. And I also -- this happened on

Page 49

1 2-6-21. I also wrote my statement, as well,
2 because I was there, as well. So we did talk to
3 him after with Nikki, as well, and gave him a
4 warning.
5     Q. So did you speak with him on the
6 same day that this happened, or when do you
7 recall speaking with him?
8     A. I don't remember. It was like a
9 few days where he was having this behavior where
10 he was not doing any tasks, coming in late. So
11 this was multiple days, so -- yes.
12     Q. When you met with him to discuss,
13 you know, her report here, what did he say?
14     A. He was -- I don't remember what was
15 said. It's been two years. But I know for a
16 fact that he was angry and combative, so I
17 just don't remember what was said.
18     Q. Did he mention anything about being
19 physically unable to do any of those tasks?
20     A. He didn't say that. Like he didn't
21 say any -- like his impairment. He didn't say
22 anything to do with that.
23     Q. Did you speak with Ms. Craddock
24 after she sent this to you?
25     A. Yeah, we talked that day. Like she

13 (Pages 46 - 49)

Page 50

1 sent that report that night to me because I
2 wanted her also to send me something written.
3      Q.   What did she say about what had
4 happened, you know, if you recall?
5      A.   I don't remember, but this is -- to
6 an extent what's written is what happened, and
7 that's how she told me, uh-huh.
8           (Thereupon, Exhibit B, February 8,
9 2021, incident report, was marked for purposes
10 of identification.)
11 BY MR. LONG:
12     Q.   All right. I'm going to go to
13 Exhibit B, and this is the incident report.
14     A.   Uh-huh.
15     Q.   Yes.
16     A.   I'm sorry, I was agreeing with you.
17 Yes.
18     Q.   Please read over this.
19     A.   I read it.
20     Q.   Do you know who wrote this up?
21     A.   This was me. I wrote this up.
22     Q.   Do you recall when you wrote it?
23     A.   On February 8th.
24     Q.   So the same day that it was
25 reported to you?

Page 51

1      A.   I believe so, but -- yeah. It
2 could have been the next day. I don't remember.
3 But it -- it's one of those, because it started
4 that week, so I -- it's one of the days where
5 Rhonda wasn't there.
6      Q.   In this paragraph here, it says he
7 was making rude comments.
8      A.   Uh-huh.
9      Q.   Do you recall what he said?
10     A.   I don't remember what he said, but
11 he was just being rude. Like he said something,
12 I just don't remember what.
13     Q.   It says here that he was
14 complaining about the towels not being washed.
15 Do you recall anything he said about, you know,
16 that issue?
17     A.   I was -- we didn't have a laundry
18 lady that day on the weekend, so I was doing the
19 laundry. I told him Alex, I'm washing those
20 towels for you so you will have those towels.
21 That was it. But he was like -- I told him I
22 would have clean towels for him, but he just --
23 he was complaining about it to me.
24     Q.   And at the bottom here, it says
25 that he did not make any beds per the

Page 52

1 instructions he was given. What did he say
2 about why he didn't make any beds, if he gave a
3 reason?
4      A.   Well, he left without giving me the
5 list. Like he never talked to me before he
6 left. This was how he was. He would leave
7 without giving us a list. So I would have to go
8 back and check what rooms were cleaned, what
9 rooms were not cleaned. Some rooms didn't have
10 towels, so I had to go put towels -- I had to
11 clean up after him that day.
12     Q.   So what's the -- how do you manage,
13 you know, what tasks need to be done or what
14 needs to be still completed? I know there's
15 mention of boards somewhere. Can you just
16 explain to me what that -- how that process
17 works?
18     A.   Like they get a list usually of
19 what rooms need to be cleaned, and he had --
20 from this -- reading this, he had ten rooms that
21 day. So he had plenty -- and he was there for
22 ten hours. So he should have had plenty of time
23 to clean those rooms, so --
24          I'm sorry, let me take a -- sorry,
25 I'm going to step back. I didn't read that

Page 53

1 correctly. He only stripped three to four rooms
2 out of the ten he was given. So he was supposed
3 to be stripping rooms that day. I believe he
4 was also cleaning. I don't remember the
5 details, but he was cleaning rooms that day from
6 what I remember.
7          But they're usually given a board,
8 and then they let us know what they've cleaned.
9 And then usually we go back and see, you know,
10 what needs to be put into rooms, what is not in
11 the rooms.
12     Q.   You said a board. Is it like a
13 whiteboard or --
14     A.   It's like a list they're given.
15 It's printed out --
16     Q.   Okay.
17     A.   -- sorry, if that's what you're
18 asking me.
19     Q.   Like a printed sheet of paper?
20     A.   Yeah, a printed sheet of paper that
21 says what rooms are dirty, yeah.
22     Q.   In terms of employees, do they
23 clock in and clock out? How does that --
24     A.   Yes, they clock in and clock out.
25 We had a little machine in the laundry room, and

Page 54

1 they would have like a card, and they would
2 timestamp in, timestamp out.
3       Q.   So like the old-fashioned like
4 stamp time?
5       A.   Yeah.
6       Q.   Okay.
7       A.   Yeah.
8       Q.   And you said -- did he leave
9 without actually clocking out, like stamping
10 out?
11       A.   No, he clocked out, but he never
12 gave me a list.  Like he's supposed to report at
13 the end of the day, you know, hey, this is what
14 I've cleaned, this is what I've done, you know,
15 just before he left.  Like, you know, Gini, do
16 you need anything, just those things.  They're
17 required to do that before they leave, and he
18 never did that.
19       Q.   Was he working 40 hours a week?
20       A.   It depended.  I think for most time
21 he was working 40 hours.  He wanted 40 hours, as
22 well, so we gave him 40 hours.  But I don't
23 recall at all like how his hours fluctuated,
24 but -- I don't remember.  Because we also didn't
25 have -- you know, if there was nothing to do

Page 55

1 that day, then we would send them home early.
2 So I just don't remember.
3       Q.   For housekeeping staff, did they
4 work like a set 9 to 5 schedule, or like what
5 was their schedule?  What were their schedules
6 like?
7       A.   Yeah, most of the time like 9 to 5,
8 but they would start at 7 sometimes just
9 depending on who could get there first.
10       Q.   Was there someone there overnight,
11 like housekeeping staff 24/7, or --
12       A.   It was usually me if somebody
13 needed anything.  I mean, I was cleaning rooms
14 if needed.  I was there.
15            (Thereupon, Exhibit C, statement of
16 Rhonda Craddock, was marked for purposes of
17 identification.)
18 BY MR. LONG:
19       Q.   All right.  I'm going to introduce
20 Exhibit C here.  Can you see this document?
21 It's signed by Rhonda Craddock at the bottom.
22       A.   Yes, uh-huh.
23       Q.   Please read that.  Have you ever
24 seen this document before?
25       A.   Yes, I have.

Page 56

1       Q.   Do you know when Ms. Craddock wrote
2 this and signed it?
3       A.   I actually don't remember, but I
4 think it was around maybe March, I believe.  But
5 I know there's no date on it, but it is after
6 2-8 is what I can tell you.
7            (Thereupon, Exhibit D, February 9,
8 2021, Employee Disciplinary Action Form, was
9 marked for purposes of identification.)
10 BY MR. LONG:
11       Q.   Okay.  All right.  Let's move to
12 Exhibit D.  This is the disciplinary form for
13 2-9-21.  Can you still see it okay?
14       A.   Yes, I can see that.  Uh-huh, yes.
15       Q.   So who filled this form out?
16       A.   It looks like -- I'm not sure.
17 Like I signed at the bottom.  I think it was
18 Rhonda, I think.  My manager also signed at the
19 bottom, so I'm not sure.
20            MR. LONG:  Can we take a break?
21 Like five minutes would be good.
22            THE WITNESS:  Okay.
23            MR. LONG:  Thanks.
24            (Recess taken.)
25 BY MR. LONG:

Page 57

1       Q.   Can you see this document, the
2 employee disciplinary action form?
3       A.   Uh-huh.  Yes.
4       Q.   So you testified that you didn't
5 complete this, correct?
6       A.   No.
7       Q.   And you said that it would have
8 been Ms. Craddock who would have completed this?
9       A.   Either Nikki or Rhonda.
10       Q.   When an employee received this kind
11 of form, do you typically fill it out, or would
12 the --
13       A.   Either one.  Like the manager would
14 fill it out.  We also would work together to
15 fill it out with the employee, as well.  But he
16 refused to sign and include -- he didn't want to
17 write his side, so --
18       Q.   Did you -- when you -- when this
19 was issued to Mr. Moore, were you present during
20 that meeting?
21       A.   Yes, I was there.  Uh-huh, yeah.
22       Q.   And did you hand him this form at
23 that meeting?
24       A.   Yeah, like the form was given.  I
25 don't know if it was me, but I was there when we

15 (Pages 54 - 57)

Page 58

1 filled it out, and he was there.
2     Q. What did he say when you met with
3 him and gave him this form?
4     A. I don't remember.
5     Q. Did he make any complaints about
6 why he didn't make the beds for any reason?
7     A. He did complain, I just don't
8 remember what was said, but -- I mean, he showed
9 up an hour late. He never said anything. Like
10 he just wasn't doing his job.
11     Q. At the top, it says creating a
12 hostile work environment.
13     A. Uh-huh.
14     Q. Do you know what was meant by that
15 statement?
16     A. I think he just tends to yell and
17 scream. So like I think that's where the
18 hostile kind of comes into play. Like he would
19 just be very loud and aggressive, so --
20     Q. Above that, when it says type of
21 violation written, warning second, do you know
22 when the first warning occurred?
23     A. It was on the 4th. It's right --
24 the previous warning was on the 4th, and that
25 was just a meeting we had.

Page 59

1     Q. What was that meeting about?
2     A. I think it was like about the same
3 thing, like he wasn't doing his job, not
4 cleaning his rooms.
5     Q. Was there anything in particular
6 that he wasn't doing, or was he just not doing
7 any of the cleaning duties in those rooms?
8     A. Yeah, he just wasn't cleaning.
9 Like he would, again, hide the cart in his room,
10 and we won't find him. So half the time we're
11 looking for him. So those were some of the
12 things.
13     Like half of the time we're looking
14 for you. We're trying to run our day-to-day
15 operations. We need the cart outside. So, you
16 know, sometimes we have to fill his cart too.
17 So we just wanted to make sure he had
18 everything.
19     So he just wouldn't listen. He was
20 just disobedient for most of the time. That was
21 our biggest issue with him.
22     Q. Do you know what he was doing if he
23 wasn't cleaning in those rooms? I mean, were
24 there any reports that he was just sitting
25 around or anything like that?

Page 60

1     A. Well, I don't know if he was in
2 those rooms. We didn't know what room he was
3 in. So he could be sitting around in a room,
4 and we would never know what room, because we
5 would never see the cart outside on each floor.
6     Q. How could you tell that he hadn't
7 cleaned or done anything in those rooms?
8     A. We would go check the rooms, and if
9 they were not clean, we would not -- mark them
10 not clean, so that's how we would check. Rhonda
11 would go check behind him, as well, making sure
12 everything is done.
13     Q. Was he supposed to, you know, wipe
14 down mirrors, you know, wipe clean --
15     A. How you would wipe -- yes, like
16 wipe down mirrors, clean the bathroom, put the
17 toiletries, make the bed, vacuum, wipe
18 everything down that needs to be wiped down,
19 yeah.
20     Q. Moving to the next page, and it's
21 DEF2. Do you know who wrote this statement that
22 was attached to this? Was it attached to this?
23     A. It's attached to that and, like I
24 said, I don't remember who wrote it. Either
25 Rhonda or Nikki.

Page 61

1     (Thereupon, Exhibit E, March 10,
2 2021, Employee Write Up, was marked for purposes
3 of identification.)
4 BY MR. LONG:
5     Q. Okay, moving on to my next exhibit,
6 Exhibit E. Can you see this document? Please
7 review it.
8     MR. ENGEL: While she's looking,
9 off the record.
10     (Thereupon, an off-the-record
11 discussion was held.)
12 BY MR. LONG:
13     Q. I'll scroll down to this page too
14 so you can review that, as well. Have you seen
15 this document before?
16     A. Yes, uh-huh.
17     Q. Do you know, did you type this up
18 or did someone else?
19     A. I don't remember. It looks like it
20 might be Nikki, but I'm not sure. It could be
21 Rhonda too, but I don't remember. Nikki signed
22 at the bottom, so it looks like -- but --
23     Q. Do you know --
24     A. And I also signed it.
25     Q. -- is this Ms. Rhonda Craddock?

16 (Pages 58 - 61)

Page 62

1    A.   Yeah, she got married.  So she was
2  Davis Craddock for clarification, yeah.
3    Q.   On the first sentence of the
4  description of infraction, it says that he was
5  informed he needs to clean two rooms per hour.
6  The next sentence says if he was unable to do
7  that, we would not have work for him.
8       Did he ever express any concerns
9  that he wouldn't be able to clean two rooms per
10  hour?
11    A.   No, he didn't.  Like he was looking
12  for more hours to work, so -- no.
13    Q.   And about halfway down this
14  paragraph, it says MOD.  What does that refer
15  to?
16    A.   Manager on duty.  So that could be
17  either me, Nikki, and then our supervisor,
18  Rhonda.
19    Q.   And further down it says he pulled
20  another employee off her board leaving us short
21  the [sic] needed rooms to sell and killing
22  productivity.  Do you know what employee that's
23  referring to?
24    A.   I don't remember what employee it
25  was, but I think he pulled her so she could help

Page 63

1  him clean his rooms.
2    Q.   Would that have been another member
3  of the housekeeping staff?
4    A.   Yeah, I just don't know at the
5  time.
6    Q.   Further down it says that he was
7  not meeting the minimum standard required.  What
8  standard or how was he not meeting that
9  standard?
10    A.   I think just cleaning rooms, that
11  he is just not cleaning them, yeah.  And our
12  minimum standard is two rooms per hour -- per an
13  hour, so he is failing to do that, yeah.
14    Q.   Did he make -- did he complain at
15  all during that time about not being able to
16  make beds?
17    A.   No.  Yeah, like I think we would go
18  in -- some of those rooms we would have somebody
19  go and make the beds and all he had to do was
20  clean the bathroom, wipe down -- you know, we
21  had somebody -- so he had help, but he just
22  wouldn't complete it still without having that
23  help.
24    Q.   If he needed help, would he, you
25  know, need to tell somebody I need help in this

Page 64

1  room, or was it just assigned to him to do the
2  other duties other than cleaning the bed, or how
3  did that process work?
4    A.   I feel he should let us know if he
5  needs help instead of just pulling another
6  employee and, you know, we're thinking that
7  employee left, you know.  So he just doesn't --
8  you know, he doesn't let us know where he needs
9  the help.  So let us know.  But he never did.
10  And then when you ask him a question, he just,
11  you know, becomes combative and just
12  doesn't -- starts yelling and being rude, so --
13    Q.   Under the plan for improvement
14  section, it says effective immediately, Alex
15  will no longer act in a supervisory capacity.
16  Who made that decision to remove him from a
17  supervisory capacity?
18    A.   I think it was Nikki.
19    Q.   Were you involved at all in that
20  decision?
21    A.   I don't remember.  I know I was
22  there, but I think it was Nikki who made the
23  decision.
24    Q.   Would it have been anyone else
25  along with Nikki who made the decision?

Page 65

1    A.   I mean, probably me and Rhonda,
2  since she was the housekeeping supervisor then.
3    Q.   At the bottom of that paragraph, it
4  says he must meet the minimum to remain on the
5  team as part of the housekeeping department --
6  as part of the housekeeping department, period.
7  What minimum was that referring to?
8    A.   Cleaning rooms, just showing up on
9  time, like I think that's the minimum.  Just
10  cleaning his rooms that he's required to clean
11  when he comes in, his expectations of what we
12  expect from a housekeeper.
13    Q.   Did you meet with him to give him
14  this form?
15    A.   I don't remember that.
16    Q.   Do you know if someone else met
17  with him to give him the form?
18    A.   I don't remember, but -- I don't
19  remember what happened, but I think we
20  documented this.
21       (Thereupon, Exhibit F, March 13,
22  2021, Authorization for Light Duty, was marked
23  for purposes of identification.)
24  BY MR. LONG:
25    Q.   All right.  We can move on to the

17 (Pages 62 - 65)

Page 66

1 next exhibit, Exhibit F. Please review this
2 document. Do you recall seeing this document at
3 any time?
4     A. Yes, uh-huh.
5     Q. When did you first receive it?
6     A. I think the -- like the 14th maybe.
7 I don't recall. But it was given to Nikki, and
8 I did see it, uh-huh.
9     Q. Did he hand it to you, or did the
10 doctor email it to you? How did you get it, if
11 you recall?
12     A. I think he handed it to us. Like
13 he brought it in.
14     Q. When he brought it in, did he say
15 anything or talk about --
16     A. I don't remember. I think he had a
17 conversation with Nikki about it. But I did see
18 the form. I did see the form though.
19     Q. Did you have any conversations with
20 him about his request or what he could or
21 couldn't do?
22     A. No.
23     Q. Would that have been Nikki who had
24 that?
25     A. Yeah, I think it was Nikki at that

Page 67

1 time, yeah, from what I remember.
2     Q. After she talked with him, did she
3 discuss it with you?
4     A. Yeah. Yeah, I think she did.
5 Uh-huh, yeah.
6     Q. What did she say?
7     A. She just said he's on light duty,
8 so we'll just give him light duty. So that's
9 what we ended up doing.
10     Q. How did you figure out, you know,
11 what light duty would consist of?
12     A. So for cleaning rooms, like he
13 can't lift anything over 30 pounds, there's
14 nothing to lift. If somebody needs to strip
15 rooms for him, we had somebody stripping rooms
16 for him. So that's where, you know, you're
17 bending your back.
18         So we had people doing most things
19 for him, and he -- you know, whatever he -- he
20 told us he can't lift heavy things and he can't
21 bend down, so Rhonda helped him, as well.
22     Q. What duties could he still do in
23 terms of the cleaning role?
24     A. I don't remember, but from what I
25 remember, like, you know, just wiping things

Page 68

1 down. That was easy to do. That's not -- he's
2 not lifting anything. Just making sure
3 everything is placed properly and making sure
4 the mirrors are wiped down, putting all the
5 toiletries where they need to be.
6         And even like organizing laundry
7 sometimes wasn't -- like when we had to do
8 laundry, he just had to fold towels and sheets,
9 so that was considered light duty.
10     Q. Did Nikki raise any concerns about
11 not being able to have enough staff to cover
12 the -- you know, all the job duties if he
13 couldn't do, you know, most of what he had been
14 assigned?
15     A. No, we obeyed -- we obeyed this
16 request. Like he was on light duty, and we made
17 sure he was on light duty during this time
18 period.
19     Q. Before you received this form, did
20 he ever make any requests for light duty,
21 request accommodations in any way?
22     A. No.
23     Q. Did he ever express to you that he
24 was having physical issues or limitations in any
25 way?

Page 69

1     A. No.
2     Q. Did Nikki ever say anything to you
3 about him having physical issues or limitations
4 before this?
5     A. No. Yeah, before this, no.
6     Q. What about Rhonda, did she say
7 anything about any physical issues with him?
8     A. No.
9         (Thereupon, Exhibit G, March 15,
10 2021, statement of Gini Kaur, was marked for
11 purposes of identification.)
12 BY MR. LONG:
13     Q. Moving on to my next exhibit,
14 Exhibit G. Please review this document.
15     A. Uh-huh. Yeah.
16     Q. So did you type this up?
17     A. Yes, I did, uh-huh.
18     Q. Did you sign it the same day, the
19 15th of March?
20     A. Yes, uh-huh. Yep, I typed it up
21 that day, and I signed it, as well, uh-huh.
22     Q. In the second sentence, it says he
23 accused you of being racist multiple times.
24     A. Uh-huh.
25     Q. Other than February 9th, do you

18 (Pages 66 - 69)

Page 70

1 recall any other time he said that you were
2 racist?
3     A. He has -- like I said, I don't
4 remember, but he has said it. But that's
5 February 9th is the one I remember specifically,
6 but I just -- he said a lot of things, so --
7     Q. What else did he say?
8     A. I don't remember.
9     Q. Did he say anything, you know,
10 about you personally other than being racist?
11     A. No. Like I just don't remember,
12 but he -- like those were one of the ones that
13 stood out to me the most, just being rude,
14 disrespectful. Like I don't -- I don't remember
15 anything he said to me personally other than the
16 racist comment a couple of times.
17     Q. Did he say why he felt that you
18 were racist or why he said that?
19     A. He said I was like checking on him,
20 and I was like, yeah, because I need to know
21 what rooms are done. Like you're not telling me
22 what rooms are done. So he perceived me
23 checking on his work, the manager on duty, the
24 owner on site -- like she can't do that is what
25 I perceived as, you know, that's -- he didn't

Page 71

1 want anybody -- he just wanted to be independent
2 like and do whatever he wanted. So he didn't
3 want anybody like, you know, just managing him
4 and seeing what work he's doing, so --
5     Q. Any other reasons that he said he
6 felt like that?
7     A. No, like he just, again, was
8 disobedient. He just didn't listen, so --
9     Q. In the first sentence here, it says
10 hostile work environment.
11     A. Yes.
12     Q. What did you mean by hostile work
13 environment?
14     A. His attitude would shift daily, so,
15 you know, he's yelling, screaming, slamming
16 doors. So for me that's hostile.
17     Q. Did you -- is this something that
18 you just put in his file, or did you actually
19 give him a copy of this?
20     A. I did not give him a copy of this
21 from what I remember. I just put this in the
22 file, because he left the shift without
23 completing his tasks, so I had to document that
24 day what I --
25     Q. So you typed this up and signed it

Page 72

1 on March 15th?
2     A. Yeah, I did.
3         (Thereupon, Exhibit H, March 18,
4 2021, statement of Gini Kaur, was marked for
5 purposes of identification.)
6 BY MR. LONG:
7     Q. I'm going to go to my next exhibit,
8 H. This is --
9     A. Yes.
10     Q. Please review this.
11     A. Yes.
12     Q. So tell me what happened with this
13 customer complaining about Mr. Moore.
14     A. Of course I was at the front desk
15 when a guest came down, and he told me about
16 this incident where they asked Alex that -- they
17 needed some towels. He's like oh, you need to
18 go downstairs. Like this is my -- he told me
19 something like this is -- like this is not my
20 job, or something along those lines, but I don't
21 remember exactly what was said. I know the
22 guest came, and he told me this.
23         So I said Alex -- like I did talk
24 to him about this, so -- but he just wasn't
25 professional and did not help the guest.

Page 73

1     Q. So did you talk -- after you -- the
2 guest came in and made this complaint --
3     A. Yes.
4     Q. -- did you talk with --
5     A. Yeah.
6     Q. -- Nikki, or who did you discuss it
7 with?
8     A. I don't remember, but I know I was
9 there, so I wrote this then. And he was like
10 yeah, he came, he said something about -- I
11 asked him what happened, but -- I mean, either
12 way, he just didn't do his job. Like in the
13 hospitality business, we are -- if a guest asks
14 for something, you make sure the guest gets it,
15 so -- either, you know, pleasantly he could have
16 said it, but he didn't say that, so --
17     Q. Did you call him to the office, or
18 how did that happen?
19     A. Yeah, I think I was in the office.
20 I think I did call him and talk to him about
21 this, uh-huh, yeah.
22     Q. Was anybody else there; do you
23 recall?
24     A. I don't remember. I don't. My
25 front desk staff was there, my laundry lady was

19 (Pages 70 - 73)

Page 74

1 there, so I believe there were people there.
2     Q.   Who was on the front desk staff?
3     A.   Betsy was her name.
4     Q.   Do you remember her last name?
5     A.   No.
6     Q.   Did he provide any explanation of
7 what happened, Mr. Moore?
8     A.   No.  I mean, he -- again, his
9 behavior shifted, and he didn't say anything
10 about it.
11     Q.   I'm going to go back to Exhibit --
12 before I do that, you said that you wrote this
13 and signed it on March 18th, 2021; is that
14 correct?
15     A.   Yeah.  Yes, uh-huh.
16     Q.   Okay.  I'm going back to Exhibit C.
17 This is a statement from Mrs. Craddock.
18     A.   Uh-huh.
19     Q.   Please read over this.
20     A.   Yes.
21     Q.   Do you know when she wrote this?
22     A.   That I don't remember, but from
23 what it looks like, it's after February 8th.
24     Q.   Do you know if it was before he was
25 terminated?

Page 75

1     A.   Yes, like it had -- yeah, we didn't
2 write anything after, so yeah.
3     Q.   Did someone ask her to write this
4 up, or how did this come to be reported?
5     A.   That I don't remember, but usually
6 I was -- if there's anything going on, like
7 since he was already -- you know, this was --
8 this was happening for days.  So whatever we
9 had, we tried to document as much as possible.
10     So I did -- you know, we did inform
11 her if anything like this happens where he's not
12 listening, just document it, because that's
13 how -- every day was seeming like he was doing
14 something, so -- yeah, we told -- to any
15 employee to document anything, so yes.
16     Q.   So did she just write this and put
17 it in his employee file?
18     A.   She showed it to me.  She showed it
19 to Nikki and I, and we read it and put it in his
20 file, yeah.
21     (Thereupon, Exhibit I, statement of
22 Nikki Williams, was marked for purposes of
23 identification.)
24 BY MR. LONG:
25     Q.   All right, I'm going to go to

Page 76

1 Exhibit I.
2     A.   You can scroll down.  Yes.
3     Q.   Have you seen this --
4     A.   Yes.
5     Q.   -- document before?
6     A.   Uh-huh.
7     Q.   Did you -- were you involved at all
8 in drafting it?
9     A.   No, she wrote that.
10     Q.   Do you know when she wrote it?
11     A.   As soon as he left, she wrote that.
12 It was right away.
13     Q.   Did you tell her to write it up or
14 document it or something similar to that?
15     A.   No, I didn't document anything.
16     Q.   Did you tell her to write this
17 statement?
18     A.   She wrote it herself, uh-huh.  I
19 didn't have to tell her.
20     Q.   All right.  In the first sentence,
21 it says that he arrived late again for the 11th
22 straight workday.  Does Kings Inn document when
23 employees are late at all?  How do you keep
24 track of that?
25     A.   We usually check their timestamps,

Page 77

1 so when they're supposed to clock in.  Like if
2 they're -- usually the policy is they're
3 supposed to be here -- they're supposed to clock
4 in like six minutes after or before.  So we
5 usually do keep track of that.  And usually we
6 just give them a verbal warning, hey, why were
7 you late, or usually they'll let us know hey,
8 I'm running late.  So that's fine as long as you
9 let us know, yeah.
10     Q.   Do you review the timecards every
11 week, or how do you check that?
12     A.   Whenever I have to do payroll, I
13 check every week.  Like whenever I just need to
14 see who was there, yeah.  I also record the
15 hours on there, put -- I transcribe it onto a
16 spreadsheet.  So I looked at it quite frequently,
17 uh-huh.
18     Q.   Do you keep any kind of running
19 list of when employees are late or how many
20 absences or something like that that they have
21 accumulated?
22     A.   I do not.
23     Q.   Then the second sentence, it says
24 that Alex was given a limited board due to his
25 light duty status.

20 (Pages 74 - 77)

1    A.   Uh-huh.
2    Q.   Do you know what that limited board
3  was referring to?
4    A.   I think just a few rooms he was
5  given to clean.
6    Q.   It says see attached list.
7    A.   Uh-huh.
8    Q.   Was there a list attached?
9    A.   It must have been the list of his
10  rooms, but I don't know.
11    Q.   Moving down, it says he told her
12  what? What do you want? Did you hear -- were
13  you present when he said that to her?
14    A.   No, I was not. This happened
15  upstairs. I was downstairs.
16    Q.   Who is Devon that's referred to
17  here?
18    A.   I think he was one of our housemen
19  that was helping like strip rooms for us.
20    Q.   Did you hear any of the
21  conversation that took place between Nikki and
22  Mr. Moore on this day that's described here?
23    A.   I -- at the bottom, I was a witness
24  to what happened when he came downstairs and
25  her. Anything upstairs in the rooms I did not.

1  I was not a witness to that.
2    Q.   Before he came downstairs, did
3  Nikki tell you what had happened or what he had
4  said?
5    A.   No. He came downstairs, and she
6  came right after him, so that's -- that's when I
7  found out like.
8    Q.   Then going down, it says he gave
9  the paper to Betsy. That was the front desk
10  clerk?
11    A.   Uh-huh. Yes.
12    Q.   Is that correct?
13    A.   Yes, that's correct.
14    Q.   So when did you -- did you hear him
15  when he came down and said -- he yelled at her I
16  already gave it to her, damn? Did you hear that
17  part?
18    A.   Yeah, I was there.
19    Q.   Tell me, you know, what you recall
20  about when, you know, all this happened and he
21  came down and he was, you know, saying these
22  things.
23    A.   Yeah, he just -- when he came down,
24  he just clocked out, I believe. I don't
25  remember. But I know for a fact that it was

1  kind of getting heated there, but I don't
2  remember the exact, you know, events that were
3  happening, but he -- they were arguing back and
4  forth, so I was -- I did listen in, but I
5  just -- I didn't -- I was listening, like that
6  was it.
7        I can't recall what exactly
8  happened, but I did witness like the fact that
9  he did call her a bitch. He did say those
10  things to her. And then we just let him go,
11  this is it.
12    Q.   When they were, I guess, arguing,
13  did he raise his voice?
14    A.   Yep, he raised his voice. Yeah,
15  uh-huh.
16    Q.   Did she raise her voice, if you
17  recall?
18    A.   No, she didn't. Uh-uh.
19    Q.   What did she say back to him when
20  he was saying these things?
21    A.   She just said Alex, like why are
22  you being disrespectful. It's rude. Like what
23  is going on. Like she was very calm in this
24  situation.
25        But I think we were just done with

1  him at that point. Like, you know, this was
2  enough. This is not -- this happened multiple
3  times now. So he just doesn't listen. We're
4  babysitting him basically trying to -- so --
5  yeah, that's exactly what happened.
6    Q.   Did Nikki say we can no longer
7  tolerate your behavior here at Kings Inn; today
8  will be your last day? I think you're frozen.
9    A.   Hello. Sorry about that. I don't
10  know what happened. Can you hear me?
11    Q.   Yep.
12    A.   Perfect.
13    Q.   So was it Nikki who said I can no
14  longer tolerate your behavior here at Kings Inn;
15  today will be your last day?
16    A.   Yes, uh-huh.
17    Q.   Did she talk to you before she said
18  that to him? Did she say I'm going to terminate
19  him, or anything similar?
20    A.   No. She fired him, uh-huh.
21    Q.   You were there when this part of
22  the conversation took place?
23    A.   Yeah, I was. Uh-huh.
24    Q.   Did you have any concerns about
25  firing him or --

Page 82

1    A.  No.
2    Q.  -- any disagreement about that?
3    A.  Because we were thinking about
4  terminating him anyways, so this was just the
5  last straw.  But we wanted to do it respectfully
6  and -- you know.  Yeah, that was just how it
7  ended up being.
8    Q.  Did you have any, you know, set
9  date that you were planning to terminate him
10  before this?
11    A.  No, we didn't.  Like we were still
12  talking about it.  Like, you know, at that
13  point, we did decide that, you know, this is
14  continuing on multiple days, multiple times,
15  that we should probably, you know, fire him at
16  some point, so --
17    Q.  Was it based on his
18  insubordination, talking back and being
19  disrespectful for that, or not doing his duties?
20  What was the reason why you were thinking about
21  terminating him?
22    A.  Both.  He would not show up to
23  work.  He would show up to work late.  I'm
24  sorry.  He would show up to work late.  He would
25  not tell us where he's at.  When we need rooms

Page 83

1  cleaned, we're hunting down to look for him.  He
2  was just disobedient.  He was crazy.
3        So there were a lot of factors in
4  play.  It was just not one instance that -- you
5  know, unfortunately it happened this way that he
6  was fired, but there were a lot of things
7  leading up to it that we were thinking about
8  firing him.
9    Q.  Going down where it's saying that
10  he called her a dirty bitch, did you hear that
11  part?
12    A.  Yes, I heard that.  That was right
13  in front of me.
14    Q.  What did he say?
15    A.  He said you're a dirty bitch.
16  That's the way he said it, yep.  He pointed his
17  finger at her, uh-huh.
18    Q.  Then in the next part, it says
19  that's why they fired you at Centre Park, and I
20  know you're going to be -- you be going around
21  trying to steal leads.  What is that referring
22  to?
23    A.  So I told you before that they all
24  kind of worked together at a different place.
25  So they all knew each other before, so -- and I

Page 84

1  think what he meant by like stealing leads, I'm
2  assuming they're talking about business leads,
3  like to bring in business to the hotels.  So I
4  think that's what he's referring to in that
5  sentence.
6    Q.  And then the next to last sentence,
7  he says you're going to be hearing from my
8  lawyer cause you fired me on restricted duty.
9  Did he say anything else about that portion?
10    A.  He did say like -- all I heard was
11  you're going to be hearing from my lawyer.  So I
12  didn't hear the restricted.  Like I don't
13  remember that part, but he did say something
14  like that when he was leaving, uh-huh.
15    Q.  Before that, did he ever say
16  anything like, you know, you can't fire me or do
17  anything to me because I'm disabled or I have
18  light duty accommodations?
19    A.  No, he did not say that.
20    Q.  So after this conversation took
21  place, did you discuss it -- did you meet with
22  Nikki and anyone else?
23    A.  I talked to Nikki about this, and
24  she told me like yeah, like I fired him.  Like
25  I'm like yep, I saw.  So she was like I'm just

Page 85

1  going to write up my statement, and that's it.
2  You know, when he comes to get his paycheck,
3  we'll give him his paycheck, and that's it.
4    Q.  After -- so did she write this out
5  and then send it to you to look at?
6    A.  I was right there.  She wrote it,
7  and I read it, and she put it in his file, yeah.
8    Q.  Did you ever write anything similar
9  to that?
10    A.  I don't remember at all.  This is
11  all we found in his file.  And I also checked my
12  email, and I don't think I wrote anything.
13        (Thereupon, Exhibit J, Defendant's
14  Response to First Set of Requests for Discovery,
15  was marked for purposes of identification.)
16  BY MR. LONG:
17    Q.  Moving on to Exhibit J.  These are
18  the defendant's responses to the first set of
19  discovery requests.  Did you assist your counsel
20  with preparing these responses in any way?
21    MR. ENGEL:  I'm going to instruct
22  the witness not to answer to the extent we get
23  into attorney/client privilege and attorney work
24  product here.
25        THE WITNESS:  I'm sorry, can you

22 (Pages 82 - 85)

Page 86

1 repeat that again? I don't know what was --
2 BY MR. LONG:
3       Q.   Yeah.  Did you review the responses
4 or approve them or anything similar before they
5 were sent to us?
6       A.   Like I'm confused what this paper
7 is.  Like I don't know what you're showing me.
8       Q.   This is a set of discovery
9 responses that the defendant filed.  Basically
10 these are questions we asked and then counsel
11 filled out the answers --
12      A.   Yes.
13      Q.   -- and sent them to us.  Do you
14 recall seeing this document, or did you review
15 it at all?
16      A.   I'm not going to answer that.  I
17 don't know -- like I don't know what -- like,
18 Josh, I don't know what you said, but I --
19           MR. ENGEL:  I think you can answer
20 yes or no.  I just don't want you to get into
21 any of the conversations we had and how this
22 document was prepared.
23           THE WITNESS:  Oh, okay.  Well,
24 we --
25           MR. ENGEL:  But if he's asking you

Page 87

1 if you've seen it before, you can answer that
2 question.
3           THE WITNESS:  Okay.  Can you scroll
4 down?  Like I'm trying to recall my memory here.
5 I've seen it before.
6           MR. LONG:  Let's take a five-minute
7 break.  I might have a few more questions, but
8 I'm almost done.
9           MR. ENGEL:  Okay.  We'll have a
10 little bit of follow-up here.
11          MR. LONG:  Okay.
12          (Recess taken.)
13 BY MR. LONG:
14      Q.   All right, just a few more
15 questions.  Did Mr. Moore ever raise any
16 concerns or complaints about potential
17 retaliation against him for any reason?
18      A.   Can you repeat the question again?
19      Q.   Yeah.  Did Mr. Moore ever raise any
20 concerns or complaints that you're aware of
21 regarding retaliation for any reason?
22      A.   No.
23      Q.   Did he ever raise any complaints
24 that you're aware of regarding concerns that
25 Ms. Craddock might have held a grudge against

Page 88

1 him or something similar based on their past
2 relationship?
3       A.   No.
4       Q.   Did you ever have any concerns that
5 she might have treated him unfairly because they
6 had been involved in a relationship in the past?
7       A.   No.
8       Q.   Did anyone ever raise any concerns
9 with you about Ms. Craddock's and Mr. Moore's
10 previous relationship?
11      A.   No.
12      Q.   Any reason for you to believe that
13 she could have sexually harassed him in any way?
14      A.   No.
15      Q.   Do you have any concerns -- did you
16 have any concerns at all that she could have
17 discriminated against him on the basis of his
18 sex during -- while she was his supervisor?
19      A.   No.
20      Q.   Do you have -- did you have any
21 concerns that race could have played a factor in
22 the decision to terminate Mr. Moore?
23      A.   No.
24      Q.   Did you have any concerns that
25 Mr. Moore's disability or light duty status

Page 89

1 could have played any role in the decision to
2 terminate his employment?
3       A.   No.
4       Q.   Did Ms. -- did Nikki or Ms. Craddock
5 ever complain about Mr. Moore being on light
6 duty and not being able to do all of his job
7 duties?
8       A.   Can you repeat that question?
9       Q.   Yeah.  Did Nikki or Ms. Craddock
10 ever complain about Mr. Moore being on light
11 duty and not being able to do all of the job
12 duties that other housekeeping staff did?
13      A.   No.
14          MR. LONG:  I don't have any further
15 questions right now.
16          MR. ENGEL:  Thank you.  I'm going
17 to ask a few follow-up questions here just so
18 we're clear.
19          REDIRECT EXAMINATION
20 BY MR. ENGEL:
21      Q.   First, one little correction.  I
22 noticed a couple times you described him -- I'm
23 sorry, you described the plaintiff as being
24 competitive.  Did you mean combative or
25 competitive?

23 (Pages 86 - 89)

1       A.   Combative.  I'm sorry, that's what
2  I meant.
3       Q.   What do you mean by combative?
4       A.   Just aggressive.  Like he was
5  aggressive.  So just kind of yelling, screaming
6  at us.  So, I mean, just kind of threatening in
7  a way, so --
8       Q.   Were you ever concerned about the
9  physical safety of yourself or employees because
10 of the actions of the plaintiff?
11      A.   Sometimes, because he would yell
12 and scream.  So I just, you know, tried to keep
13 a distance from him.  But I wasn't entirely
14 concerned, because I was surrounded by a lot of
15 people, so -- yeah.
16      Q.   Were you ever concerned that he
17 would become physical with either yourself or
18 other employees?
19      A.   Yes, I was concerned about that.
20      Q.   So just so we're clear, he started
21 working in approximately October 2020 for your
22 company?
23      A.   Yes, that seems right.  Uh-huh.
24      Q.   At the time when he was hired, was
25 anyone -- I'm sorry, let me rephrase that.  At

1  the time he was hired, were you aware that he
2  had had a romantic relationship with another one
3  of your employees?
4       A.   No, he did not disclose that.
5       Q.   And just so we're clear, did he
6  disclose that relationship before you made the
7  decision to terminate him?
8       A.   Can you repeat that question again?
9       Q.   Let me rephrase it.  At some point
10 you learned that he was having a romantic
11 relationship with Ms. Craddock?
12      A.   Yes, uh-huh.
13      Q.   Did you learn about that romantic
14 relationship before you initially decided to
15 terminate him?
16      A.   I learned about it after I made the
17 decision.  I made the decision to terminate him
18 before I even learned about the relationship.
19      Q.   When he started working for the
20 company, did he disclose that he had any
21 injuries that would limit his work?
22      A.   No.
23           MR. ENGEL:  In fact, I'm going to
24 show you, or if -- Sam, maybe since you have the
25 screen, can you pull up the job application?

1  And we'll mark this as Exhibit -- what are we up
2  to, K?
3           (Thereupon, Exhibit K, job
4  application, was marked for purposes of
5  identification.)
6  BY MR. ENGEL:
7       Q.   So I'm showing you what was marked
8  as Exhibit K, which is a document indicating job
9  application for Kings Inn & Suites.  Are you
10 familiar with this document?
11      A.   Yes.
12      Q.   And is this a document that is kept
13 in the regular course of business by Kings Inn?
14      A.   Yes.
15      Q.   And is there a place on this form
16 where the employee can indicate if they have any
17 health issues or concerns?
18      A.   Yes.
19      Q.   And did Mr. Moore indicate any
20 health issues or concerns on this form?
21      A.   No.
22      Q.   So if he had -- if he said
23 somewhere else that he was -- that he -- I'm
24 sorry.  If he said somewhere else that -- well,
25 let me scratch that whole line of questioning.

1           At any other point during his job
2  application process did he indicate to you any
3  health issues or concerns?
4       A.   No.
5       Q.   And in particular, did he tell you
6  that he had a back injury?
7       A.   No.
8       Q.   Did he tell you that he was
9  considered disabled?
10      A.   No.
11      Q.   Did you perceive him as disabled in
12 any way?
13      A.   No.
14      Q.   Did you perceive him as having any
15 physical impairments in any way?
16           MR. ENGEL:  Sam, I can see what
17 you're typing there.  You might want to --
18           THE WITNESS:  I'm sorry, can you
19 repeat the question again?
20 BY MR. ENGEL:
21      Q.   Did you perceive him as having any
22 physical impairments?
23      A.   No.
24      Q.   Did you believe that he was able to
25 perform the essential functions of his job?

24 (Pages 90 - 93)

Page 94

1    A.  Yes.
2    Q.  And then at some point he came in
3  with a document, which we marked as Exhibit D.
4  If we could pull that up on the screen, please.
5  I'm sorry, I'm looking for the --
6        MR. LONG:  The form here for light
7  duty?
8        MR. ENGEL:  The light duty form.
9  I'm sorry.  Was that I [sic]?  Is that right?
10        MR. LONG:  Yes.
11  BY MR. ENGEL:
12    Q.  So I'm showing you what we marked
13  as Exhibit I [sic], which is the light duty
14  form.  Do you remember receiving this document?
15    A.  Yes.  Nikki did receive it, so I
16  did see it, uh-huh.
17    Q.  Did he provide any other
18  documentation along with this document?
19    A.  No.
20    Q.  Did he provide a description of
21  what injuries or disabilities he had?
22    A.  No.
23    Q.  Did you make accommodations for him
24  as a result of receiving this document?
25    A.  Yes.

Page 95

1    Q.  And after the last date of this
2  document, March 8th of 2021, did he indicate to
3  you that he was unable to perform any of his job
4  duties?
5    A.  No.
6    Q.  Did he provide any other
7  documentation other than what we've marked as
8  Exhibit I?
9    A.  No, this is the only documentation
10  we received.
11    Q.  And did he ever -- other than this
12  document here, did he ever give you any notice
13  of his disability or inability to perform any of
14  the essential functions of his job?
15    A.  No.
16    Q.  So he never sent you an email, a
17  text, anything like that?
18    A.  No.
19    Q.  And did you make accommodations for
20  him from March 13th through March 18th of 2021
21  based on this note?
22    A.  Yes, we did.
23    Q.  Did you ever refuse any
24  accommodations that he made otherwise because of
25  health issues?

Page 96

1    A.  No.
2    Q.  Did he ever complain to anyone
3  about a failure of Kings Island [sic] Suites to
4  permit him accommodations?
5    A.  Can you repeat that question again?
6    Q.  Did he ever complain to anyone
7  about the failure to give him accommodations
8  based on a perceived disability?
9    A.  No.
10    Q.  Did he ever complain that he was
11  doing supervisory level work without supervisory
12  level pay?
13    A.  No.
14    Q.  Did anyone ever threaten to delay
15  or not pay him any overtime hours?
16    A.  No.  I'm the one who pays.  I'm the
17  one who works the payroll and -- so no.
18    Q.  Did you ever refuse to pay him any
19  overtime?
20    A.  No, I did not refuse him.
21    Q.  Did he ever complain that he wasn't
22  being paid overtime?
23    A.  No.
24    Q.  Did anyone else ever complain that
25  they weren't being paid overtime?

Page 97

1    A.  No.
2    Q.  Did he ever complain that a failure
3  to give him light duty accommodations was
4  worsening his back condition?
5    A.  No.
6    Q.  So let's then skip ahead to January
7  of 2021.  How was his job performance in January
8  of 2021?
9    A.  I think initially it was fine.  I
10  think around that time that's when it started to
11  get worse.  He would show up late, sometimes he,
12  again, would not listen to us, was very
13  disobedient, would not complete his board, the
14  list of rooms that we gave him, and then, in
15  general, just like being argumentative towards
16  me, towards the staff.
17        But he -- like he -- his behavior
18  was, like I said, erratic most days, the next
19  day he would come in, and he would be fine and
20  do his job fine, and the next day, you know, it
21  would -- the pattern would continue.
22    Q.  Okay.  Now, are you aware of any
23  incidents that happened in January of '21 that
24  caused him to be written up?
25    A.  No, not in January, like -- no.

25 (Pages 94 - 97)

Page 98

1    Q.   Okay, in other words, I'm looking
2  at -- and you can't see it, but I'll read you
3  from his complaint.  In paragraph 35, it says in
4  or around January 2021, Craddock wrote up Moore.
5  Do you know what that's about?
6    A.   No.
7    Q.   Do you know of any time when
8  Craddock wrote up Moore because they were
9  attempting to hide their romantic relationship?
10    A.   No.
11    Q.   Did Moore ever complain to you that
12  he was written up as retaliation for not
13  engaging in a continuing relationship with
14  Craddock?
15    A.   No.
16    Q.   So the first, then, documentation
17  we have is what we marked as Exhibit A, which is
18  February 8th of 2021.  If we could pull that up
19  on the screen, please.  And this was an email
20  you received from Ms. Craddock?
21    A.   Uh-huh.  Yes.
22    Q.   Okay.  And you received it on or
23  about February 8th of 2021?
24    A.   Yes, uh-huh.
25    Q.   And is it the regular course of

Page 99

1  business for you to receive documents like this?
2    A.   Yes, like usually I think -- this
3  is late in the day, but I think she left, and
4  she wrote up something at home for me.  But
5  usually it's during work hours we ask her to
6  write it, but I think she had an appointment or
7  something that she couldn't do it right there
8  and then.
9    Q.   In other words, it's the regular
10  practice of --
11    A.   Yeah.
12    Q.   -- your company to create documents
13  like this?
14    A.   Yes, that is correct.  Uh-huh,
15  yeah.
16    Q.   And what was the purpose of
17  creating this document?
18    A.   So we have documentations of when
19  he was being a bad employee.
20    Q.   And do you believe that all the
21  information in this document is true and
22  accurate?
23    A.   It is accurate, uh-huh.
24    Q.   Would this information that was
25  provided here have been sufficient to terminate

Page 100

1  him?
2    A.   Yes, it is sufficient to terminate
3  him.
4    Q.   But you didn't terminate him.  Why
5  didn't you terminate him on February 8th of
6  2021?
7    A.   I mean, he was still -- like we
8  were still giving him chances.  Like we just
9  didn't want to let him go.  Like we know he has
10  been a good employee before, so -- but just
11  because, you know, Rhonda said, you know -- this
12  is Rhonda's point of view.  So we all had to
13  take in our point of view, as well.  So this is
14  just, you know, an incident that happened.  I
15  couldn't fire him based off of this.
16    Q.   Okay.  And you also received what
17  we marked as Exhibit B too, right, which is a --
18  which is another copy of an incident report.  If
19  you can pull that up on the screen too.  There
20  you go.
21    A.   Yes, I wrote that one.  Uh-huh.
22    Q.   Okay.  And did you write this as
23  part of the regular course of business of the
24  company?
25    A.   Yes, I did.  Uh-huh.

Page 101

1    Q.   And so just to be clear, you had
2  observed inappropriate conduct from him on the
3  job at that point, right?
4    A.   Yeah, I -- yeah, he wasn't
5  listening, he was being disobedient.  So yes,
6  uh-huh.
7    Q.   Was he being insubordinate?
8    A.   Yes.  Like he wouldn't listen.
9    Q.   And was the behavior, then, that he
10  showed to you on or about February 8th of 2021,
11  would that have been sufficient to terminate
12  him?
13    A.   Yeah.  Like I'm reading my
14  perspective -- or my report, but, yeah, for ten
15  hours he was there, and he only cleaned three
16  rooms.  To me, that's just milking the clock.
17  But that is sufficient enough for me to
18  terminate him.
19    Q.   But you decided not to terminate
20  him at that point.  Why?
21    A.   I was like let me just give him
22  another chance.  Like he has -- I've seen a good
23  side of Alex.  But I was like I don't want to
24  terminate him.  Like I do want to give him
25  multiple -- like we gave him multiple chances,

26 (Pages 98 - 101)

Page 102

1 but that -- you know, this was just one chance,
2 but -- I didn't want to fire him at this point.
3     Q.  So did you confront him with the
4 misconduct that was described on February 8th of
5 2021?
6     A.  Yeah, this happened between me and
7 him.  So he -- again, he doesn't like -- he's
8 angry, he talks, but like I didn't want to -- I
9 don't want to fire him.  But this was a reason
10 to give me -- like, you know, I could fire him
11 if I need to based off the events that occurred
12 this day.
13     Q.  Did you later talk to him about
14 those events?
15     A.  These events?
16     Q.  Yes.
17     A.  No, I didn't talk to him, because
18 he just left.  Like there's no -- he doesn't
19 talk.
20     Q.  At any point did he indicate that
21 he was being singled out for harassment?
22     A.  No.
23     Q.  At any point did he indicate he had
24 had a romantic relationship with another
25 employee?

Page 103

1     A.  No.
2     Q.  When -- and these questions are
3 focusing on this time around February 8th of
4 2021.
5     A.  No.
6     Q.  So just so we're clear, did he ever
7 claim that the write-ups on or about
8 February 8th of 2021 were discriminatory based
9 on sex or gender or sexual harassment?
10     A.  No.
11     Q.  Did he ever say that the write-ups
12 were retaliatory based on his claim that he had
13 a disability?
14     A.  No.
15     Q.  And then we have then what we -- I
16 think the undated document, which is Exhibit C,
17 which is a statement from Rhonda Craddock.  Do
18 you remember receiving that statement?
19     A.  Yes, uh-huh.
20     Q.  Is it the regular course of
21 business --
22     A.  Yes.
23     Q.  -- of Kings Island Suites to
24 receive this document?
25     A.  Yes.

Page 104

1     Q.  And it sounds like based on your
2 information around this time, Rhonda and
3 Mr. Moore discussed his misconduct?
4     A.  Yeah.  From what it looks like,
5 yes, uh-huh.
6     Q.  Do you have any reason to
7 believe -- do you believe everything contained
8 in this document is true?
9     A.  Yes.
10     Q.  And in particular, did he complain
11 that this -- that the approaches from Rhonda
12 Craddock described in this document were
13 retaliatory in any way?
14     A.  No.
15     Q.  If it wasn't retaliatory in any
16 way, did he ever claim it was a result of either
17 his disability, his race, or his gender?
18     A.  No.
19     Q.  And then we had a disciplinary form
20 that was described -- or marked as Exhibit D.
21 Do you remember receiving this document?
22     A.  Yes.
23     Q.  And is this also a document that's
24 kept in the regular course of business by the
25 company?

Page 105

1     A.  Yes.
2     Q.  So looking through this, first it
3 says he received a written notice; is that
4 right?
5     A.  This is -- yeah.  This is the
6 written notice, yes.
7     Q.  So he actually would have received
8 a piece of paper describing everything on this
9 document?
10     A.  Yes, I think --
11     Q.  Would he have received this actual
12 document or something else?
13     A.  I think he would have received
14 this.  I don't think we have anything else that
15 we would give him.
16     Q.  So when he received this document,
17 did he ever raise any issues of retaliation?
18     A.  No, he just didn't sign it.  He's
19 like I don't -- I'm not going to sign this, and
20 he was sent home for the day.  But we talked
21 about this.
22     Q.  So he didn't complain that he was
23 being discriminated against because of his
24 disability when he received this document, did
25 he?

27 (Pages 102 - 105)

Page 106

1    A. No. No.
2    Q. He didn't complain about being
3 harassed because he was having an affair with
4 another employee, did he?
5    A. No.
6    Q. Did he raise up any concerns
7 whatsoever about discriminatory conduct when he
8 received this warning?
9    A. No.
10    Q. Did his conduct improve after he
11 received this warning?
12    A. I can't remember if it did or not.
13 It changed like constantly, so I -- it didn't
14 improve much is what I'm going to tell you from
15 what I recall.
16    Q. And then we fast forward ahead to
17 an incident that happened in -- around March 10th
18 of 2021. Do you remember that incident?
19    A. Yes. I --
20    Q. I think this is on Exhibit -- do we
21 have this employee write-up? There it is. What
22 exhibit is that? I'm sorry.
23       MR. LONG: That would be Exhibit E.
24 BY MR. ENGEL:
25    Q. Exhibit E. So this is dated, it

Page 107

1 looks like, March 10th of 2021. Is this
2 document also kept in the regular course of
3 business by your company?
4    A. Yes, uh-huh.
5    Q. And it indicates second warning.
6 What is the significance of a second warning?
7    A. Basically, that, you know, we are
8 kind of keeping an eye -- like there's a
9 possible chance of termination. So I think this
10 is -- I know we've given him a lot of warnings,
11 but for a written one, this could be the second
12 one from what I'm interpreting.
13       But basically at this point, like,
14 you know, if he doesn't continue to do his
15 essential job duties, that he would be
16 terminated, so -- and, you know, his behavior
17 doesn't change, that there's a chance that he
18 will be terminated based off of that, so --
19    Q. Was he given a copy of this
20 document?
21    A. I don't remember, but this was
22 shown to him, I believe.
23    Q. When it was shown to him, did he
24 ever complain that he was being subject to
25 discipline based on the fact that he was having

Page 108

1 an affair with somebody?
2    A. No.
3    Q. Did he ever complain that he was
4 being harassed at work?
5    A. No.
6    Q. Did he ever complain this was
7 retaliatory because he had asked for disability
8 accommodations?
9    A. No.
10    Q. Did he raise any concerns
11 whatsoever about retaliation or discrimination
12 when he received this document?
13    A. No.
14    Q. In fact, did he deny any of the
15 actions that are described as leading to
16 warning?
17    A. I don't remember.
18    Q. In other words, at any point did
19 he -- when he was being subject to discipline,
20 did he say no, I am cleaning the rooms, or no, I
21 am doing my job as I'm supposed to?
22    A. No, he didn't say that back.
23    Q. What did he say back?
24    A. He would just start yelling. Like
25 he -- that's all I can think of. Like he would

Page 109

1 just start being combative and just start
2 being aggressive. But he just would say leave
3 me alone, like I know what I'm doing, things
4 like that of, you know, his nature. But he --
5 he just didn't meet the requirements that we
6 wanted him to, so -- when it came to cleaning
7 rooms and doing what we tell him to do. He
8 would do the opposite.
9    Q. And just so we're clear on this
10 document, Exhibit E I think it is, this
11 indicates his failure to do his job duties on
12 March 9th and March 10th of 2021?
13    A. I'm sorry, what was your question?
14    Q. So we've moved forward in time. In
15 other words, this is about misconduct that
16 occurred on March 9 and March 10 of 2021?
17    A. Yes, that's correct.
18    Q. So why didn't you just fire him on
19 March 10th?
20    A. I kind of -- we were thinking of
21 firing him at this point, but I just -- you
22 know, we wanted again to monitor his production
23 for the next 30 days and see how he's doing.
24 Because we've talked to him like, and then he
25 does agree -- you know, he did agree -- like a

28 (Pages 106 - 109)

Page 110

1  lot of it he does say like yeah, I'll do better.
2  And in some cases, you know, he would apologize
3  too, but --
4        And we did give him multiple
5  chances. But I just, you know, wanted to give
6  him a few more chances, like -- but I just
7  didn't think that, you know, this -- that we
8  would just need to fire him right now. But we
9  continued to document as much as we could,
10 but --
11      Q. Let me get the timeline right. As
12 of about March 10th of 2021, were you thinking
13 about terminating him?
14      A. Yeah, like it is -- like we are
15 thinking about terminating him, and it's just,
16 you know, how should we go about kind of doing
17 it per se, like --
18      Q. I'm trying to give you some
19 context. Is this at a time when it's very hard
20 to get employees?
21      A. Yes, it was. During Covid-19, it
22 was kind of hard to get employees. So I think
23 our kind of goal was to see if we can hire
24 somebody else before we terminate him, but
25 that's --

Page 111

1       Q. Yeah, let me ask this very precise
2  question then, as of March 10th of 2021, when
3  you started thinking about terminating him, were
4  you aware that he had had a romantic
5  relationship with another employee?
6       A. No.
7       Q. So then let's skip ahead to
8  March 15th, and that's when you write the memo
9  that we marked as Exhibit G. Is this a document
10 also kept in the regular course of business by
11 your company?
12      A. Yes, uh-huh.
13      Q. And why did you write this
14 document?
15      A. From what -- this is what's been
16 happening, so I wrote this as, you know, it's
17 still continuing to happen after five days, you
18 know, from the 10th to the 15th, that it's still
19 continuing to happen even despite giving him
20 light duty. So he also left his shift without
21 completing tasks, you know, even when we
22 provided him his accommodations. So it's
23 just -- again, just disobedient, doesn't listen.
24      Q. Would you describe him as
25 insubordinate even after the March 10th warning?

Page 112

1       A. Yeah.
2       Q. And during -- between March 10th
3  and March 15th, did he ever say that he was
4  being sexually harassed?
5       A. No.
6       Q. Between March 10th and March 15th,
7  did he disclose that he had been having an
8  affair with another employee?
9       A. No.
10      Q. And then our next milepost is an
11 event that happened on March 18th of 2021, which
12 you documented in Exhibit H.
13      A. Uh-huh.
14      Q. And this was an incident with a
15 guest?
16      A. Yes, that is correct. Uh-huh.
17      Q. And is a bad interaction with a
18 guest particularly significant to you?
19      A. Yes, it is. Uh-huh.
20      Q. Why is that?
21      A. To the point if you are being rude
22 to our staff, to me that's fine. But when you
23 take it outside to our guests, yeah, that's a
24 problem for me. So this is something that, you
25 know, he is already being unprofessional with

Page 113

1  us, and now you're taking your anger and
2  whatever issues you have out on our, you know,
3  guest now.
4        So this was a huge no for me. Like
5  essentially this was kind of the last straw for
6  me with him, and I, you know, decided that he
7  should no longer work for us. But, again, you
8  know, kind of gauging the situation with
9  Covid-19 and stuff, like I'm like, you know,
10 I'll just -- I did talk to him about this, but,
11 again, this is unacceptable.
12      Q. So is it fair to say that on or
13 about March 18th of 2021 when you wrote this
14 memo, you had decided you were going to
15 terminate him?
16      A. Yeah.
17      Q. And were you aware on March 18th of
18 2021 when you made the decision to terminate him
19 that he had been having a romantic relationship
20 with another employee?
21      A. No.
22      Q. Had he, prior to March 18th of
23 2021, complained that he was being sexually
24 harassed?
25      A. No.

29 (Pages 110 - 113)

Case: 1:22-cv-00548-MRB Doc #: 10-2 Filed: 03/13/24 Page: 30 of 35 PAGEID #: 201

Page 114

1   Q.   Had he, prior to March 18th, 2021,
2 complained that he wasn't receiving adequate
3 accommodations for his claim of disability?
4   A.   No.
5   Q.   So then what caused you to
6 terminate him a few days later?
7   A.   Just kind of the situation that
8 happened with Nikki, my manager, that, you know,
9 he just wasn't listening, just running around
10 the building, being aggressive towards her, just
11 yelling, screaming, especially around the
12 building when you're just going around, guests
13 are watching, like we don't need that.  Like --
14 and -- yeah, I mean --
15   Q.   And this was the incident described
16 on the statement by Nikki Williams --
17   A.   Yes.
18   Q.   -- that we marked as -- what was
19 it -- Exhibit K is it?
20     MR. LONG:  I believe that's I.
21     MR. ENGEL:  I.  Sorry, I.
22 BY MR. ENGEL:
23   Q.   This document also is maintained in
24 the regular course of business by your company?
25   A.   Yes, uh-huh.

Page 115

1   Q.   And it's your regular practice
2 to --
3   A.   Uh-huh.
4   Q.   -- create statements like this when
5 incidents happen?
6   A.   Yes, uh-huh.
7   Q.   Did you discuss the conduct
8 described in this memo that occurred on
9 March 26th with Mr. Moore?
10   A.   Can you repeat the question again?
11   Q.   Yeah, let me rephrase it.  Did
12 anyone discuss the conduct described in this
13 statement that occurred on March 26th, 2021,
14 with Mr. Moore?
15   A.   Yes, Nikki described what happened,
16 and I was also there when this was happening.
17   Q.   During that conversation, did he
18 deny any of his insubordination?
19   A.   No.
20   Q.   Did he deny any of the underlying
21 facts described in the statement from
22 Ms. Williams?
23   A.   Well, the statement was written
24 after he was fired, so he -- we never showed him
25 the statement.  This is just what had unfolded

Page 116

1 on that day.
2   Q.   But -- so let me back up.  So
3 during this meeting with Mr. Moore, this was a
4 discussion about some of the things that
5 happened though, right?
6   A.   Yes, that is correct.  Uh-huh.
7 Yep, we did talk about that.
8   Q.   During that conversation, did he
9 deny that he did any of the things that
10 Ms. Williams alleged he did?
11   A.   No.
12   Q.   During this conversation, did he
13 disclose that he had been having an affair with
14 another employee?
15   A.   Yes, he did say something about it
16 then.
17   Q.   Did you have any concerns that the
18 affair that he described was leading to him
19 being subject to harassment or tougher scrutiny?
20   A.   No.
21   Q.   Did you have any concerns that
22 Ms. Williams was complaining about his conduct
23 for retaliatory purposes?
24   A.   Can you repeat that question again?
25   Q.   Yeah.  Did you have any concerns

Page 117

1 that he was being retaliated against?
2   A.   No.
3   Q.   So just so we have a clear
4 statement from you, what were the reasons that
5 he was terminated?
6   A.   He was just a bad employee, just
7 simple as that.  He just didn't do his job as
8 described.  So that's honestly the whole reason
9 here, that he just was being disrespectful and
10 rude to staff, including guests.  He was
11 disobedient most of the time, did not follow any
12 directions, any rules.  Like that is simply it.
13 He was just a terrible employee, and I would
14 never hire him again.
15   Q.   Did he ever complain that he was
16 being harassed and insulted on the basis of his
17 disability?
18   A.   No.
19   Q.   And did you tell him the reasons
20 that he was being terminated?
21   A.   Yes.  He's aware, as well, of all
22 these written documents and statements.  He knew
23 exactly why he was getting fired.
24   Q.   Are you aware of any situation
25 where Mr. Moore was treated differently because

30 (Pages 114 - 117)

Veritext Legal Solutions
www.veritext.com                888-391-3376

Page 118

1 he had a previous romantic relationship with
2 another employee?
3     A.  No.
4     Q.  Was he treated differently than any
5 other employee?
6     A.  No.
7        MR. ENGEL:  So let me -- if you
8 could pull up, please, the amended complaint.  I
9 think you have it in your thing, Sam.  Are we up
10 to L?  Is that K or L we're marking this?
11        MR. LONG:  That would be K.
12        THE COURT REPORTER:  I think it's
13 L.
14        (Thereupon, Exhibit L, Complaint,
15 was marked for purposes of identification.)
16 BY MR. ENGEL:
17     Q.  So let's scroll down to, for
18 example, paragraph 79.  In paragraph 79, he
19 claims that he reported the sexual harassment to
20 his supervisor verbally and in writing.  Did
21 that ever happen?
22     A.  No.
23     Q.  Is he telling the truth there?
24     A.  No.
25     Q.  So if we look at -- for example,

Page 119

1 let's go back up to paragraph -- let me scratch
2 that -- paragraph 153.  And he writes that he
3 complained about the disability discrimination
4 and sex/gender discrimination he was
5 experiencing.  Did he ever make such a
6 complaint?
7     A.  What line was it?
8     Q.  We're on 153.
9     A.  No, he did not.
10     Q.  So is that statement a lie?
11     A.  Yes.
12        MR. ENGEL:  I have nothing else for
13 you.  Thank you very much for your time today.
14 I will turn it back over to counsel if he has
15 any follow-up.
16        MR. LONG:  Yes, just a few
17 follow-ups.
18        RECROSS-EXAMINATION
19 BY MR. LONG:
20     Q.  Do you know if Mr. Moore and Rhonda
21 Craddock had any kind of romantic relationship
22 at the time that they both worked at Kings Inn?
23     A.  No.
24     Q.  Are you aware of any threats of
25 physical violence that Mr. Moore made to anyone

Page 120

1 at Kings Inn?
2     A.  No.
3        MR. LONG:  I have no further
4 questions.
5        MR. ENGEL:  Are you done, Sam?
6        MR. LONG:  Yes, no further
7 questions.
8        MR. ENGEL:  Okay.  Well, I have
9 nothing further, so we'll read.
10        (Thereupon, the deposition was
11 concluded at 12:54 p.m.)

Page 121

1 STATE OF OHIO        )
2 COUNTY OF MONTGOMERY )  SS:  CERTIFICATE
3        I, Karen M. Rudd, a Notary
4 Public within and for the State of Ohio, duly
5 commissioned and qualified,
6        DO HEREBY CERTIFY that the
7 above-named GAGANPREET KAUR, was by me first
8 duly sworn to testify the truth, the whole truth
9 and nothing but the truth.
10        Said testimony was reduced to
11 writing by me stenographically in the presence
12 of the witness and thereafter reduced to
13 typewriting.
14        I FURTHER CERTIFY that I am not a
15 relative or Attorney of either party, in any
16 manner interested in the event of this action,
17 nor am I, or the court reporting firm with which
18 I am affiliated, under a contract as defined in
19 Civil Rule 28(D).

31 (Pages 118 - 121)

Page 122

```
1        IN WITNESS WHEREOF, I have hereunto set
2   my hand and seal of office at Dayton, Ohio, on
3   this 12th
4           Karen M. Rudd
5           _____
            KAREN M. RUDD
6           NOTARY PUBLIC, STATE OF OHIO
            My commission expires 5-21-2027
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 123

```
1              Veritext Legal Solutions
                 1100 Superior Ave
2                   Suite 1820
                Cleveland, Ohio 44114
3               Phone: 216-523-1313
4
   July 19, 2023
5
   To: Joshua Adam Engel
6
   Case Name: Moore, Demond v. Next Generation Hospitality, LLC
7
   Veritext Reference Number: 5930128
8
   Witness: Gaganpreet Kaur     Deposition Date: 7/6/2023
9
10 Dear Sir/Madam:
11
   Enclosed please find a deposition transcript. Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change. Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA
```

Page 124

```
1           DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2
      ASSIGNMENT REFERENCE NO: 5930128
3     CASE NAME: Moore, Demond v. Next Generation Hospitality, LLC
      DATE OF DEPOSITION: 7/6/2023
4     WITNESS' NAME: Gaganpreet Kaur
5        In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7        I have made no changes to the testimony
   as transcribed by the court reporter.
8
         _____    _____
9  Date            Gaganpreet Kaur
10       Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
             Statement; and
14       Their execution of this Statement is of
             their free act and deed.
15
         I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
         _____
18       Notary Public
19       _____
         Commission Expiration Date
20
21
22
23
24
25
```

Page 125

```
1           DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2
      ASSIGNMENT REFERENCE NO: 5930128
3     CASE NAME: Moore, Demond v. Next Generation Hospitality, LLC
      DATE OF DEPOSITION: 7/6/2023
4     WITNESS' NAME: Gaganpreet Kaur
5        In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7        I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9        I request that these changes be entered
   as part of the record of my testimony.
10
         I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13       _____
   Date            Gaganpreet Kaur
14
         Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18         in the appended Errata Sheet;
         They signed the foregoing Sworn
19           Statement; and
         Their execution of this Statement is of
20         their free act and deed.
21       I have affixed my name and official seal
22 this _____ day of_____, 20____.
23       _____
         Notary Public
24
         _____
25       Commission Expiration Date
```

32 (Pages 122 - 125)

Page 126

1          ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
2            ASSIGNMENT NO: 5930128
3    PAGE/LINE(S) /       CHANGE       /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19

     _____    _____
20   Date          Gaganpreet Kaur
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23   _____
         Notary Public
24
     _____
25       Commission Expiration Date

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.