IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| DEMOND MOORE, | Case No.  1:22-cv-00548-MRB |
| Plaintiff, | JUDGE: BARRETT |
| v. | MOTION FOR SUMMARY JUDGMENT |
| NEXT GENERATION HOSPITALITY LLC. | |
| Defendant | |

Pursuant to Federal Rule of Civil Procedure 56, Defendant Next Generation Hospitality, LLC, d/b/a Kings Inn & Suites ("NGH"), respectfully submits the following Motion for Summary Judgment.

**FACTS**

Defendant operates Kings Inn and Suites in Mason, Ohio.  Plaintiff was hired in 2021 as a house-keeping employee.

Prior to working for Kings Inn, Plaintiff had been engaged in a sexual relationship with one of his supervisors, Wanda Craddock.  During his deposition, he described her as his "friend" and denied any "romantic relationship."  (Pl. Depo., Doc#10-1, PageID#146-147 ("I don't have to be in a romantic relationship to have sex with anybody…").)  Notably, the relationship ended prior to his working for Kings Inn.  He testified:

> Q. … Was the last time you had sex with Ms. Craddock prior to your working at Kings Inn?
> A. Yes.
> Q. Why did you guys stop having sexual relations?
> A. What do you mean? We -- I don't -- I'm not -- we just don't do it. I don't -- I just -- I'm not interested.

1

> Q. So just so I'm clear, at some point prior to your working at Kings Inn, you guys stopped having sexual relations, but you can't tell me why?
> A. We just stopped. There was no reason.

(Pl. Depo., Doc#10-1, PageID#147.) In his employment application, Plaintiff lied about his experience and education. (Pl. Depo., Doc#10-1, PageID#154 ("So when you wrote down that you completed three years at Wright State on your job application, that was not a true statement, was it? A. No, it was not.").) Plaintiff indicated that he did not have any health issues or concerns.[1]

(Application, Doc#10-12; PageID#219.) This is consistent with the Manager's deposition testimony:

> Q. Did anyone ever mention to you when Mr. Moore was hired that he had any kind of physical limitations at all?
> A. No.

(Kaur Depo., Doc#10-2, PageID#181-182.)

On February 8, 2021, Craddock, noted in an email that Plaintiff had not completed his assigned tasks. She noted that Plaintiff "worked about 10 hours this day and overall completed a few room request per the owner and disregarded every task that was given to him to do.. [Plaintiff] clearly is defiant and refuses to obey orders, from his Manager/Supervisor and the owner…" (Email,

---

[1] Plaintiff had answered an interrogatory that he had included this information in his job application. This was a lie. (Pl. Depo., Doc#10-1, PageOD#154.) During his deposition, Plaintiff claimed there was a "Second" job application. Nobody has seen this. (Pl. Depo., Doc#10-1, PageID#154.) Of course, when asked if he described any health concerns on this second application, he could say only "I don't remember." (Pl. Depo., Doc#10-1, PageID#154.)

2

Doc#10-3, PageID#207.) Another manager wrote a Memo. stating "During his whole shift [Plaintiff] was being rude and disrespectful." (Memo., Doc#10-4, PageID#208.) Plaintiff was given a verbal warning and asked to improve. This did not happen. His supervisor later wrote:

> This statement is in reference to an employee [Plaintiff] after the time of the verbal documentation on 2/8/2021 in which there was a conversation on the performance and quality of work of [Plaintiff], following the conversation there was an agreement that tasks given to him would be completed and quality of work would improve. Since then [Plaintiff] has not improved yet he has made it very difficult for others to work creating a hostile environment. I have attempted to approach [Plaintiff] on this behavior and he intentionally ignores me and doesn't follow through with work assignments and just clocks out and leaves anytime you attempt to follow up with him. [Plaintiff] doesn't listen to any direct orders from his supervisor, the owner and GM of the hotel. [Plaintiff's] acts of insubordination is very disturbing and takes away from the focus and the needs of a working environment.

(Statement, Doc#10-5, PageID#209.) On February 16, 2021, Plaintiff received a written warning after he showed up late for work.

(Disciplinary Action Form, Doc#10-6, PageID#211.) Plaintiff was given a "Second Warning" on March 10, 2022. The warning notes that "He constantly fails to complete his assigned work & becomes combative with the MGT team." (Employee Write Up, Doc#10-7, PageID#212-231.)

3

| Type of Warning | | |
|---|---|---|
| ☐ First Warning | ☒ Second Warning | ☐ Final Warning |

| Type of Offenses | | |
|---|---|---|
| ☐ Tardiness/Leaving Early | ☒ Absenteeism | ☐ Violation of Company Policies |
| ☒ Substandard Work | ☐ Violation of Safety Rules | ☐ Rudeness to Customers/Coworkers |
| ☐ Other: | | |

**Details**

**Description of Infraction:** On 2/9/2021 Alex was informed in a meeting with management that we only needed housekeepers, able to clean 2 room per hours. If unable to do that job, we would not have work for him. He replied no problem If that is what you need that's what I will do, but I need 40 hours. He was also told that he would be given assignments in writing & that is what he would need to do along with notifying the MOD hourly of his completed rooms so the system could be updated. 3/10/21 he failed to complete his work assignment for the 2nd day in a row. He also pulled another employee off her board leaving us short the needed rooms to sell & killing productivity. On 3/9 he completed 10 of 12 rooms & the 10 he completed the bed were already made. 3/10 he & the employee he removed from her board completed 11 of 15 rooms he was assigned & 4 of those the beds were made. Alex is not meeting the minimum standard required. He constantly fails to complete his assigned work & becomes combative with the MGT team. He was 52 minutes late for his shift without calling.

(Employee Write Up, Doc#10-7, PageID#212-231.)

On March 13, 2021, Plaintiff presented a note from a chiropractor recommending that he be limited to "light duty" through March 18, 2021. (Authorization, Doc#10-8, PageID#214.) This is the first time Defendant was aware that Plaintiff had some physical issues:

> Q. Before you received this form, did he ever make any requests for light duty, request accommodations in any way?
> A. No.
> Q. Did he ever express to you that he was having physical issues or limitations in any way?
> A. No.

(Kaur Depo., Doc#10-2, PageID#189.) Defendant, without asking for additional documentation or medical records, complied and assigned him lighter tasks for the week. (Kaur Depo., Doc#10-2, PageID#189 ("we made sure he was on light duty during this time period").)

On March 15, 2021, the Assistant General Manager wrote a Memorandum documenting his continued inappropriate and insubordinate conduct. (Statement, Doc#10-9, PageID#215.) She wrote:

> Since January 2021, [Plaintiff] has been creating a hostile work Environment His attitude shifts daily regarding the wok he has 10 do. He has accused me (manager/owner) of being a racist multiple times. [Plaintiff] continues to complain

4

when he is asked a question regarding his housekeeping board. [Plaintiff] also has left his shift w/o completing the tasks he has been assigned for the day. It has become impossible to foster a productive, collegial work environment when he continues 10 be combative and disrespectful to the management and the staff at Kings Inn and Suites.

(Statement, Doc#10-9, PageID#215.)[2] Plaintiff's misconduct continued. On March 18, 2021, Plaintiff was rude to a guest. This was documented in another Memorandum.[3] (Memorandum, Doc#10-10, PageID#216.) The Manager described the incident in her deposition:

> …I was at the front desk when a guest came down, and he told me about this incident where they asked [Plaintiff] that – they needed some towels. He's like oh, you need to go downstairs. Like this is my -- he told me something like this is -- like this is not my job, or something along those lines, but I don't remember exactly what was said. I know the guest came, and he told me this.
> So I said Alex -- like I did talk to him about this, so -- but he just wasn't professional and did not help the guest….
> I asked him what happened, but -- I mean, either way, he just didn't do his job. Like in the hospitality business, we are -- if a guest asks for something, you make sure the guest gets it, so -- either, you know, pleasantly he could have said it, but he didn't say that…

(Kaur Depo., Doc#10-2, PageID#190.) The manager further testified:

> To the point if you are being rude to our staff, to me that's fine. But when you take it outside to our guests, yeah, that's a problem for me. So this is something that, you know, he is already being unprofessional with us, and now you're taking your anger and whatever issues you have out on our, you know, guest now.

---

[2] Plaintiff denied that this statement was accurate. However, when asked why supervisors would fabricate these statements, he was unable to identify a discriminatory motive. He simply said that they were upset that he was unable to make "14 freaking beds every day." (Pl. Depo., Doc#10-1, PageID#162.)

[3] Plaintiff initially at his deposition said that the allegation from the guest was "bogus." (Pl. Depo., Doc#10-1, PageID#162.) However, when asked why supervisors would fabricate these statements, he was unable to identify a discriminatory motive. He changed his story and admitted that the interaction with the customer occurred:

> Q. So, again, can you think of a reason why Ms. Kaur would create false information about you?
> A. I didn't say that was false. I said that was true. I remember that guest.

(Pl. Depo., Doc#10-1, PageID#162.)

5

> So this was a huge no for me. Like essentially this was kind of the last straw for me with him, and I, you know, decided that he should no longer work for us….

(Kaur Depo., Doc#10-2, PageID#200.)

On March 26, 2021 Plaintiff, again, arrived late for work for the eleventh straight time. (Kaur Depo., Doc#10-2, PageID#191.) The Manager testified that Plaintiff was "just running around the building, being aggressive towards [his manager], just yelling, screaming, especially around the building when you're just going around, guests are watching, like we don't need that." (Kaur Depo., Doc#10-2, PageID#201.) Management at the hotel decided to terminate Plaintiff. The manager testified:

> A. … at that point, we did decide that, you know, this is continuing on multiple days, multiple times, that we should probably, you know, fire him at some point, so --
> Q. Was it based on his insubordination, talking back and being disrespectful for that, or not doing his duties? What was the reason why you were thinking about terminating him?
> A. Both. He would not show up to work. He would show up to work late…. He would not tell us where he's at. When we need rooms cleaned, we're hunting down to look for him. He was just disobedient. He was crazy. So there were a lot of factors in play. It was just not one instance that – you know, unfortunately it happened this way that he was fired, but there were a lot of things leading up to it that we were thinking about firing him.

(Kaur Depo., Doc#10-2, PageID#193.) As documented in a contemporaneous Memorandum, when told by the General Manager that he was likely to be terminated, instead of promising better conduct he continued to be rude and insubordinate. (Memorandum, Doc#10-11, PageID#218.) She wrote:

> [Plaintiff] returned to the laundry area even more aggressive while insulting me, saying you a dirty bitch you let me work and then you fire me. .. He said you going to hear from my lawyer cause you fucked up firing me while on restrictive duty.

(Memorandum, Doc#10-11, PageID#217-218.) The manager testified at her deposition: "Like he was being very disruptive that day. He came to work late. He wasn't doing anything. Like that was it. That was when we fired him." (Kaur Depo., Doc#10-2, PageID#176.)

This litigation followed.

6

**ARGUMENT**

A.   **Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant has the burden of establishing that there are no genuine disputes of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). A court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).

B.   **The Discrimination Claims**

In Counts I, II, VII, VIII and XI, Plaintiff asserts discrimination claims under state and federal law related to the termination of his employment. In Counts I and II, Plaintiff asserts a claim for Gender Discrimination under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII") and Ohio Rev. Code § 4112.02. In Counts VII and VIII, Plaintiff asserts a claim for disability discrimination under the Americans with Disability Act, 42 U.S.C. § 12112. In Count XI, Plaintiff alleges a claim for "retaliatory discrimination" under both Title VII, the ADA, and R.C. Chapter 4112.

   1.   **All Discrimination Claims Fail Under the *McDonnell Douglas* Test Because Defendant "Was A Bad Employee"**

The Sixth Circuit has instructed that this Court should analyze both discrimination and retaliation claim under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 394 (6th Cir. 2017); *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011). Under this test, assuming that Plaintiff can

7

establish a *prima facie* case of employment discrimination, the burden shifts to the defendant to articulate a non-discriminatory explanation for the employment action. *Gamble v. JP Morgan Chase & Co.*, 689 F. App'x 397, 401 (6th Cir. 2017). If the defendant does so, the burden shifts back to the plaintiff to show the defendant's explanation is pretextual. *Id.*

Assuming, initially, that Plaintiff can make a *prima facie* case that he was fired for a discriminatory reason, (*but*, *see*, *infra*), Defendant had numerous non-discriminatory reasons to terminate Plaintiff. Plaintiff was terminated because he was "disruptive," "disobedient," and "did not listen." (Kaur Depo., Doc#10-2, PageID#176.) The manager testified:

> … He would not show up to work. He would show up to work late… He would not tell us where he's at. When we need rooms cleaned, we're hunting down to look for him. He was just disobedient. He was crazy.

(Kaur Depo., Doc#10-2, PageID#193.) Further:

> He was just a bad employee, just simple as that. He just didn't do his job as described. So that's honestly the whole reason here, that he just was being disrespectful and rude to staff, including guests. He was disobedient most of the time, did not follow any directions, any rules. Like that is simply it. He was just a terrible employee, and I would never hire him again.

(Kaur Depo., Doc#10-2, PageID#201.) These reasons, as described *supra* in the statement of facts, were well documented over a period of time. (*See*, *supra*, Statement of Facts (collecting documents.)[4]

---

[4] To meet his burden under the McDonnell Douglas framework, Plaintiff would have to show that those non-pretextual reasons were, in fact, pretextual. He could do so by showing that those reasons (1) had no basis in fact, (2) didn't actually motivate his firing, or (3) were insufficient to explain the firing. Regardless of which option is used, Plaintiff would have to produce sufficient evidence that would allow a jury to reasonably reject Defendant's reason for the firing and infer that the real reason was discrimination. But even then, if Defendant had an honest belief in its reasons for firing Plaintiff – that is, if the decision was reasonably informed and considered – then Plaintiff cannot establish that those reasons were pretextual even if they were wrong. *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 559 (6th Cir. 2009).

### 2. Plaintiff's Gender Discrimination Claims Fail Because He Admitted "I Didn't Say [My Supervisor] Discriminated Against Me On My Gender"

Title VII makes unlawful an employer's failure or refusal "to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).[5] In order to establish a *prima facie* case of reverse sex discrimination, Plaintiff is required to show: (i) that Defendant is the unusual employer who discriminates against men, (ii) that he was qualified for his position, (iii) that Defendant took an adverse action against him, and (iv) that he was treated differently from similarly situated women. See *Becker v. Elmwood Local School Dist.*, 519 F.App'x 339, 342 (6th Cir. 2013); *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 568-69 (6th Cir. 2009); *Arendale v. City of Memphis*, 519 F.3d 587, 603-04 (6th Cir. 2008). Because Plaintiff is male, the Sixth circuit conduct a "modified analysis" as to the first and fourth prongs. *Suimpson,* 359 F.Appx. at 569.

Plaintiff fails on prongs (i) and (iv). To prevail on the first prong in the "modified analysis," Plaintiff must "demonstrate background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority." To prevail on the fourth prong, Plaintiff "must show that the defendant treated differently employees who were similarly situated but were not members of the protected class." *Simpson*, 359 F. App'x at 569. Plaintiff may demonstrate that Defendant discriminates against male employees by presenting either (i) direct evidence that he was fired at least in part because of his gender; or (ii) indirect evidence that permits an inference of illegal discrimination, such as, for example, "statistical evidence or employment policies…" *Treadwell*

---

[5] The elements and legal standard for establishing unlawful gender discrimination are the same under both statutes; accordingly, they are discussed here together. *Gutierrez v. Stonemor G.P.*, S.D.Ohio No. 1:18-cv-876, 2020 U.S. Dist. LEXIS 259815, at *7 (Apr. 24, 2020) ("we need not analyze state and federal [gender discrimination] claims separately"), *citing inter alia Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 828 (6th Cir. 2000).

9

*v. Am. Airlines, Inc.*, 447 F. App'x 676, 678 (6th Cir. 2011). Significantly, Plaintiff's "own situation cannot provide that contrast," as "some indication of impermissible discrimination in addition to the plaintiff's own poor treatment is necessary to support an inference of impropriety." *Id.*

Plaintiff has provided no evidence suggesting even a "suspicion" that Defendant discriminates against men in general or specifically fired him based on his gender. His interrogatory response, when asked to state the basis of his claim that he was discriminated against because of his gender, only mentions his own treatment – and even this is minor and not tied to gender, such as allegedly being "followed around." (Interrogatory Answers, Doc#10-13, PageID#233-234.) He failed, in his deposition, to suggest and specific incidents of discrimination independent of some different conversational tones:

> I didn't say [his supervisor] discriminated against me on my gender. You asked me did she treat me different. I said she treated me different because I was a male. You know, just different in conversation. Like women say hey, girl, how are you doing…

(Pl. Depo., Doc#10-1, PageID#161.) He further testified:

> Q …You're claiming as we sit here today defendant treated you, quote, differently than other similarly situated employees based on his gender, end quote. Tell me how.
> A. Well, making me feel -- making me feel like, you know, since I'm a man, I should be able to do more and handle more…
> Q. Any other way you were treated differently than other --
> A. No.
> Q. -- similarly situated --
> A. No.

(Pl. Depo., Doc#10-1, PageID#163.) He also testified unequivocally that this was *not discriminatory*:

> Q. So did anyone at Kings Inn & Suites discriminate against you on the basis of your gender during your employment?
> A. No, not because I'm a man.

(Pl. Depo., Doc#10-1, PageID#161.)

10

Plaintiff has produced less evidence of discrimination than plaintiffs in other Sixth Circuit cases whose claims failed to survive summary judgment on reverse discrimination claims.[6] Defendant, in response to an interrogatory, offered no statistical evidence or employment policies indicating that Defendants treated males unfavorably. (Interrogatory Ans. No. 16, Doc#10-13, PageID#233-234.) No could he definitively identify any similarly situated employees. (Pl. Depo., Doc#10-1, PageID#163.) In *Simpson* and *Becker*, *supra,* the plaintiffs' discrimination claims were unable to survive a motion for summary judgment even after the plaintiffs presented *some* evidence about other employees who allegedly engaged in similar misconduct but were not disciplined. 359 F.App'x at 569; 519 F.App'x at 342. In *Treadwell*, the plaintiff had provided witness statements attesting that the employer treated people unequally. This, too, – which is far more than Plaintiff provided in discovery – was insufficient to avoid summary judgment. The Sixth Circuit said: "Our circuit's heightened standard for reverse-discrimination cases presumes that such discrimination is comparatively rare, and that some indication of impermissible discrimination in addition to the plaintiff's own poor treatment is necessary to support an inference of impropriety." 447 F.App'x at 679 (6th Cir. 2011).

> 3. **Plaintiff's Disability Discrimination Claims Fail Because "Scoliosis" Does Not Constitute A Disability And Failed To Identify Any Nondisabled Person Who Was Treated More Favorably**

The ADA protects an employee from discrimination because of a disability. *See Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008). A "basic element for a cause of action under the ADA" is that the employer "harbored an 'animus toward the disabled' that was a but-for

---

[6] This Court should disregard any affidavits or other evidence executed after the discovery unless Plaintiff adequately explains why he failed to depose or obtain sworn affidavits prior to the discovery deadline. Defendant also pre-emptively observes that notes that case law has established that "conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact and are insufficient to withstand a motion for summary judgment." *Helton v. World Wide Fin. Servs., Inc.*, No. 01-CV-74288, 2003 U.S. Dist. LEXIS 26156, *18 (E.D. Mich. March 31, 2003).

cause" of the discrimination. *Gamble v. Greater Cleveland Reg. Transit Auth.*, No. 15-4208, 2017 U.S. App. LEXIS 16219 (6th Cir. June 2, 2017), *quoting Gohl v. Livonia Pub. Sch. Sch. Dist.*, 836 F.3d 672, 682 (6th Cir. 2016).[7]

As an initial matter, Plaintiff cannot show that he suffered an actual "disability" under the ADA, a plaintiff must show a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). This Court has observed that "it is clear that 'not every impairment, illness or injury will constitute a disability,' especially when the plaintiff provides 'no medical proof that [the] alleged medical conditions substantially limited a major life activity.'" *McGonegle v. Select Comfort Retail Corp.*, S.D.Ohio No. 1:19-cv-442, 2021 U.S. Dist. LEXIS 11916, at *25 (Jan. 22, 2021), *quoting Perry v. Am. Red Cross Blood Servs.*, M.D. Tenn. No. 3-13-1146, 2015 U.S. Dist. LEXIS 38515, at *2 (M.D. Tenn. Mar. 26, 2015). In this case, Plaintiff testified only that because of scoliosis he could not "touch his toes" and that "it's difficult to do a lot of -- you know, long periods of standing." (Pl. Depo., Doc#10-1, PageID#152.) Such difficulties do not show actual disability. *See Jones v. AKKO Fastener, Inc.*, S.D. Ohio No. 1:09-cv-286, 2010 U.S. Dist. LEXIS 86368, at *11 (Aug. 23, 2010) (difficulties must be more than merely "inconvenient" to achieve the "severity required to qualify the ailment as a substantial limitation"). Plaintiff has not produced evidence shown that his scoliosis substantially limits a major life activity; he admitted he had no documents to support his disability, and produced no expert testimony in discovery. (Pl. Depo., Doc#10-1, PageID#152-153; Interrogatory Answers 14, 15, 17, Doc#10-13, PageID#231-235.) *See Peterec-Tolino v. Commercial Elec. Contrs., Inc.*, S.D.N.Y. No. 08 Civ. 0891, 2011 U.S. Dist. LEXIS 125102, at *13-14 (Oct. 26, 2011) (finding that claim of scoliosis was insufficient to support a finding that these impairments

---

[7] Ohio's disability discrimination law parallels the Americans with Disabilities Act in all relevant respects. *Belasco v. Warrensville Heights City Sch. Dist.*, 634 F. App'x 507, 514 (6th Cir. 2015).

substantially limited plaintiff in major life activities). *Cf Daniell v. Commr. of Social Sec.*, M.D.Fla. No. 8:15-cv-1563-T-JSS, 2016 U.S. Dist. LEXIS 93882, at *25-26 (July 19, 2016) ("the diagnosis and continued treatment of Plaintiff's scoliosis is not, in itself, determinative of disability, nor does it establish functional limitations resulting from the disorder").

Plaintiff, when asked to provide a basis for his disability claims in interrogatory answers, failed to identify any nondisabled person who was treated more favorably. (Interrogatory Answers Nos. 15, 17) This is fatal to his claims; the Sixth Circuit has held that a plaintiff alleging disability discrimination needs first to establish a *prima facie* case of discrimination by "showing that similarly situated non-protected employees were treated more favorably." *Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 660 (6th Cir. 1999). Plaintiff, like with his gender discrimination claim, has produced less evidence of disability discrimination than plaintiffs in other Sixth Circuit cases whose claims failed to survive summary judgment. In *Griffin v. Secy. of Defense*, 6th Cir. No. 23-3220, 2023 U.S. App. LEXIS 32390, at *9 (Dec. 5, 2023), a plaintiff's claim was dismissed on summary judgement when the disabled individual had not "identified a nondisabled comparator employee or pointed to evidence that, after he was fired, [the plaintiff] was replaced by a nondisabled person or that his position remained open." Similarly, in *Hoffman v. O'Malley*, 849 F.App'x 535, 539 (6th Cir. 2021), a plaintiff's claim was dismissed on summary judgement where she "failed to present to the district court evidence on the disability status of any of the employees she alleged were treated more favorably than her."

C. **Plaintiff's Sexual Harassment And Hostile Work Environment Claims Fail Because He Merely Claims That Defendant Maintained "A Very Not Pleasant Place To Work"**

In Counts III, IV, V, and VI, Plaintiff asserts sexual harassment and hostile work environment claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* and R.C. c. 4112.[8] In order to successfully bring a claim for sexual harassment based upon the creation of a hostile work environment, Plaintiff must establish five elements: (i) the employee is a member of a protected class, (ii) the employee was subject to unwelcome sexual harassment, (iii) the harassment complained of was based on sex, (iv) the sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive work environment, and (v) the existence of *respondeat superior* liability. *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 49 (6th Cir. 1996).

Plaintiff's claims fail because he fails to allege any actionable harassment. The record shows that Plaintiff had a previous consensual sexual relationship with Ms. Craddock, the housekeeping manager. His Interrogatory Answer states:

> Plaintiff was in a casual romantic relationship with Wanda [Craddock] from 2018 until 2020, prior to his employment with Defendant. Plaintiff and [Craddock] did not meet up frequently, and only saw each other once or twice a week.

(Interrogatory Answer No. 10.) Significantly, Plaintiff clarified in his deposition that the sexual relationship ended prior to his work for Defendant. (Pl. Depo., Doc#10-1, PageID#147.) There is no evidence that the existence of this prior relationship interfered with Plaintiff's work performance. Nor is there any evidence that while he was employed by Defendant, Craddock continued with any sexual advances.

---

[8] The elements and legal standards for evaluating hostile work environment sexual harassment claims are the same under both federal and state law. *Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 828 (6th Cir. 2000); *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009).

In his deposition, Plaintiff complains about how he was treated, but never testified that he was actually subjected to sexual harassment or harassment on the basis of his disability.  In other words, Plaintiff does not claim that the mere fact that he had a prior consensual relationship with his supervisor is conduct that is sufficiently severe or pervasive to create an intimidating, hostile, or abusive work environment that altered the conditions of his employment.  *Cf. Velis v. Deepti Sadhwani,* S.D.Fla. No. 21-14128-CIV, 2022 U.S. Dist. LEXIS 3150, at *12 (Jan. 5, 2022) (request to resume a prior consensual relationship was not "severe or pervasive sufficient to alter the conditions of [plaintiff's] employment and create an abusive working environment"); *Hollis v. Acoustic Sounds*, Inc., D.Kan. No. 13-CV-1083, 2014 U.S. Dist. LEXIS 25695, at *16 (Feb. 28, 2014) (noting that "emotional response of a jealous ex-boyfriend" did not constitute "unlawful harassment based on plaintiff's sex").

Plaintiff offers no evidence or testimony which would permit a jury to find that Craddock made any unwelcome sexual advances towards him, threatened to terminate or affect her employment unless they re-started the sexual relationship, or in any way demanded sex from him.  The best Plaintiff can offer that that, as he testified at his deposition, another supervisor, Ms. Williams, mentioned the relationship and generally "made it a very -- a very not pleasant place to work." (Pl. Depo., Doc#10-1, PageID#148.)  When pressed about what was unpleasant, Plaintiff failed to attribute anything to the prior relationship or sexual harassment.  Instead, he specifically complained that he was asked to wash the windows and shovel snow.  (Pl. Depo., Doc#10-1, PageID#148.)  That was the extent of his complaints:

> Q. Anything else that she did that made it not a pleasant place to work?
> A. No.
> Q. Anything else she did that caused you emotional stress and anguish?
> A. Not that I can recall.

(Pl. Depo., Doc#10-1, PageID#148.)

Plaintiff's claims cannot survive summary judgment because he was unable to testify in his deposition that he was discriminated against or harassed because of his prior sexual relationship with Craddock.

> Q. Did anyone discriminate against you because you had had a previous sexual relationship with Ms. Craddock?
> A. I can't answer that.

(Pl. Depo., Doc#10-1, PageID#161.) Plaintiff is similarly unable to claim that his prior affair with Craddock affected Defendant's decision to fire him because the manager had no knowledge of the relationship:

> Q. Did the manager on duty know that you had had a previous sexual relationship with Rhonda Craddock?
> A. I don't know.
> Q. Do you have any reason to believe she would know?
> A. I don't know. I can't answer that question.
> Q. Did you ever tell her?
> A. No, I didn't have discussions like that with her. That's personal.
> Q. So just so we're clear, it's your testimony today that you never told [the manager] that you had a sexual relationship with Rhonda Craddock?
> A. We never had a discussion about that, that is correct.

(Pl. Depo., Doc#10-1, PageID#158.)

The failure of Plaintiff to tie this extra work – or anything else – to any sexual conduct is fatal to his claim. "Title VII is not 'a general civility code for the American workplace.'" *Wasek v. Arrow Energy Servs.*, 682 F.3d 463, 467 (6th Cir. 2012), *quoting Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 79 (1998). "[T]he conduct of jerks, bullies, and persecutors is simply not actionable under Title VII unless they are acting because of the victim's gender." *Wasek*, 682 F.3d at 467. Plaintiff has not, in discovery, produced any evidence that Defendant's employee made sexually inappropriate comments. Plaintiff has provided to evidence that similarly situated individuals were not subject to harassment. Nor has Plaintiff produced any evidence that the alleged harassment was sufficiently

severe or pervasive when looking at the totality of the circumstances. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

Finally, even if harassment occurred, Defendant cannot be liable because Plaintiff failed to report any harassment on the basis of sex or disability to his supervisor:

> Q. Did you ever report sexual harassment to your supervisor?
> A. No.
> Q. Did you ever report disability discrimination to your supervisor?
> A. Disability, no, I did not.

(Pl. Depo., Doc#10-1, PageID#163.)

### D. Plaintiff's Failure To Accommodate Disability Claim Fails Because Defendant Gave Him What He Asked For

In Count XI, Plaintiff alleges that Defendant failed to make reasonable accommodations for his alleged disability. The ADA includes failure to make reasonable accommodations for a disabled but otherwise qualified employee in its definition of "discrimination," and the legal framework for failure to accommodate claims is a version of the framework for disability discrimination claims. *Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007).

Initially, as shown *supra,* Defendant cannot show that he was disabled.

More to the point, Defendant cannot be held liable for failing to provide an accommodation that Plaintiff never requested for a disability that Defendant was unaware Plaintiff had. Plaintiff is also unable to identify any specific adverse employment action based on his disability. Defendant, in his interrogatory answers, states that Plaintiff "made multiple complaints about the removal of his accommodations and increased workload," that "Defendant did not take any action to address the removal of Plaintiff's accommodations," and "Defendant terminated Plaintiff's employment for pretextual reasons." (Interrogatory Answer No. 14.) None of this is supported by the record.

Instead, the record shows that Plaintiff did not disclose any disabilities or physical limitations when he was hired. His job application left that section blank. (Application, Doc#10-12, PageID#219.) He also admitted in his deposition that he never reported unfair treatment related to his alleged disability to a supervisor. (Pl. Depo., Doc#10-1, PageID#163 ("Q. Did you ever report disability discrimination to your supervisor? A. Disability, no, I did not.").) The Manager testified:

> Q. And did he ever … give you any notice of his disability or inability to perform any of the essential functions of his job?
> A. No.
> . . .
> Q. Did he ever complain to anyone about the failure to give him accommodations based on a perceived disability?
> A. No.

(Kaur Depo., Doc#10-2, PageID#196.)

Finally, in order to prevail on his failure to accommodate claims, Plaintiff must show that defendant failed to provide the necessary reasonable accommodation. *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018) (describing elements of claim). Assuming Plaintiff had a disability, and assuming that this disability was disclosed, the record shows that the one time Plaintiff requested an accommodation for health issues, Defendant more than complied with the law by allowing him to be on "light duty." Plaintiff brought in a one-page note from his chiropractor suggesting that he be placed on "light duty" for a few days. Defendant accommodated this request; Plaintiff was permitted to work on "light duty" without requesting any additional documentation. The Manager testified:

> Q. Did he provide any other documentation along with this document?
> A. No.
> Q. Did he provide a description of what injuries or disabilities he had?
> A. No.
> Q. Did you make accommodations for him as a result of receiving this document?
> A. Yes.

> Q. And after the last date of this document, March 8th of 2021, did he indicate to you that he was unable to perform any of his job duties?
> A. No.

(Kaur Depo., Doc#10-2, PageID#196.)

## CONCLUSION

Summary Judgment should be granted in in favor of Defendant on all counts. Costs should be awarded to Defendant. Defendant further requests that that Court permit Defendant 45 days to submit a motion for fees pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1927, or other applicable statute.

Respectfully submitted,
/s/ Joshua A. Engel
Joshua Adam Engel (0075769)
ENGEL AND MARTIN, LLC
4660 Duke Dr., Suite 101
Mason, OH 45040
(513) 445-9600
engel@engelandmartin.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served via the Court's ECF System this March 14, 2024 upon all counsel of record.

/s/ Joshua Engel
Joshua Adam Engel (0075769)