**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| Demond Moore, ) | |
| ) | |
| Plaintiff, ) | Case No.: 1:22-cv-00548 |
| ) | |
| vs. ) | Judge Michael R. Barrett |
| ) | |
| Next Generation Hospitality LLC ) | |
| d/b/a Kings Inn & Suites, ) | |
| ) | |
| Defendant. ) | |

**OPINION & ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 11). Plaintiff filed a memorandum in opposition (Doc. 13), to which Defendant replied (Doc. 14). For the reasons that follow, Defendant's Motion will be GRANTED.

**I.    BACKGROUND**

**A. Plaintiff's Employment History with Defendant**

Defendant Next Generation Hospitality LLC ("NGH") operates Kings Inn & Suites ("Kings Inn") in Mason, Ohio. In the relevant time period, Gaganpreet ("Gini") Kaur was the "acting owner on the property[]" and managed "day-to-day operations there." (Doc. 10-2, Kaur depo., PAGEID 10–13 (10:9–11:14; 12:12–13:7)). Kaur's father owns the hotel. (*Id.*).

Demond Alex Moore[1] applied for a job at Kings Inn on September 23, 2020. (Doc. 10-12 PAGEID 219). The application asked the applicant to indicate "[a]ny Health

---

[1] Moore testified that he goes by his middle name, Alex. (Doc. 10-1, Moore depo., PAGEID 142 (7:3–6); PAGEID 145 (19:7–20); *see, e.g.*, Doc. 10-2, Kaur depo., PAGEID 175 (11:25–12:6)).

1

Issues or concerns". (*Id.*).  Moore left this space blank. (*Id.*).[2]  He started work in October 2020.  (Doc. 10-2, Kaur depo., PAGEID 195 (90:20–23)).  Nikki Williams, general manager,[3] and (likely) Rhonda Craddock, then-housekeeping manager,[4] made the decision to hire Moore.  (*Id.* PAGEID 181 (37:4–19)).  Kaur testified, "Rhonda and Nikki, they worked before, so a lot of like the employees that came in they knew.  So I always trusted their judgment on who they were hiring." (*Id.* PAGEID 181 (37:20–23)).

Moore testified that he was hired as a "houseman" as opposed to a "housekeeper".[5]  (Doc. 10-1, Moore depo., PAGEID 159 (74:12–15)).  "That means just

---

[2] When asked why, Moore explained:

> A. **I left it blank**.  I left it blank, because when I was filling out the application, I said now you know I had this back surgery.  They said oh, that's ok.  Don't worry about it.  And that – and that was it.
> Q. And you're saying now – so now is it your testimony that there's a separate mystery job application out there somewhere –
> A. Well, I'm –
> Q. – that you detailed all your health information?
> A. I'm saying that there was two applications.  There was another – there was a paper application.  There was a one-page application, and then there was another application that was – that was two pages.  So I don't know.  I don't know.
> Q. Well, this is two pages here.
> A. It's not folded.
> Q. This is two pages.
> A. It wasn't folded.  It wasn't folded.  There was an application that was two pages.  There was another application that was a one-page.
> Q. And it's your testimony that you wrote about your health issues on that one-page mystery application?
> A. I didn't say that.  **I just said there were two applications.**
> Q. **Did you write on that other application about your health issues?**
> A. **I don't – I don't remember.  I don't remember.**  Because I don't have it in front of me, so I wouldn't be able to answer that question.

(Doc. 10-1, Moore depo., PAGEID 154–155 (57:14–58:23) (emphasis added)).  Separately, Moore admitted to lying about his educational background on the application.  Listing that he completed three years at Wright State University "was not a true statement[.]"  (*Id.* PAGEID 154 (55:8–56:17)).

[3] (Doc. 10-2, Kaur depo., PAGEID 175 (12:17–18)).

[4] (Doc. 10-2, Kaur depo., PAGEID 180–181 (33:19–34:6)).

[5] The application likewise asked the applicant, "What position are you applying for?"  Moore left this space blank, too.  (*See* Doc. 10-12 PAGEID 219).

go around sweep, you know, do a little mopping, do a little stuff here and there in the main lobby, you know, stuff like that, not – not – not strenuous.  Not a lot." (*Id.* PAGEID 153 (53:3–8)).[6]  In contrast, a "housekeeper" cleans rooms and makes beds.  (*Id.*; PAGEID 159 (74:11–15)).  Kaur, on the other hand, testified that Moore was working "in a housekeeping **capacity**."  (Doc. 10-2, Kaur depo., PAGEID 180 (30:15–23) (emphasis added)).  "So he was – during Covid times, everybody was working in different capacities.  So he was in a housekeeping role, so we had him work as a housekeeper, laundry, and houseman."  (*Id.*).

Things started well.  (Doc. 10-2, Kaur depo., PAGEID 182 (38:13–21)).  In Moore's words:

> [E]verything was great.  In fact, they were happy to get me, because, again, we all had worked together.  We were – you know, I thought we were all friends.  You know, I thought we were, you know, a work family, quote, unquote.
>
> They was glad to get me, because they knew they would get the job done, you know, as far as the cleanliness of the hotel.  Because they were suffering in that aspect with points.  They were trying to build up their clientele, so that's what was going on.

(Doc. 10-1, Moore depo., PAGEID 164–165 (97:22–98:11)).  Because "his work ethic was great" and "he was going a good job," Moore was appointed housekeeping manager (likely in January 2021) on a temporary basis to cover a leave of absence. (Doc. 10-2, Kaur depo., PAGEID 180 (30:24–31:21)).

---

[6] (*See* Doc. 10-1, Moore depo., PAGEID 165 (98:12–21) ("My job duties were to make sure that the lobby was clean, make sure that the upstairs, the different floors were clean and vacuumed, and, you know, different things like that, the windowsills were free of debris, bathrooms in the lobbies were cleaned.  Just mainly the – what they call the public areas.  I was in charge of public space.")).

But, not long after, things fell apart.  In February 2021, "everything started to go downhill" with Moore.  (*Id.* PAGEID 180 (31:22–32:1)).  On February 8, 2021, Wanda Craddock emailed an "Incident Report" to Gini Kaur and Nikki Williams.  (*Id*. PAGEID 184 (48:2–21)).  It reads:

> This statement is in reference to employee Demond Moore On 2/6/2021 on this day he was given a task to do when he arrived to work. The task sheet was not turned in at the end of the day nor was any of the task executed. Demond was asked to go and inspect a room for cleanliness and intentionally place items on the floor and told front desk agent that the room was clean. This was discovered after the task was requested. In addition Demond was asked to strip all the rooms and make all the beds in each room and it was found that none of these rooms had been stripped nor was any beds made upon checking his work on 2/7. The position in which Demond agreed to intel all of the task that is mentioned in this statement. **Demond worked about 10 hours this day and overall completed a few room request per the owner and disregarded every task that was given to him to do.. Demond clearly is defiant and refused to obey orders.** from his Manager / Supervisor  and the owner in which he is employed.

(Doc. 10-3 (emphasis added)).  That same date, Kaur, as the "Manager on Duty" diaried her own "Incident Report".  It reads:

> Demond Moore showed up an hour late for his scheduled shift. Upon his arrival he was given a board with instructions left behind by the Housekeeping Manager the day prior. He was also given a list of arrivals and due-outs for the day. During his whole shift he was being rude and disrespectful. Everytime I would come into the laundry room he was making rude comments and assumed I was following him. He was complaining about why the towels were not washed. During the shift I was washing towels. He had clean towels the whole time. **I asked him what rooms needed clean towels and he never gave me any room numbers. I asked him to give me his instructions/list which he was given in the morning. He left without giving me the list.** I went ahead and checked the list of due outs. **He only stripped 3-4 rooms out of the 10 rooms he was given. Did not make any beds per the instructions he was given. For ten hours he was here, he only cleaned three rooms.**

(Doc. 10-4 (emphasis added)). Moore was given a written warning on February 9, 2021 that noted his disobedience, poor work quality, and "creating [a] hostile work enviro[n]ment." (Doc. 10-6). He was advised to "complete his assigned tasks daily & report to [the manager on duty] and turn in his board" or face further disciplinary action "up to and including termination[.]" (*Id.*). Moore refused to sign the form or add his own statement of facts. (*Id.*; *see* Doc. 10-2, Kaur depo., PAGEID 186 (57:1–24)).[7]

Moore was given a second written warning on March 10, 2021. It reads:

> On 2/9/2021 Alex was informed in a meeting with management that we only needed housekeepers, able to clean 2 room per hours. If unable to do that job, we would not have work for him. He replied no problem If that is what you need that's what I will do, but I need 40 hours. He was also told that he would be given assignments in writing & that is what he would need to do along with notifying the [manager on duty] hourly of his completed rooms so the system could be updated. **3/10/21 he failed to complete his work assignment for the 2nd day in a row. He also pulled another employee off her board leaving us short the needed rooms to sell & killing productivity. On 3/9 he completed 10 of 12 rooms & the 10 he completed the bed were already made. 3/10 he & the employee he removed from her board completed 11 of 15 rooms he was assigned & 4 of those the beds were made. Alex is not meeting the minimum standard required. He constantly fails to complete his assigned work & becomes combative with the MGT team. He was 52 minutes late for his shift without calling.**

(Doc. 10-7 (emphasis added)). Moore's "Plan for Improvement" specified that he would "no longer act in a supervisory capacity." It reads:

> His consistent inability to meet the minimum speed and quality standards makes him unfit to lead the team even on a part-time basis

---

[7] Moore testified that Craddock's rendition of the facts was "inaccurate" and he was "sure" she was "pressured" to include false information. (*See* Doc. 10-1, Moore depo., PAGEID 156 (62:3–65:3)). When asked what evidence he had to support this allegation, he said "I don't – I don't have any evidence. I'm just giving you – I'm just telling you what I think." (*Id.* PAGEID 156 (64:25–65:9)).

> at this time. We will monitor Alex's production for the next 30 days to see if he improves and exceeds the minimum. **If there is documented improvement, we will revisit his role as a supervisory. He must meet the minimum to remain on the team as part of the housekeeping department period.**

(*Id.* (emphasis added)).[8]  Moore was advised that "[c]ontinued failure to meet the minimum productivity" could result in additional discipline, even termination.  (*Id.*).

Not long after, Moore presented an "Authorization for Light Duty" to Williams signed by a provider at Shank Chiropractic Clinic.  (*See* Doc. 10-8 ("In order to avoid aggravation of **his**/her **condition**, I recommend that he/she be limited to 'light duty'.") (emphasis added)).  "Light duty" was defined as "no lifting in excess of 30 lbs." and "no prolonged bending" for the period March 13, 2021 to March 18, 2021.  (*Id.*).  Of note, the authorization did not describe Moore's "condition".  (*See id.*).  Kaur testified that they "obeyed" this request.  (Doc. 10-2, Kaur depo., PAGEID 189 (68:10–18) ("Like he was on light duty, and we made sure he was on light duty during this time period."); *see id.* PAGEID 196 (94:12–25)).

## B. Plaintiff's Termination and this Lawsuit

The "last straw" came on March 18, 2021 when Moore was rude to a guest who asked him for towels.  (*See* Doc. 10-10; Doc. 10-2, Kaur depo., PAGEID 200

---

[8] Kaur explained that Moore was removed as housekeeping manager, "[b]ecause of his behavior, his work ethic."  (Doc. 10-2, Kaur depo., PAGEID 180 (32:2–7)).

> He wasn't doing anything in that role, so **he was basically milking our clock and doing nothing**.  So from a day-to-day – from a management perspective, we just couldn't have that anymore.  So we had to let him go for that role, but he was more than welcome to work in other roles.

(*Id.* PAGEID 180 (32:7–13) (emphasis added)).

(112:10–24) ("[I]f you are being rude to our staff, to me that's fine. But when you take it outside to our guests, yeah, that's a problem for me.")).[9] At this point, Gini Kaur's mind was made up—Moore would be terminated. (Doc. 10-2, Kaur depo., PAGEID 200 (113:4–16)).

More upset occurred on March 26, 2021. Nikki Williams fired Moore after he was again "disrespectful" and "insubordinate"; she told him to clock out and leave the property. (See Doc. 10-11 PAGEID 217). Moore resisted. (See id. PAGEID 217–218). At this point, Williams "turned around and headed to the office to get assistance if needed."

> Demond returned to the laundry area even more aggressive while insulting me, saying you a dirty bitch you let me work and then you fire me. That's why they fired you at Centre Park and I know you been going around trying to steal leads. I said okay can you please just leave the property now. He said you going to hear from my lawyer cause you fucked up firing me while on restrictive duty. I said okay I wish you the best of luck in future, he said I don't need your luck.

(Id. PAGEID 218).

This lawsuit followed. NGH moves for judgment as a matter of law as to all eleven counts set forth in Moore's (First) Amended Complaint (Doc. 3).

## II. LAW & ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[9] Moore testified that he "remember[ed] that guest." (See Doc. 10-1, Moore depo., PAGEID 162 (86:24–88:18)). He called the allegation that he was rude both "bogus" and "true." (Id.).

Fed. R. Civ. P. 56(a). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" only if its resolution affects the outcome of the suit. *Id.* On summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248–49. Additionally, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

**B. Gender Discrimination, Sexual Harassment, and Hostile Work Environment Claims under Federal and State Law (Counts I–VI)**

In response to NGH's summary judgment motion, Moore abandons these specific claims. (*See* Doc. 13 PAGEID 297–298 ("Moore does not oppose the dismissal of his claims for gender discrimination, sexual harassment, and hostile work environment, Counts I-VI.")). Accordingly, NGH is entitled to judgment as a matter of law as to Counts I, II, III, IX, V, and VI of the (First) Amended Complaint (Doc. 3). *See, e.g., Stevens v. Lockheed Martin Energy Sys., Inc.*, No. 3:06-CV-40, 2006 WL 2128861, at *8 (E.D. Tenn. July 27, 2006).

### C. Disability Discrimination Claims under Federal and State Law (Counts VII–X)

#### 1. Discharge (Counts VII & VIII)

The Americans with Disabilities Act ("ADA"), as amended by the Amendments Act of 2008,[10] makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or **discharge** of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (emphasis added). Ohio Rev. Code § 4112.02(A) prohibits discrimination generally, including "discharge without just cause," against an employee because of his "disability."[11]

A plaintiff can prove a claim for discrimination based on wrongful termination under the ADA through direct or circumstantial evidence. *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 79 (6th Cir. 2020). The direct evidence test does not apply here, as the Court will subsequently explain.

**Circumstantial evidence.** When analyzing an ADA discrimination claim based on circumstantial evidence, courts in the Sixth Circuit use an adapted version of *McDonnell Douglas*[12] burden-shifting framework. *Id.* at 79–80. Specifically, in such a circumstance, a plaintiff must show that (1) he is disabled; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse

---

[10] Pub. L. No. 110-325, § 2, 122 Stat. 3553 (2008).

[11] "Ohio courts follow federal law in regard to disability discrimination claims filed under O.R.C. § 4112.02." *Siewertsen v. Worthington Indus., Inc.*, 783 F. App'x 563, 578 n.5 (6th Cir. Aug. 20, 2019) (citing *Bloomfield v. Whirlpool Corp.*, 984 F. Supp. 2d 771, 776 (N.D. Ohio 2013)). Thus, Moore's federal and state claims rise or fall together. *See Smith v. AdvancePierre Foods, Inc.*, No. 1:18-cv-242, 2020 WL 3488580, at *9 (S.D. Ohio June 26, 2020) (Cole, J.) (citing *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 848 n.1 (6th Cir. 2018)).

[12] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) as modified by *Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).

employment decision; (4) the employer knew or had reason to know of his disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011); *Plank v. Great Am. Fin. Res., Inc.*, No. 1:19-cv-935, 2021 WL 3089374, at *8 (S.D. Ohio July 22, 2021).

As to the third element, the disability must be a "but-for" cause of the adverse employment decision. *Tennial v. United Parcel Serv.*, 840 F.3d 292, 306–07 (6th Cir. 2016). That is to say, "the plaintiff must present **sufficiently 'significant' evidence of animus toward the disabled** that is a but-for cause of the discriminatory behavior." *Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672, 682 (6th Cir. 2016) (emphasis added); *Gamble v. Greater Cleveland Reg. Transit Auth.*, No. 15-4208, 2017 WL 5135537, at *2 (6th Cir. June 2, 2017) (citing *Gohl*).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for the adverse employment action. *Brown*, 814 F. App'x at 80. If the defendant does so, the burden shifts to the plaintiff to show that the proffered reason is merely pretext. *Id.* (citing *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 298 (6th Cir. 2019)).[13]

At most, Moore meets two of the five elements necessary to establish a prima facie case: he is qualified for a housekeeping position and was terminated. Otherwise, Moore falls short.

---

[13] A plaintiff can demonstrate pretext in one of three ways. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008). He can show that the stated reason (1) has no basis in fact or (2) was not the actual reason or (3) is insufficient to explain the employer's action. *Id.*; *see Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012). Notably, a plaintiff need only produce enough evidence "to rebut, but not to disprove" the employer's justification. *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012) (quotation marks and citation omitted).

As an initial matter, Moore has not shown that he is disabled, the *sine qua non* of a disability discrimination claim. The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities[.]" 42 U.S.C. § 12102(1)(A). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A). Yet this Court has observed that "it is clear that 'not every impairment, illness or injury will constitute a disability,' especially when the plaintiff provides 'no medical proof that [the] alleged medical condition[ ] substantially limited a major life activity.'" *McGonegle v. Select Comfort Retail Corp.*, No. 1:19-cv-442, 2021 WL 229038, at *6 (S.D. Ohio Jan. 22, 2021) (Cole, J.) (quoting *Perry v. Am. Red Cross Blood Servs.*, No. 3-13-1146, 2015 WL 1401058, at *2 (M.D. Tenn. Mar. 26, 2015), *aff'd on other grounds*, 651 F. App'x 317 (6th Cir. 2016)).

Moore testified that he had back surgery (in either 2016 or 2017) because his "scoliosis" would not allow him to "touch [his] toes." (Doc. 10-1, Moore depo., PAGEID 151–152 (45:24–46:11)).[14] As it relates to his job duties at Kings Inn, "first of all, it's difficult to do a lot of – you know, long periods of standing, which is – you know, doing hotel work, you know, you're able to sit down for a little bit. There are periods. But, you know, you're not able to make beds, you know, do a lot of bending all through the day. That's – that's – I – yeah, you can't do that, not on an everyday basis." (*Id.* PAGEID 152 (48:5–16)). But when asked whether he had any medical documents indicating that he

---

[14] Moore's isolated reference to suffering from "rheumatoid arthritis" (*see* Doc. 10-1, Moore depo., PAGEID 151 (42:17–43:1)) will be disregarded.

couldn't perform his housekeeping assignments, Moore answered "**Not in hand, no**." (*Id.* PAGEID 152–153 (49:23–50:1) (emphasis added)). And he didn't "recall" whether any such documents existed. (*Id.* PAGEID 153 (50:2–5)). Moore testified that his doctor gave him "different advice, different things to do[,]" but there is no record evidence that she believed his scoliosis[15] substantially limited a major life activity. (*Id.* PAGEID 152 (49:2–22) ("I do believe I did talk to my doctor, you know, about that, you know, the bending and stuff, and, you know, she just told me things to do. You have to take breaks. Just don't do a lot of bending.")).

Moore has also failed to establish that the Kings Inn decisionmakers "knew or had reason to know" of his purported disability. As mentioned earlier, Moore left blank that part of his application inquiring about "Health Issues or concerns". Further, owner Gini Kaur testified that Moore never disclosed any injuries that would "limit" his work. (Doc. 10-2, Kaur depo., PAGEID 195 (91:19–22)). In particular, there was no mention of a back condition or a claim of being disabled. (*Id.* PAGEID 195 (93:1–13)).

Moore testified he gave notice of his alleged disability to general manager Nikki Williams. (Doc. 10-1, Moore depo., PAGEID 153–154 (53:16–54:5) ("She knew. We talked. I said – I said – I said now, Nikki, I said you know – you know I got the, you know, scoliosis and had the back injury. She says oh, yeah, I know. She says Alex, I know, because we worked together. I said okay, good. And that was – that was it.")). Crediting

---

[15] Indeed, other than his own pronouncement, there is no record evidence that Moore has even been *diagnosed* with scoliosis. A plaintiff's "bare assertions of [a spine disorder], without any supporting medical evidence" are insufficient to establish an impairment within the meaning of the ADA. *Hopper v. Bernstein Allergy Grp., Inc.*, No. 1:18-cv-671, 2020 WL 2526121, at *8 (S.D. Ohio May 18, 2020) (Dlott, J.) (quoting *Neely v. Benchmark Family Servs.*, 640 F. App'x 429, 433 (6th Cir. 2016)).

his testimony for purposes of summary judgment, Moore's claim still fails. "A prima facie case is **not made out** if the decisionmaker is **unaware of the specifics** of an employee's disabilities or restrictions, even if the decisionmaker has a general knowledge that a disability exists." *Tennial*, 840 F.3d at 306 (quoting *Arthur v. Am. Showa, Inc.*, 625 F. App'x 704, 708 (6th Cir. 2015)) (emphasis added). Despite Moore's assertions, the only record evidence of a "specific" limitation was his chiropractor's "Authorization for Light Duty" to avoid aggravation of an unspecific "condition" for a period of *five days only*. Still, as a matter of law and even in the wake of the 2008 Amendments, "non-severe impairments that last only a short period of time are not necessarily covered by the ADA." *Lovreta v. Delta Global Servs.*, No. 2:19-cv-02469-JTF-jay, 2019 WL 8016714, at *5 (W.D. Tenn. Nov. 5, 2019) (collecting cases), *report & recommendation adopted*, 2020 WL 91503 (W.D. Tenn. Jan. 8, 2020).

In opposition to NGH's summary judgment motion, Moore attaches an affidavit sworn by former housekeeping manager Rhonda Craddock. In it, she testifies that Kings Inn: (1) "was **aware that Moore had a medical condition** which interfered with some of his job duties[;]" (2) "**did not provide Moore with an accommodation** to allow him to perform his job duties[;]" and (3) "**reprimanded Moore** when he did not perform job duties which conflicted with his medical conditions." (*See* Doc. 13-1) (emphasis added). Craddock's statements, though, are both vague and conclusory. Without more, they cannot serve to overcome a motion for summary judgment. *Greenberg v. Hill*, No. 2:07-CV-1076, 2009 WL 890521, at *4 (S.D. Ohio Mar. 31, 2009) (Sargus, J.) (citing, *inter alia*, *Stalbosky v. Belew*, 205 F.3d 890, 895 (6th Cir. 2000)). It is well settled that Moore (and

13

plaintiffs like him) "need specific supporting facts to forestall summary judgment." *Salens v. Tubbs*, 292 F. App'x 438, 434–44 (6th Cir. 2008).

Finally, Moore "has not identified a nondisabled comparator employee or pointed to evidence that, after he was fired, [he] was replaced by a nondisabled person or that his position remained open." *Griffin v. Sec'y of Def.*, No. 23-3220, 2023 WL 8437145, at *3 (6th Cir. Dec. 5, 2023) (footnote omitted). This "alone" warrants summary judgment, because it precludes Moore "from sustaining his burden of presenting a prima facie case of disability discrimination." *Id.*; *see also Hoffman v. O'Malley*, 849 F. App'x 535, 539 (6th Cir. 2021) (affirming a grant of summary judgment when the plaintiff "failed to present to the district court evidence on the disability status of any of the employees she alleged were treated more favorably than her").

**Direct evidence.** Moore argues for the application of the "direct" test for discrimination instead of the *McDonnell Douglas* framework. (Doc. 13 PAGEID 289–290). He relies on *Hostettler v. Coll. of Wooster*, which clarifies "that the direct test is the correct approach when an employer **rescinds** a reasonable accommodation." 895 F.3d 844, 853 (6th Cir. 2018) (emphasis added). In that case, the employer conceded that it fired Hostettler, a human resources generalist, "solely" because it determined "it could no longer accommodate" her part-time schedule, which was an "already-in-place" accommodation. *See id.*

Counsel here ambitiously asserts, as a statement of *fact*, that Moore's "accommodation" was rescinded in February 2021. (Doc. 13 PAGEID 285). Unlike the circumstance in *Hostettler*, there is no categorical testimony by a Kings Inn manager to this effect. So counsel is left with his client's testimony. From it, one would need to infer

14

that (in 2020) Kings Inn specifically agreed to hire Moore as a houseman, instead of a bed-making housekeeper, to accommodate his scoliosis. This, despite him leaving blank the position for which he was applying and failing to list any "Health Issues or concerns" on his application. This, despite him telling his managers, when "they needed more staff," "I'll do **anything**. What do you need me to do?" (*See* Doc. 10-1, Moore depo., PAGEID 165 (98:22–99:4) (emphasis added)). This, despite his doctor putting him on "light duty"—"for a little bit"—with lifting and bending restrictions but no prohibition as to bed-making and no explanation of his "condition". (*See id.* PAGEID 166 (102:14–18) (emphasis added)).

The inferential leap Moore's counsel puts forward is not only unreasonable, but at odds with the concept of *direct* evidence, which "explains itself." *See M.J. by & through S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 452 (6th Cir. 2021) (quoting *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 916 (6th Cir. 2013)). Direct evidence does not require the factfinder "to make **any** inferences before concluding that unlawful discrimination happened." *Id.* (citing *Martinez*) (emphasis added).

Applying *McDonnell Douglas* and concluding that Moore cannot establish a prima facie case of disability discrimination regarding his termination, NGH is entitled to judgment as a matter of law as to Counts VII and VIII of the (First) Amended Complaint (Doc. 3).

### 2. Failure to Accommodate (Counts IX & X)

"[F]ailing to make a reasonable accommodation falls within the ADA's definition of 'discrimination.'" *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) (citing 42 U.S.C. §12112(b)(5)(A)). Even so, a plaintiff still must meet the "threshold

burden" of showing that he is a "disabled" individual within the meaning of the ADA. *Perry*, 2015 WL 1401058, at *2. If a plaintiff has no disability, an employer cannot be liable "**for** discrimination because of it or **failure to accommodate it**." *Id.* (emphasis added). Accordingly, NGH is entitled to judgment as a matter of law as to Counts IX and X of the (First) Amended Complaint (Doc. 3).

### D. Retaliation under Federal and State Law (Count XI)

"The ADA prohibits retaliation against someone who has 'opposed any act or practice made unlawful by [the ADA]' or who has 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' [in connection with] the ADA." *Moody v. MidMichigan Med. Ctr. Midland*, 704 F. Supp. 3d 772, 780 (E.D. Mich. 2023) (quoting 42 U.S.C. §12203(a)). "Unlike the participation clause, '[t]he opposition clause protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices.'" *Id.* (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (Title VII claim)).

Moore alleges retaliation in violation of the opposition clause. (Doc. 3 ¶¶ 153, 155–160). To establish a prima facie case of retaliation under the ADA, a plaintiff must show:

> (1) they engaged in activity protected under the ADA; (2) the defendant knew of that activity; (3) the defendant took an adverse action against that employee; and (4) there was a causal connection between the protected activity and the adverse action.

*Moody,* 704 F. Supp. 3d at 780 (citing *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014)).

Moore contends that NGH "provides no argument as to why it should be entitled to summary judgment on this claim." (Doc. 13 PAGEID 288–289).[16] NGH begs to differ. (Doc. 14 PAGEID 301). While the briefing for and against could have been more clear-cut, the Court is sufficiently advised in the premises to rule on whether this claim survives summary judgment. It does not.

Moore alleges in the (First) Amended Complaint that he was terminated after he reported disability discrimination to his supervisor. (Doc. 3 ¶ 155). But Moore deposed that he did *not* report disability discrimination to his supervisor. (See Doc. 10-1, Moore depo., PAGEID 163 (93:21–23) ("Q. Did you ever report disability discrimination to your supervisor? A. **Disability, no, I did not.**") (emphasis added)). Moore also alleges that he was terminated after he reported a failure to accommodate. (Doc. 3 ¶ 156). But when asked during his deposition whether he ever "formally" complained to Gini Kaur, Moore responded, "What did I just tell you? **She knew.** The answer is yes. The chain stops there." (Doc. 10-1, Moore depo., PAGEID 164 (94:19–24) (emphasis added)). Saying that she "knew", though, is not the same as saying "I told her"—the first explanation is equivocal, the second definite. And Moore conceded there was no paperwork to support his reputed disability, because, he explained, "That's why I went to my doctor and got a light duty." (*Id.* PAGEID 164 (94:25–95:5)).

Because Moore fails to identify any protected activity, his claims for retaliation (under the ADA and the Ohio counterpart) necessarily fail. Accordingly, NGH is entitled to judgment as a matter of law as to Count XI of the (First) Amended Complaint (Doc. 3).

---

[16] Counsel mistakenly refers to Moore's "Retaliation Claim" as Count X**V**. (*See* Doc. 13 PAGEID 288–289).

### III. CONCLUSION

Consistent with the foregoing, Defendant's Motion for Summary Judgment (Doc. 11) is hereby **GRANTED**.  All eleven counts set forth in Plaintiff's (First) Amended Complaint (Doc. 3) are **DISMISSED with PREJUDICE**.

**IT IS SO ORDERED.**

/s/ *Michael R. Barrett*
Michael R. Barrett, Judge
United States District Court